ORIGINAL

FILED

1  Thomas R. Malcolm (State Bar No. 39248)
   trmalcolm@jonesday.com
2  Richard J. Grabowski (State Bar No. 125666)
   rgrabowski@jonesday.com
3  Marc K. Callahan (State Bar No. 156616)
   mkcallahan@jonesday.com
4  Matthew A. Berliner (State Bar No. 224384)
   mberliner@jonesday.com
5  Corbett H. Williams (State Bar No. 246458)
   chwilliams@jonesday.com
6  JONES DAY
   3 Park Plaza, Suite 1100
7  Irvine, California 92614
   Telephone: (949) 851-3939
8  Facsimile: (949) 553-7539

9  Attorneys for Plaintiff
   EXPERIAN INFORMATION
10 SOLUTIONS, INC.

11

**UNITED STATES DISTRICT COURT**

12

**CENTRAL DISTRICT OF CALIFORNIA**

13

14  EXPERIAN INFORMATION
    SOLUTIONS, INC., a corporation,

15

16          Plaintiff,

17          v.

18  LIFELOCK, INC., a corporation; and
    DOES 1 through 10, inclusive,

19

20          Defendants.

| | |
|---|---|
| Case No. SACV08-00165 AG(MLG) | |

Assigned for all purposes to:
Hon. Andrew J. Guilford

DEMAND FOR JURY TRIAL

**FIRST AMENDED COMPLAINT FOR:**

1. **Concealment/Suppression of Fact;**

2. **Intentional Misrepresentation;**

3. **Negligent Misrepresentation;**

4. **Violation of Lanham Act;**

5. **Violation of California Business & Professions Code § 17500;**

6. **Violation of California Business & Professions Code § 17200;**

7. **Unjust Enrichment/Restitution.**

21

22

23

24

25

26

27

28

LAI-2954633v1

**JURISDICTION AND VENUE**

1.     This Court has original jurisdiction over this matter, under 28 U.S.C. § 1331, in that it is a civil action arising under a law of the United States, specifically 15 U.S.C. § 1125 and 15 U.S.C. § 1681 *et seq.*

2.     This Court has original jurisdiction over this matter, under 28 U.S.C. § 1332, in that it is a civil action between citizens of different states in which the matter in controversy exceeds, exclusive of costs and interest, seventy-five thousand ($75,000.00) dollars.

3.     Venue is proper in the Central District of California, under 28 U.S.C. § 1391(a), in that all of the defendants are subject to personal jurisdiction in this District at the time the action is commenced and a substantial part of the events or omissions on which the claims in this matter are based occurred in this District.

**INTRODUCTION**

4.     This action arises out of LifeLock, Inc.'s ("LifeLock") illegal placement of "fraud alerts" on the credit files maintained by Experian Information Solutions, Inc. ("Experian") and other consumer reporting agencies.  In conjunction therewith, LifeLock is engaged in a pattern of false and misleading advertising and fraud, which has and continues to mislead and damage Experian and consumers.

5.     Under the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA"), any consumer who asserts a good faith suspicion that he or she has been or is about to become a victim of fraud or related crime, including identity theft, may request that a national consumer reporting agency (such as Experian) place an "initial fraud alert" in his or her credit file for at least 90 days.  These initial alerts are a temporary measure to be requested only when the consumer actually suspects that identity theft has occurred or is about to occur.  If the consumer thereafter confirms that fraud has occurred, the FCRA provides for an "extended" fraud alert when the consumer provides a police report or other "identity theft report".

6.    Because the placement of initial fraud alerts is limited by statute to only those consumers who actually believe that fraud has occurred or is imminent, a prospective issuer of credit is required by law to take reasonable steps to confirm the identity of the person making the request before opening a new credit account or increasing a credit limit in the name of that consumer.

7.    Under the FCRA, an initial fraud alert is available to any eligible consumer—for free — from a national consumer reporting agency.  Consumers can place a free initial fraud alert simply and quickly through a toll-free telephone number, the internet or mail. However, the FCRA mandates that a request for an initial fraud alert *must be made directly by the consumer or by an individual acting on behalf of or as a personal representative of a consumer*.  The FCRA does not permit the placement of an initial fraud alert by corporations such as LifeLock. Despite this prohibition, LifeLock has surreptitiously placed hundreds of thousands of fraud alerts on Experian's files by posing as the consumer.

8.    Once an initial fraud alert is placed, it triggers costly statutory obligations for consumer reporting agencies such as Experian.  First, Experian and the other credit reporting agencies are required to mail a notice to each consumer each time a fraud alert is filed explaining various rights that the consumer has, including the right to receive a free credit report by virtue of the placement of a fraud alert.  Experian is then mandated to provide a free credit report to any such consumer who requests one.  Although costly for the credit reporting agencies, these requirements make sense in the context of a statute that was designed to protect consumers who have an actual and legitimate concern that fraud has occurred or is imminent.  However, as described more fully below, such obligations were never intended to be triggered by a private company seeking to profit by illegally placing fraud alerts on behalf of consumers who do not have a genuine suspicion of imminent fraud.

9.      Befitting a company whose co-founder has spent time in jail after having been arrested for financial fraud and who has been barred by the FTC for life from engaging in certain credit reporting related activities, LifeLock's business model consists of a scheme to "game the system," which is imbued with illegal activity, fraud and deception at every level:

    a.      As a corporation, LifeLock is not legally entitled to place fraud alerts on behalf of consumers, but continues to do so thousands of times per month;

    b.      LifeLock deceives Experian (and other consumer reporting agencies) by actively concealing that its requests are being submitted by a corporation;

    c.      LifeLock misleads consumers into believing that it is authorized to place fraud alerts with credit reporting agencies when it is not;

    d.      Although initial fraud alerts are designed to be temporary, 90 day measures for people who actually discover or suspect fraud, LifeLock deceives consumer reporting agencies into implementing an indefinite or perpetual state of "initial" alert by submitting a "new" fraud alert request every 90 days;

    e.      LifeLock misleads consumers into believing that the FCRA authorizes the repeated, sequential and perpetual placement of initial fraud alerts when it does not;

    f.      LifeLock submits requests for alerts every 90 days where neither LifeLock nor the consumer has a good faith suspicion that fraud has occurred or is imminent.

10.     LifeLock actively advertises that its customers "…will receive an email from us stating that your credit reports have been ordered on your behalf from the major credit bureaus."  What LifeLock does not adequately disclose to the consumer is that it is charging the consumer to obtain his or her one free annual

1    report to which they are entitled to under law.  Rather than *pay* for a credit report at

2    each of the major credit bureaus, LifeLock goes to the "centralized source" that the

3    major credit bureaus were required to jointly establish in order to provide

4    consumers with the free annual credit report.  LifeLock then requests the

5    consumer's one free annual report from each of the major credit bureaus by posing

6    as that consumer.  Thereafter when a LifeLock customer goes to the centralized

7    source to obtain a copy of his or her free annual credit report, that request is denied

8    because LifeLock already used it.

9         11.   LifeLock's scheme damages Experian (and other consumer reporting

10    agencies), consumers, and the economy as a whole.  LifeLock's scheme costs

11    Experian millions of dollars every year in processing large numbers of improper

12    initial fraud alerts, mailing mandatory notices to consumers, and providing free

13    credit reports to consumers who are not eligible for such reports.  The consuming

14    public has been harmed too.  LifeLock's scheme creates the impression that

15    consumers must pay for the protections provided by initial fraud alerts, potentially

16    deterring those who legitimately need fraud alerts but who cannot afford LifeLock's

17    subscription fees.  LifeLock's fraudulent scheme harms the economy as well.

18    LifeLock's practices threaten to clog the credit system with stale and unnecessary

19    fraud alerts, potentially devaluing the efficacy of necessary alerts as LifeLock

20    "cries wolf" on behalf of thousands of unthreatened customers.  Further, LifeLock's

21    practices also unnecessarily slow the extension of credit, impose additional costs

22    and burdens on businesses, and may lead to unnecessary denials of legitimate

23    applications for credit thereby forcing consumers to make repeated applications for

24    credit and harming their credit scores in the process.

25         12.   As a result of LifeLock's wrongful conduct, Experian seeks:

26    (i) declaratory relief establishing the parties' rights under the FCRA; (ii) restitution

27    of the costs to Experian for LifeLock's wrongful conduct; (iii) disgorgement of

28    profits earned by LifeLock as a result of its illegal practices; (iv) compensatory and

1  punitive damages; and (v) an injunction precluding LifeLock from continuing to

2  engage in false and misleading advertising regarding (a) its services and (b) the

3  efficacy and availability of fraud alerts (for free) from Experian, Trans Union

4  and Equifax.

5  **PARTIES**

6      13.   Experian is an Ohio corporation having its principal place of business at

7  475 Anton Boulevard, Costa Mesa, California 92626.

8      14.   LifeLock is a Delaware corporation with its principal place of business

9  located at 60 Salado Pkwy, Tempe, Arizona 85281.

10      15.   The true names and capacities, whether individual, corporate, associate

11  or otherwise, of the defendants named as DOES 1 through 10, inclusive, are

12  unknown to Experian who, therefore, sues those defendants by such fictitious

13  names.  Experian is informed and believes and thereon alleges that each of the

14  defendants sued herein as DOES 1 through 10 are and were the agents and/or

15  employees of each and every other defendant and were at all relevant times acting

16  within the course and scope of such agency and employment, and/or are legally

17  responsible in some manner for the events and happenings herein referred to and

18  caused injuries and damages proximately thereby to Experian as herein alleged.

19  Experian will seek to amend its complaint to allege the true names and capacities of

20  such defendants when ascertained.

21      16.   Experian is informed and believes and thereon allege that, at all

22  relevant times, each Defendant was acting as the agent, employee, principal,

23  officer, partner, joint venturer, director or other representative of one or more of the

24  other Defendants, and, in committing the acts and/or omissions mentioned herein,

25  was acting within the course and scope of such employment, agency, partnership,

26  joint venture, or other relationship, and with the knowledge and consent of the

27  remaining Defendants.

28

# BACKGROUND

## THE FCRA AND THE FRAUD ALERT SYSTEM

17.   The FCRA provides for three types of fraud alerts, which are available to consumers based upon the consumers' risk of becoming, or having been, an actual victim of fraud, including identity theft. *See* 15 U.S.C. §§ 1681c-1(a)(1), 1681c-1(b)(1), 1681c-1(c).  These fraud alerts are not available as a matter of right to all consumers, but only upon a showing that the consumer falls within a particular risk category, entitling them to receive a fraud alert.

18.   Under 15 U.S.C. § 1681c-1(a), a consumer can request an "initial" 90-day fraud alert, which is designed as a temporary, stopgap measure for a consumer who suspects he or she has been or is in imminent danger of becoming a victim of fraud.  Such alerts are available to consumers "[u]pon the direct request of a consumer, or an individual acting on behalf of or as a personal representative of a consumer, who asserts in good faith a suspicion that the consumer has been or is about to become a victim of fraud or related crime, including identity theft…" and the provision of "appropriate proof of the identity of requestor." 15 U.S.C. § 1681c-1(a)(1).

19.   Once a consumer requests an initial alert and asserts his or her good faith suspicion, the credit reporting agency must:  (i) include a fraud alert in that consumer's file for at least 90 days (15 U.S.C. § 1681c-1(a)(1)(A)); (ii) refer the fraud alert to each of the other credit reporting agencies (15 U.S.C. § 1681c-1(a)(1)(B)); (iii) disclose to the consumer that the consumer may receive a free copy of his credit report (15 U.S.C. § 1681c-1(a)(2)(A)); and (iv) provide the consumer with a credit report free of charge upon the request of the consumer (15 U.S.C. § 1681c-1(a)(2)(B)).

20.   Under 15 U.S.C. § 1681c-1(b), a consumer who is the actual victim of a documented case of identity theft can obtain an "extended" fraud alert.  Extended alerts are available "[u]pon the direct request of a consumer, or an individual acting

on behalf of or as a personal representative of a consumer, who submits an identity theft report to a consumer reporting agency…" 15 U.S.C. § 1681c-1(b)(1).

21.   Once a consumer requests an extended alert and provides an identity theft report, the credit reporting agency must:  (i) include a fraud alert in the consumer's file for the next seven (7) years (15 U.S.C. § 1681c-1(b)(1)(A)); (ii) for the next five (5) years, "exclude the consumer from any list of consumers provided by the agency to any third party to offer credit or insurance to the consumer that was not initiated by the consumer" (15 U.S.C. § 1681c-1(b)(1)(B)); (iii) refer the fraud alert to each of the other credit reporting agencies (15 U.S.C. § 1681c-1(b)(1)(C)); (iv) disclose to the consumer that the consumer may receive a free copy of his credit report (15 U.S.C. § 1681c-1(b)(2)(A)); and (v) provide the consumer with a credit report free of charge upon the request of the consumer (15 U.S.C. § 1681c-1(b)(2)(B)).

22.   Section 15 U.S.C. § 1681c-1(c) allows an "active duty military consumer" to obtain a 12-month fraud alert.  Active duty alerts are available "[u]pon the direct request of a consumer, or an individual [not a corporate entity] acting on behalf of or as a personal representative of an active duty military consumer…" 15 U.S.C. § 1681c-1(c).  This is the only type of alert permitted under the FCRA that allows consumers to obtain a fraud alert without any type of showing that they are, or are likely to become, a victim of fraud.

23.   The FCRA provides that whenever a consumer reporting agency receives a request for an initial fraud alert, the agency must "refer the information regarding the alert" to each of the other credit reporting agencies.  15 U.S.C. § 1681c-1(a)(B).  When a credit reporting agency receives a referral from another credit reporting agency, it must follow the procedures for handling the fraud alert "as though the agency received the request from the consumer directly." 15 U.S.C. § 1681c-1(e).  Because Experian has no way of determining whether an initial fraud alert that was referred to Experian from another credit reporting agency was legal

(i.e., a request from "a consumer, or an individual acting on behalf of or as a personal representative of a consumer") or illegal (i.e., through LifeLock), without seeking verification directly from each consumer, Experian: (i) places an initial fraud alert on the consumer's file; (ii) notifies the consumer of the availability of a free credit report; and (iii) within three (3) days, provides a free credit report to the consumer upon the consumer's request.

24. The FCRA specifically provides that credit reporting agencies must honor a request for an initial fraud alert from "a consumer, or an individual acting on behalf of or as a personal representative of a consumer." 15 U.S.C. §§ 1681c-1(a)(1). The FCRA does not require the credit reporting agencies to accept fraud alerts placed by corporations (such as LifeLock) on behalf of consumers.

25. "Initial" fraud alerts place limits on potential creditors who use a credit report to establish a "new credit plan," grant an "extension of credit," issue an "additional credit card" on an existing account, or "grant an increase in credit limit" on an existing account. 15 U.S.C. § 1681c-1(h)(1)(B). When an initial fraud alert appears on a consumer's credit report, the creditor must "utilize[] reasonable procedures to form a reasonable belief that the user knows the identity of the person making the request." 15 U.S.C. § 1681c-1(h)(1)(B). The consumer may provide a contact phone number in placing a fraud alert; however, there is no requirement that the creditor call the consumer directly to verify that the consumer has authorized the credit application. Instead of calling the consumer, the creditor may "take reasonable steps to verify the consumer's identity and confirm that the application or a new credit plan is not the result of identity theft." 15 U.S.C. § 1681c-1(h)(1)(B)(ii).

26. Fraud alerts only are effective against certain types of fraud. While they can be useful to prevent the opening of certain new accounts that require a credit report to be pulled, they are ineffective to prevent identity theft involving the opening of accounts that do not require a credit report. Fraud alerts provide no

1   protection to individuals against the fraudulent use of existing accounts, such as the

2   unauthorized use of a credit card, and they provide little or no protection against an

3   identity theft that already is in progress.

4       27.   A fraud alert places a significant burden on creditors before they may

5   grant credit.  For example, it imposes upon them an obligation "to take reasonable

6   steps to verify the consumer's identity and confirm that the application for a new

7   credit plan is not the result of identity theft." 15 U.S.C. § 1681(h)(1)(B).  These

8   measures are over and above the procedures that many creditors have in place for

9   verifying a consumer's identity prior to granting credit.

10       28.   Fraud alerts can have unintentional negative effects on individuals, and

11   their ability to obtain credit.  Creditors can simply deny a credit application if a

12   consumer's credit report has a fraud alert rather than implement procedures that

13   satisfy the verification requirements.  For creditors that implement verification

14   procedures, they must deny a credit application if the creditor is unable to verify the

15   legitimacy of the application at the time of processing.  Thus, unnecessary fraud

16   alerts can result in increased denials of credit to consumers who neither are the

17   victims of identity theft nor are about to become victims of identity theft.  Denials

18   such as these can lead to repeated attempts to apply for credit which, in turn, may

19   reduce a consumer's credit score or credit rating.  Further, the cumulative effect of

20   placing unwarranted and unauthorized fraud alerts on consumers' files places undue

21   and unnecessary burdens on the credit granting industry as a whole, and results in

22   even broader implications for the economy.

23       29.   Under 15 U.S.C. § 1681j(a), each of the national credit reporting

24   agency must provide every consumer with a free credit report once per year upon

25   the request of the consumer.  The free credit report is available to consumers

26   through a "centralized source" located at www.annualcreditreport.com, and

27   established jointly by the three national credit bureaus.  The credit reporting

28   agencies are required to provide the free annual credit report "only if the request

from the consumer is made using the centralized source established for such purpose…" 15 U.S.C. § 1681j(a)(1)(B).  The free credit reports are available online immediately, or are mailed to consumers at their address on file with the credit reporting agencies for consumers who request their credit reports by telephone, or in writing.

## EXPERIAN

30.   Experian is a consumer credit reporting agency under the FCRA.  As a consumer credit reporting agency, Experian acts as a conduit of credit information that is pertinent to prudent credit granting and related decisions.  Experian gathers credit information originated by others, and makes that information available to parties engaged in credit-related transactions.  Experian essentially acts as a storehouse of credit information by storing, retrieving, and furnishing data as allowed by the FCRA and similar state laws.

31.   Under 15 U.S.C. § 1681c-1, Experian allows individuals to request "initial" fraud alerts — the exact same fraud alerts placed by LifeLock's paid service — quickly and easily over its website located at www.experian.com or through a toll-free number (which is posted on Experian's website) and without cost.  The request process can be completed in a matter of minutes; the process is completely free of charge; Experian automatically generates a notice to consumers that they can request a free credit report and provides credit reports for those who make that request; online consumers who request a report may immediately view their credit report over the Internet; telephone consumers who request a report will receive a credit report in the mail; those who request an extended alert may request two free reports in the twelve month period after they submit an identity theft report; and Experian automatically refers all fraud alerts to the other credit reporting agencies.

## LIFELOCK

32. Todd Davis and Robert J. Maynard, Jr. founded LifeLock in 2005. Although LifeLock has touted its founders as "seasoned veterans of the banking credit and security industries," who "did solid research for more than three years" to develop its system, LifeLock does not disclose less auspicious information about its founding and, specifically, about its founding-member, Maynard. According to newspaper reports, Maynard developed the idea for LifeLock while sitting in a jail cell after having been arrested for reneging on a $16,000.00 casino marker taken out at the Mirage Hotel in Las Vegas. Maynard, who initially held the title of Chief Operating Officer, and later Marketing Director, had been banned for life by the FTC from "advertising, promoting, offering for sale, selling, performing, or distributing any product or service relating to credit improvement services." That lifetime ban resulted from Maynard's previous scheme involving the operation of a credit repair clinic. The credit repair industry is notorious for a multitude of unsavory practices and characters. This fact is particularly relevant here given that the legislative history to the FCRA confirms that the statute was drafted to specifically exclude companies, like credit repair agencies, from placing fraud alerts on consumer credit files: The legislative history states that the statute "use[s] the word 'individual' instead of 'person' to ensure that the provision would only apply to specific individuals such as a consumer's authorized family members or guardians (or attorneys acting as personal representatives), authorized representatives from bona fide military service organizations, **and not to companies and entities such as credit repair clinics**." *See* H.R. Rep. No. 108-263 at 40 (Sept. 4, 2003) (emphasis added).

33. Despite all of this, under the scheme developed by Maynard and his partners, LifeLock charges consumers to request placement of initial fraud alerts, even though they are available for free from a consumer reporting agency upon

1    direct request of the consumer.  LifeLock currently charges $10 per month or $110

2    per year.

3        34.    Under the FCRA, LifeLock is not authorized to request placement of an

4    initial fraud alert on a consumer's credit file; instead, only the consumer, or an

5    individual acting on behalf of or as a representative of the consumer, may submit

6    requests for the placement of initial fraud alerts.  But LifeLock improperly places

7    fraud alerts for consumers.  Worse yet, LifeLock does so for consumers who are not

8    even eligible for such alerts.

9        35.    The FCRA requires that the consumer or personal representative "assert

10   in good faith a suspicion that the consumer has been or is about to become a victim

11   of fraud or related crime, including identity theft…"  LifeLock submits requests

12   where neither it nor its customers have such a belief.  LifeLock's advertising and

13   customer intake process attempts to dilute this standard by convincing consumers

14   that fraud alerts may be set as a proactive, preventive measure to combat identity

15   theft rather than in reaction to a good faith suspicion that they are or are about to

16   become a victim of identity theft (as required by the FCRA).  For example,

17   LifeLock's website repeatedly touts LifeLock as "proactive identity theft

18   protection," and even suggests that the desire to stop receiving junk mail "alone is

19   worth the price."  LifeLock's order form asks consumers to state "why do you think

20   you or your family members will become a victim of identity theft?"  Among the

21   answers scripted by LifeLock (which allow consumers to enroll in LifeLock) are

22   responses that are not assertions "in good faith that the consumer has been or is

23   about to become a victim of fraud…" — to wit:  (i) "I have heard media reports that

24   give me a reason"; or (ii) "One of my friends or family members is a victim of

25   identity theft."  Worse, LifeLock allows customers who did not, or refuse to,

26   disclose their reason to enroll (provided they pay LifeLock a fee).

27       36.    LifeLock's scheme also includes automatically renewing the initial

28   fraud alerts, and continuing to renew the alerts, so long as the consumer continues

1  to pay LifeLock a subscription fee.  This conduct effectively converts "initial" fraud

2  alerts into perpetual or indefinite "initial" alerts.  The FCRA does not authorize

3  indefinite fraud alerts under any of the three categories of alerts established by

4  Congress.

5       37.  LifeLock does not require that its customers affirmatively assert —

6  prior to making each request for an initial fraud alert — that they believe that they

7  are or about to become victims of fraud or related crime, including identity theft.

8  Instead, after misleading consumers into believing that lesser fears or concerns

9  constitute a good faith suspicion of identity theft, LifeLock seeks the consumer's

10  agreement to notify LifeLock if that suspicion ever changes.  The FCRA does not

11  authorize the placement of an initial fraud alert where that request is based upon the

12  consumer's failure to retract an assertion that the consumer was or was about to

13  become a victim of fraud or related crime, including identity theft, which was made

14  in connection with a prior request for an initial fraud alert.

15       38.  In order to place fraud alerts on behalf of consumers with Experian,

16  LifeLock has engaged in systematic fraud and concealment.  Experian has

17  established an automated system over a toll free number to allow consumers to

18  quickly and easily place fraud alerts for free.  Experian's automated phone system

19  requires its users to input information following a series of prompts.  Although the

20  precise wording of the prompts has varied over time, the substance has not.  These

21  prompts require, among other things, the caller to respond affirmatively to

22  statements such as:  (i) "if you believe your credit information is being used

23  fraudulently, press 3"; (ii) "to add an alert to your credit report through our

24  automated system, press 2"; and (iii) "if you suspect you are a victim of fraud and

25  want to add a temporary initial fraud security alert to your account, press 1."  The

26  prompts also ask the caller to enter personal information, such as "enter your social

27  security number," "enter your 5 digit ZIP code now," and "enter the numeric

28  portion of your address now."

39.   After calling Experian's telephone system, LifeLock responds affirmatively to these prompts by pressing the corresponding number and by entering in the requested information.  This is fraud:  (i) *LifeLock* did not believe that its own credit information was being used fraudulently or that it was a victim of fraud; (ii) *LifeLock* was not seeking to add an alert to its credit reports; (iii) *LifeLock* was not seeking a temporary alert (but was seeking to craft an indefinite or perpetual alert for someone else); and (iv) *LifeLock* did not enter its own social security number, ZIP code or address.

40.   Experian's automated system also includes a prompt for personal representatives requesting a fraud alert on the behalf of another to press the appropriate number, with corresponding instructions to submit a written request to Experian.  LifeLock did not respond affirmatively to that prompt or make the written submission that Experian's instructions required.

41.   Further, LifeLock did not have a good faith suspicion that the consumer had been or was about to become a victim of fraud or related crime, including identity theft.  LifeLock knew that, in many cases, the consumers on whose behalf it was surreptitiously and illegally requesting the placement of initial fraud alerts were instead acting on desires to proactively prevent identity theft, generalized concern about identity theft, the suspected victimization of a person other than the consumer, on the basis of media reports about identity theft, or even a desire not to receive junk mail.

42.   Additionally, many of LifeLock's customers were not affirmatively asserting, at the time that LifeLock made the request for the placement of a fraud alert, that they had been or were about to become a victim of fraud.  Instead, the customers had simply failed to retract assertions made months or years previously in connection with a prior request for an initial fraud alert.

43.   In addition to making express misrepresentations to Experian to induce Experian place fraud alerts on behalf of LifeLock, LifeLock engaged in an

1   elaborate scheme to disguise its activities, including laundering the fraud alerts

2   through the other national credit reporting agencies.

3        44.   LifeLock placed large numbers of fraud alerts, as many as thousands

4   per day, through Experian's toll-free number using a single telephone number based

5   in Canada.  This caused Experian to incur significant costs in maintaining its toll-

6   free number, which is toll-free to consumers, but which Experian must pay for on a

7   per call basis.

8        45.   After Experian discovered that the calls were placed by LifeLock, not

9   consumers as LifeLock had represented, Experian attempted to block calls from this

10   number. LifeLock then attempted to disguise its activities by placing calls through

11   another phone bank, this time in Pennsylvania, which Experian again discovered

12   and attempted to block.  LifeLock then resorted to larger banks of telephone

13   numbers in an attempt to further disguise its activities; Experian once again

14   discovered LifeLock's activities and attempted to block the calls.  Upon

15   information and belief, Experian's efforts to completely block all of LifeLock's

16   improper  phone calls into Experian's system have been unsuccessful, and LifeLock

17   continues to improperly use Experian's phone system to place fraud alerts on behalf

18   of consumers.

19        46.   LifeLock also continues to place fraud alerts with Experian by

20   laundering these alerts through Trans Union and Equifax.  LifeLock games the

21   automatic referral system for fraud alerts established in 15 U.S.C. § 1681c-

22   1(a)(1)(B) by fraudulently representing to Trans Union and Equifax that LifeLock

23   is a "consumer" or "individual" placing a fraud alert on its own credit file, and

24   concealing its identity as a corporation from Trans Union and Equifax.  Trans

25   Union and Equifax then automatically forward such alerts to Experian.  When

26   Experian receives those alerts, Experian: (i) is unable to determine whether the

27   referred alerts were placed by LifeLock or whether they were placed by consumers;

28   and (ii) must honor the fraud alerts as if placed by consumers directly with

Experian. If Experian could effectively determine which fraud alerts were placed by LifeLock, Experian would block such requests.

47.   In order to maximize the number of consumers who request LifeLock to place fraud alerts with Experian, LifeLock has engaged in a campaign to mislead consumers into enrolling for LifeLock's service. LifeLock markets its product through its website located at www.lifelock.com, through press releases and news outlets, and through television and radio commercials. The representations made in LifeLock's marketing are false, misleading, and fail to disclose material facts regarding the service offered by LifeLock.

48.   **LifeLock Misrepresents Its Authority And Ability To Place Alerts.** LifeLock misrepresents and creates the overall net impression that LifeLock can place fraud alerts on behalf of consumers even though the FCRA does not require credit reporting agencies to honor requests made by corporations. Specific misrepresentations include, *inter alia*:

>    (i)   "[W]e will, upon enrollment...request that Equifax, Experian and TransUnion, or other credit bureau [sic] as may become appropriate, place fraud alerts on your consumer to the extent permitted by 15 U.S.C. § 1681c-1." (LifeLock Website at the webpage address: www.lifelock.com/about-us/about-lifelock/terms-and-conditions, dated Jan. 26, 2008.)

>    (ii)  "[W]e...use integrity and operate within the law." (LifeLock Website at the webpage address: www.lifelock.com/lifelock-for-people/who-we-are/who-uses-lifelock, dated Jan. 26, 2008.)

49.   **LifeLock Misrepresents What Constitutes A Sufficient Good Faith Belief Regarding Identity Theft.** LifeLock induces consumers to enroll in its service by misleading them as to what constitutes a "good faith...suspicion that the consumer has been or is about to become a victim of fraud or related crime, including identity theft." LifeLock creates the net impression that general concerns

1   about identity theft or the proactive desire to prevent identity theft is a sufficient

2   basis to place a fraud alert.  They are not.  LifeLock's website repeatedly touts

3   LifeLock as "proactive identity theft protection." (LifeLock Website at the webpage

4   address: www.lifelock.com, dated Jan. 26, 2008.)  LifeLock's website includes

5   testimonials from customers who do not express any suspicion that they were or

6   were about to become the victim of identity theft:  "I had seen a new report about

7   LifeLock. The CEO gave out his social security number on TV!  The reporter tried

8   to use it to open new accounts and couldn't.  That's when I signed up." (LifeLock

9   Website at the webpage address: www.lifelock.com, dated Jan. 26, 2008.)

10   LifeLock's advertisements and website suggest that a desire to end junk mail is a

11   sufficient reason to cause LifeLock to place fraud alerts:  "[A]ll that mail is just so

12   irritating.  Many of our clients tell us that this alone is worth the price." (LifeLock

13   Website at the webpage address: www.lifelock.com/lifelock-for-people, dated

14   Jan. 26, 2008.)  LifeLock's website even includes testimonials from individuals

15   who enrolled in LifeLock even though they were skeptical that they needed

16   protection from identity theft:  "When I first learned about a company called

17   LifeLock that protects families from identity theft, my husband was skeptical.  I

18   signed us up anyway, and forgot about it." (LifeLock Website at the webpage

19   address: www.lifelock.com, dated Jan. 26, 2008.)  LifeLock's order form asks

20   consumers to state "why do you think you or your family members will become a

21   victim of identity theft?"  Among the answers scripted by LifeLock are responses

22   that are not assertions "in good faith that the consumer has been or is about to

23   become a victim of fraud…" such as:  (i) "I have heard media reports that give me a

24   reason"; or (ii) "One of my friends or family members is a victim of identity theft."

25   LifeLock also allows customers who did not, or refuse to, disclose their reason

26   to enroll.

27       50.   **LifeLock Misrepresents That Everyone Is Entitled To Fraud Alerts**

28   **As A Preventative Measure.**  LifeLock misrepresents, and creates the overall net

impression, that all individuals are entitled to receive a fraud alert. They are not. The FCRA only allows individuals who "assert[] in good faith a suspicion that the consumer has been or is about to become a victim of fraud or related crime" to place an initial fraud alert on their credit files. LifeLock also makes such specific misrepresentations, including, *inter alia*:

(i)   "[P]roactive identity theft protection." (LifeLock Website at the webpage address: www.lifelock.com, dated Jan. 26, 2008.)

(ii)   "The key that everybody can do is go out and place a fraud alert with the major credit bureaus." (Statement by Todd Davis, CEO of LifeLock, Inc., in article titled "Fraud alerts can protect ID," www.azstarnet.com/business/202488, Sept. 22, 2008.)

(iii)   "Any individual with an identity worth protecting can benefit from LifeLock proactive identity theft services." (LifeLock Website at the webpage address: www.lifelock.com/lifelock-for-people/who-we-are/who-uses-lifelock, dated Jan. 26, 2008.)

(iv)   "LifeLock, the industry leader in proactive identity theft protection, offers a proven solution that prevents your identity from being stolen before it happens." (LifeLock Website at the webpage address: www.lifelock.com, dated Jan. 26, 2008.)

(v)   "This is the kind of preventative measures all companies should be taking for their employees and the people they serve." (LifeLock press release dated January 8, 2008, located at www.lifelock.com/about-us/2008-press-release-narfe-premier-federal-credit-union-selects-lifelock-to-provide-protection-to-employees-and-members.)

51.   **LifeLock Misrepresents That Consumers Are Entitled To Automatic Renewals.** LifeLock misrepresents and creates the overall net impression that consumers are entitled to receive automatic renewals of fraud alerts

1  without an assertion of a good faith suspicion that the consumer has been or is

2  about to become a victim of fraud or related crime.

3      52. **LifeLock Misrepresents To Consumers The Scope Or Effectiveness**

4  **Of Fraud Alerts.** LifeLock misrepresents and creates the overall net impression

5  that LifeLock can protect against all types of fraud including computer hacking and

6  accessing a bank account using stolen passwords when fraud alerts only are

7  effective against fraud that requires accessing a credit report.  LifeLock also makes

8  such specific misrepresentations, including, *inter alia*:

9        (i)    "Here's a report I have on John Sheiper, a young hacker – sent

10             out a virus, put more than 250,000 computers to work stealing

11             passwords to bank accounts from people around the world."

12             (LifeLock radio advertisement.)

13        (ii)   "This very second, someone could be using your identity

14             to…clear out your bank accounts …Stop it from happening now.

15             Call LifeLock…" (LifeLock radio advertisement.)

16        (iii) "You'll find out how to lock down your identity making it

17             virtually impossible for identity thieves to wreak havoc on your

18             good name…" (LifeLock radio advertisement.)

19      53. **LifeLock Misrepresents That Fraud Alerts Prevents Access To**

20  **Credit Reports.** LifeLock misrepresents and creates the overall net impression

21  that LifeLock "locks" the credit file of a consumer, when in fact it only requests the

22  placement of a fraud alert in the credit file, and does not restrict access to the credit

23  file in any way.  Such specific misrepresentations include, *inter alia*:

24        (i)    The use of the name "LifeLock;"

25        (ii)   "As our name states, we're the lock, and you hold the key;"

26             (LifeLock Website at the webpage address:

27             www.lifelock.com/lifelock-for-people/who-we-are/how-we-do-

28             it/how-is-lifelock-different-from-a-credit-monitoring-system,

1       dated Jan. 26, 2008.)

2    (iii) "Our goal was to lock down every individual's private

3       information so no one except that individual can approve of its

4       use." (LifeLock Website at the webpage address:

5       www.lifelock.com/lifelock-for-people/who-we-are/who-is-

6       lifelock, dated Jan. 26, 2008.)

7    (iv) "Which would you rather have, a lock on your door keeping the

8       thieves out, or an alarm telling you after the thief has ripped you

9       off." (LifeLock Website at the webpage address:

10      www.lifelock.com/lifelock-for-people/how-we-do-it/how-is-

11      lifelock-different-from-a-credit-monitoring-system, dated

12      Jan. 26, 2008.)

13  54. **LifeLock Creates The Impression That Obtaining Fraud Alerts**

14 **Through Credit Bureaus Is More Difficult.** LifeLock misrepresents and creates

15 the overall net impression that consumers cannot obtain fraud alerts effectively or

16 easily from any other source, and that obtaining fraud alerts without subscribing to

17 LifeLock is a time-consuming, difficult process, when in fact it is easier to obtain a

18 fraud alert directly with the credit bureaus than it is with LifeLock. Such specific

19 misrepresentations include, *inter alia,* "Think of it this way: all of us can change

20 our own oil, but most of us have it done by specialists. We'd like to think that what

21 we do is more complicated than changing oil, but you get the idea." (LifeLock

22 Website at the webpage address: www.lifelock.com/lifelock-for-people, dated

23 Jan. 26, 2008.) In fact, consumers can place fraud alerts with all three national

24 consumer reporting agencies with a simple and free telephone call to Experian.

25  55. **LifeLock Misrepresents That Only It Can Place Fraud Alerts.**

26 LifeLock misrepresents, and creates the overall net impression, that only it can

27 place fraud alerts, that fraud alerts must be purchased through LifeLock, and that

28 the fraud alerts placed by LifeLock are different or more effective than fraud alerts

1   that consumers can place themselves directly through the credit bureaus.  LifeLock

2   claims, for example:  "At LifeLock, We Guarantee Your Good Name.  No one else

3   does because no one else can." (LifeLock Website at the webpage address:

4   www.lifelock.com, dated Jan. 26, 2008.)

5       56.   **LifeLock Misrepresents That It May Place Fraud Alerts Directly**

6   **With Experian.**  LifeLock misrepresents, and creates the overall net impression,

7   that it may place fraud alerts with Experian, does not disclose to consumers that

8   Experian has attempted to block the placement of fraud alerts by LifeLock, or that

9   LifeLock has placed fraud alerts with Experian by disguising its identity and

10   fraudulently misrepresenting to Experian that it was the consumer.  Such specific

11   misrepresentations include, *inter alia*:

12       (i)   "[W]e ask the credit bureaus to set fraud alerts on your behalf.

13            Usually, this is done through our automated systems and the

14            alerts are set within an hour." (LifeLock Website at the webpage

15            address:  www.lifelock.com/lifelock-for-people, dated

16            Jan. 26, 2008.)

17       (ii)   "[W]e will, upon enrollment…request that Equifax, Experian

18            and TransUnion, or other credit bureau [sic] as may become

19            appropriate, place fraud alerts on your consumer to the extent

20            permitted by 15 U.S.C. § 1681c-1." (LifeLock Website at the

21            webpage address: www.lifelock.com/about-us/about-

22            lifelock/terms-and-conditions, dated Jan. 26, 2008.)

23       57.   **LifeLock Misrepresents That Creditors Will Call Consumers To**

24   **Verify The Identity Of The Consumer.**  LifeLock misrepresents and creates the

25   overall net impression, that consumers will receive a telephone call when the

26   consumers' personal information is used to apply for new credit, even though there

27   is no requirement under the FCRA that initial fraud alerts require creditors to place

28   a telephone call to consumers.  Such representations include, *inter alia*:

   (i)   "Once fraud alerts have been placed, you will receive a phone call – most people register their cell phone numbers – anytime someone tries to open a credit line in your name." (Statement by Todd Davis, CEO of LifeLock, Inc., in article titled "Fraud alerts can protect ID,"  www.azstarnet.com/business/202488, Sept. 22, 2008.)

   (ii)   "If its you trying to open the account, then you'll get the call while you're standing there." (Statement by Todd Davis, CEO of LifeLock, Inc., in article titled "Fraud alerts can protect ID," www.azstarnet.com/business/202488, Sept. 22, 2008.)

   (iii)   "You should receive a phone call from the bank asking if you are actually the person applying for credit in your name." (LifeLock Website at the webpage address:  www.lifelock.com/lifelock-for-people/what-we-do/how-does-lifelock-protect-my-identity, dated Jan. 26, 2008.)

   (iv)   "If it's not you or if you don't answer, then the credit application is declined at the other end…" (Statement by Todd Davis, CEO of LifeLock, Inc., in article titled "Fraud alerts can protect ID," www.azstarnet.com/business/202488, Sept. 22, 2008.)

   (v)   "When someone seeks to open a new account, the creditor will call to confirm that it's really you through a series of identifying questions." (Statement by Todd Davis, CEO of LifeLock, Inc., in article titled "Protecting identity among the tell-all generation," www.startribune.com/templates/Print_This_Story?sid=1191451, Aug. 14, 2007.)

58.   **LifeLock Fails To Adequately Disclose To Consumers The Source Of The Credit Report Ordered By LifeLock.**  LifeLock represents to consumers that its service includes a credit report from each of the three credit bureaus every

12 months. LifeLock fails to adequately disclose, however, that the credit report ordered by LifeLock on behalf of the consumer is the free annual credit report to which consumers are entitled; fails to adequately disclose that LifeLock's ordering of the credit report makes the consumer ineligible to order the report for the next 12 months; fails to adequately disclose that ordering the free credit report from www.annualcreditreport.com is duplicative of the free credit report consumers are entitled to when placing a fraud alert under 15 U.S.C. § 1681c-1(a)(2)(B).

59.   On February 11, 2008, Experian sent LifeLock a letter via express mail informing LifeLock that Experian only was required to honor requests for fraud alerts made by "consumers" or "individuals," not corporate entities such as LifeLock; informing LifeLock that its practice of automatically renewing such fraud alerts violated the FCRA's statutory scheme; and demanding that LifeLock cease and desist placing fraud alerts on behalf of consumers with any of the three credit bureaus and renewing such fraud alerts. Experian further informed LifeLock that if it continued in the activities described above, Experian would seek all available remedies against LifeLock. Undeterred, LifeLock continues to engage in its illegal and fraudulent activities.

## FIRST CAUSE OF ACTION

### (Concealment/Suppression of Fact against LifeLock and
### DOES 1 through 10)

60.   Plaintiff repeats, re-alleges and incorporates herein by reference the allegations of paragraphs 1 through 59, inclusive, above.

61.   From on or about, June 2005, LifeLock and DOES 1-10 have surreptitiously submitted requests for initial fraud alerts to Experian and other consumer reporting agencies.

62.   In submitting requests for initial fraud alerts to Experian, and other consumer reporting agencies, LifeLock and DOES 1-10 actively have concealed and suppressed, and continue to conceal and suppress:

(i)   their corporate status and identity as the party submitting the requests;

(ii)   that the party submitting the request for the initial fraud alert was neither the consumer nor an individual acting on behalf of or as a personal representative of a consumer;

(iii)   that they did not, at the time they surreptitiously requested the placement of initial fraud alerts, have a good faith a suspicion that the consumer on whose behalf they requested the alert had been or was about to become a victim of fraud or related crime, including identity theft;"

(iv)   that the consumers on whose behalf they had surreptitiously requested the placement of initial fraud alerts were not, at the time of the request, "assert[ing] in good faith a suspicion that the consumer has been or is about to become a victim of fraud or related crime, including identity theft;"

(v)   that they were placing fraud alerts on behalf of consumers based on assertions regarding the consumers' belief about identity theft which did not constitute a "good faith…suspicion that the consumer has been or is about to become a victim of fraud or related crime," including a desire to proactively prevent identity theft, a generalized concern about identity theft, because an individual they knew had been a victim of identity theft, on the basis of media reports about identity theft, or a desire not to receive junk mail;

(vi)   that the additional requests for initial fraud alerts they surreptitiously submitted were not based on a concurrent, affirmative assertion by the consumer that he or she had been or was about to become a victim of fraud, and that such requests are

1    instead based on the consumer not retracting an assertion made

2    in connection with a prior request for an initial fraud alert;

3    (vii)  that their intent was to sequentially place initial fraud alert

4    requests to create an indefinite or perpetual fraud alert.

5    63.   LifeLock and DOES 1-10 concealed and suppressed, and continue to

6    conceal and suppress, these facts by, *inter alia*:

7    (i)   not providing proof of its identity as the requesting party in

8    connection with the requests for initial fraud alerts it placed;

9    (ii)  using a phone number other than those registered to LifeLock to

10    place calls to Experian's toll-free number;

11    (iii)  employing third parties and foreign phone banks to place

12    requests for initial fraud alerts;

13    (iv)  changing phones and/or numbers used to place requests for

14    initial fraud alerts after prior phones and phone numbers had

15    been detected and attempted to be blocked by Experian;

16    (v)   by responding affirmatively, inputting information in response

17    to, and continuing to use the automated system, after automated

18    prompts that ask:  (i) "if you believe your credit information is

19    being used fraudulently, press 3"; (ii) "to add an alert to your

20    credit report through our automated system, press 2"; (iii) "if you

21    suspect you are a victim of fraud and want to add a temporary

22    initial fraud security alert to your account, press 1"; and (iv) the

23    caller to enter personal information, such as "enter your social

24    security number," "enter your 5 digit ZIP code now," and "enter

25    the numeric portion of your address now;"

26    (vi)  completing the request for placement of initial fraud alerts over

27    the phone, rather than submitting documents establishing that

28    the requesting party was a bona fide personal representative of

the consumer as prompted by the automated system;

 (vii) submitting requests for initial fraud alerts to other credit reporting agencies, thereby requiring the other agencies to refer the alerts to Experian and laundering the identity of the party making the initial request.

64. LifeLock and DOES 1-10 made the non-disclosures, concealments and suppressions of fact alleged herein with the intent to induce Experian (and the other consumer reporting agencies) to act in reliance thereon, including placing fraud alerts in the files of the customers of LifeLock and DOES 1-10, providing free credit reports to customers of LifeLock and DOES 1-10, and to refer the requests to the other consumer reporting agencies, and with the intention of depriving Experian of property or otherwise causing injury.

65. At the time that LifeLock and DOES 1-10 made the failures to disclose and suppression of fact herein alleged, Experian was unaware of these facts, and would not have acted as it did if it had known the undisclosed, concealed or suppressed facts.

66. As a proximate result of LifeLock's and DOES 1-10 failure to disclose, concealment and suppression of fact, Experian has incurred, and continues to incur, costs and has suffered, and continues to suffer, damages.

67. In doing the things aforementioned, LifeLock and DOES 1-10 have been guilty of malice, oppression, and fraud, and Experian is, therefore, entitled to recover punitive damages.

68. By reason of acts by LifeLock and DOES 1-10 alleged herein, Experian has suffered, and will continue to suffer, irreparable harm, for which Experian has no adequate remedy at law, unless and until the conduct by LifeLock and DOES 1-10 is enjoined.

## SECOND CAUSE OF ACTION

### (Intentional Misrepresentation against LifeLock and

### DOES 1 through 10)

69.   Plaintiff repeats, re-alleges and incorporates herein by reference the allegations of paragraphs 1 through 68, inclusive, above.

70.   From on or about, June 2005, during the course of requesting the placement of thousands of initial fraud alerts on consumers' files through the toll-free number maintained by Experian, LifeLock and DOES 1-10 misrepresented: (i) the identity of the parties requesting the placement of the fraud alerts; (ii) that they were individuals seeking placement of a fraud alert in their own files; (iii) that they were individuals with a good faith belief that they had been the victim of fraud; and (iv) that they had a good faith suspicion that the consumer had been or was about to become a victim of fraud or related crime, including identity theft. Experian did not discover LifeLock's wrongful conduct until 2007.

71.   LifeLock and DOES 1-10 made these misrepresentations by way of responding affirmatively to, or entering information in response to, the prompts by Experian's automated telephone system for the placement of fraud alerts by individuals.  Although the precise wording of the prompts has varied over time, the substance has not.  These prompts require, among other things, the caller to respond affirmatively to statements such as:  (i) "if you believe your credit information is being used fraudulently, press 3"; (ii) "to add an alert to your credit report through our automated system, press 2"; and (iii) "if you suspect you are a victim of fraud and want to add a temporary initial fraud security alert to your account, press 1." The prompts also ask the caller to enter personal information, such as "enter your social security number," "enter your 5 digit ZIP code now," and "enter the numeric portion of your address now."

72.   The representations of LifeLock and DOES 1-10 in response to these prompts were false.  In fact, LifeLock and DOES 1-10:  (i) did not believe that their

1    credit information was being used fraudulently or that they were a victim of fraud;

2    (ii) were not seeking to add an alert to their credit reports; (iii) were not seeking a

3    temporary alert, but were seeking to craft an indefinite or perpetual alert; and

4    (iv) entered social security numbers, ZIP codes or addresses, which were not

5    their own.

6        73.    Further, LifeLock and DOES 1-10 did not have a good faith suspicion

7    that the consumer on whose behalf they were surreptitiously requesting a fraud alert

8    had been or was about to become a victim of fraud or related crime, including

9    identity theft. LifeLock and DOES 1-10 knew that, in many cases, the consumers

10   on whose behalf they were surreptitiously requesting the placement of initial fraud

11   alerts, were instead acting on desires to proactively prevent identity theft,

12   generalized concerns about identity theft, the suspected victimization of a person

13   other than the consumer, on the basis of media reports about identity theft, or even

14   the desire not to receive junk mail.

15       74.    Further, many of the customers of LifeLock and DOES 1-10 were not

16   affirmatively asserting that, at the time that LifeLock and DOES 1-10 made the

17   request for the placement of a fraud alert, they had been or were about to become a

18   victim of fraud. Instead, the customers simply had failed to retract assertions made

19   months or years previously in connection with a prior request for an initial

20   fraud alert.

21       75.    Upon information and belief, LifeLock and DOES 1-10 have made

22   similar misrepresentations in the course of placing alerts through the automated

23   systems maintained by other consumer reporting agencies, including Equifax and

24   TransUnion.

25       76.    At the time they made these misrepresentations, LifeLock and DOES 1-

26   10 knew that these representations were false.

27       77.    LifeLock and DOES 1-10 made, and continue to make, the

28   representations herein alleged with the intention of inducing Experian, Trans Union

and Equifax to place fraud alerts in the credit files of the customers of LifeLock and DOES 1-10, send notice to consumers that they are entitled to a free credit report, send a free credit report to customers who request one and "refer the information regarding the fraud alert to each of the credit reporting agencies," and, once referred, treat the referral "as though the agency received the request from the consumer directly."

78.   Experian was unaware of the falsity of the misrepresentations made by LifeLock and DOES 1-10, and acted in justifiable reliance upon those misrepresentations, in that Experian, *inter alia,* placed initial fraud alerts in the files of customers of LifeLock and DOES 1-10, sent notice to consumers that they are entitled to a free credit report, and generated and mailed free credit reports to those customers who requested such reports.

79.   Experian was unaware of the falsity of the misrepresentations made by LifeLock and DOES 1-10 to Equifax and TransUnion, and acted in justifiable reliance upon those representations, in that Experian was required to place fraud alerts on consumers' files which were referred to Experian from Trans Union and Equifax.

80.   LifeLock and DOES 1-10 made the intentional misrepresentations herein alleged with the intention of depriving Experian of property or otherwise causing injury.

81.   As a proximate result of the intentional misrepresentations of LifeLock and DOES 1-10, Experian has incurred, and continues to incur, costs and has suffered, and continues to suffer, damages.

82.   In doing the things aforementioned, LifeLock and DOES 1-10 were guilty of malice, oppression, and fraud, and Experian is, therefore, entitled to recover punitive damages.

83.   By reason of acts by LifeLock and DOES 1-10 alleged herein, Experian has suffered, and will continue to suffer, irreparable harm, for which Experian has

1  no adequate remedy at law, unless and until the conduct by LifeLock and DOES 1-

2  10 is enjoined.

### THIRD CAUSE OF ACTION

#### (Negligent Misrepresentation against LifeLock and

#### DOES 1 through 10)

6      84.   Experian repeats, realleges, and incorporates by reference the

7  allegations contained in Paragraph 1 through 83, inclusive.

8      85.   At the time LifeLock and DOES 1-10 made the representations herein

9  alleged, LifeLock and DOES 1-10 did not have reasonable ground for believing that

10  those representations were true.

11     86.   LifeLock and DOES 1-10 made, and continue to make, the

12  misrepresentations herein alleged with the intention of inducing Experian,

13  TransUnion and Equifax to place fraud alerts in the credit files of the customers of

14  LifeLock and DOES 1-10, send those costumers a free credit report and "refer the

15  information regarding the fraud alert to each of the credit reporting agencies," and,

16  once referred, treat the referral "as though the agency received the request from the

17  consumer directly."

18     87.   Experian was unaware of the falsity of the representations made by

19  LifeLock and DOES 1-10, and acted in justifiable reliance upon the truth of those

20  representations, in that Experian, *inter alia,* placed initial fraud alerts in the files of

21  customers of LifeLock and DOES 1-10, sent notice to consumers that they are

22  entitled to a free credit report, and generated and mailed free credit reports to those

23  customers who requested such reports.

24     88.   Experian was unaware of the falsity of the representations made by

25  LifeLock and DOES 1-10 to Equifax and TransUnion, and acted in justifiable

26  reliance upon those representations, in that Experian was required to place fraud

27  alerts on consumers' files which were referred to Experian from Trans Union

28  and Equifax.

89.   As a result of Experian's reliance upon the truth of the representations of LifeLock and DOES 1-10, and as a direct, proximate and foreseeable result of the above-described conduct, Experian sustained compensatory, incidental and consequential damages in an amount to be proven at trial.

90.   By reason of the acts by LifeLock and DOES 1-10 alleged herein, Experian has suffered, and will continue to suffer, irreparable harm, for which Experian has no adequate remedy at law, unless and until the conduct by LifeLock and DOES 1-10 is enjoined.

## FOURTH CAUSE OF ACTION

### (Lanham Act against LifeLock and
### DOES 1 through 10)

91.   Experian repeats, realleges, and incorporates by reference the allegations contained in Paragraph 1 through 90, inclusive.

92.   Since in or about June 2005, the website, television commercials and radio advertisements of LifeLock and DOES 1-10 are commercial advertisements/promotional materials that have been placed into interstate commerce by LifeLock and DOES 1-10 in connection with the sale and/or marketing of its fraud alert placement service.

93.   Many of the material descriptions and/or representations of fact contained in its advertisements are false and/or misleading, and therefore misrepresent the nature or qualities of goods/commercial activities of LifeLock and DOES 1-10.  Such representations are false and/or misleading in that they:

> (i)   misrepresent, and create the overall net impression, that LifeLock can place fraud alerts on behalf of consumers, when the FCRA does not require credit reporting agencies to honor requests made by corporations;

> (ii)   misrepresent, and create the overall net impression, that everyone is entitled to receive a fraud alert, when the FCRA only

1      allows individuals who "assert[] in good faith a suspicion that

2      the consumer has been or is about to become a victim of fraud or

3      related crime" to place an initial fraud alert on their credit files;

4   (iii) misrepresent, and create the overall net impression, that

5      consumers are entitled to receive automatic renewals of fraud

6      alerts without an assertion of a good faith suspicion that the

7      consumer has been or is about to become a victim of fraud or

8      related crime;

9   (iv) misrepresent, and create the overall net impression, that

10      consumers are entitled to receive automatic renewals of fraud

11      alerts without disclosing that the FCRA requires consumers to

12      provide an identity theft report in order to receive

13      extended alerts;

14   (v) misrepresent, and create the overall net impression, that

15      LifeLock can protect against all types of fraud including

16      computer hacking, and accessing a bank account using stolen

17      passwords when fraud alerts are only effective against fraud that

18      requires accessing a credit report;

19   (vi) misrepresent, and create the overall net impression, that

20      LifeLock "locks" a credit file of a consumer, when, in fact, it

21      only requests the placement of a fraud alert in the credit file, and

22      does not restrict access to the credit file in any way;

23   (vii) misrepresent, and create the overall net impression, that its

24      service is the proven solution to identity theft and fails to

25      disclose that that its own C.E.O. and spokesperson, Todd Davis,

26      has repeatedly been the victim of identity theft while subscribing

27      to LifeLock's service.  Moreover, LifeLock fails to disclose that

28      independent news sources, that have tested the effectiveness of

1    its service first-hand, have found it ineffective and have rated it

2    "poor" at preventing identity theft;

3    (viii) misrepresent, and create the overall net impression, that fraud

4    alerts must be purchased through LifeLock, and that the fraud

5    alerts placed by LifeLock are different or more effective than

6    fraud alerts that consumers can place themselves directly through

7    the credit bureaus;

8    (ix) misrepresent, and create the overall net impression, that

9    consumers cannot obtain fraud alerts effectively or easily from

10    any other source, and that obtaining fraud alerts without

11    subscribing to LifeLock is a time-consuming, difficult process,

12    when in fact it is easier to obtain a fraud alert directly with the

13    credit bureaus than it is with LifeLock;

14    (x) misrepresent, and create the overall net impression, that

15    LifeLock is allowed to place fraud alerts directly with Experian,

16    when in fact Experian has attempted to block requests for the

17    placement of fraud alerts by LifeLock, and LifeLock disguises

18    its identity and fraudulently misrepresents to Experian that

19    LifeLock is the consumer;

20    (xi) misrepresent, and create the overall net impression, that

21    consumers will receive a telephone call when the consumers'

22    personal information is used to apply for new credit, when there

23    is no requirement under the FCRA that initial fraud alerts require

24    creditors to place a telephone call to consumers; and

25    (xii) misrepresent, and create the overall net impression, that

26    LifeLock requests that fraud alerts will be set within an hour of a

27    customer's order of the LifeLock service.  On information and

28    belief, LifeLock has had insufficient resources to timely request

the placement of fraud alerts, resulting in delays before it
requests the placement of fraud alerts.

94.   The above-described acts of LifeLock and DOES 1-10 constitute false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

95.   The above-described acts of LifeLock and DOES 1-10 actually deceived or have the tendency to deceive a substantial segment of consumers who see or hear such representations.

96.   The above-described acts of LifeLock and DOES 1-10 are material, in that they are likely to influence a consumer's purchasing decision.

97.   LifeLock markets itself as an industry leader in identity theft protection and prevention.  Experian is a competitor of LifeLock in that Experian and LifeLock compete for the same dollars from the same customers seeking to reduce the risk that they will become the victim of identity theft.

98.   LifeLock and Experian offer competing services.  LifeLock charges its customers a monthly and/or annual fee to request the placement of fraud alerts, to maintain those fraud alerts, and to provide its customers access to credit reports. Experian offers the placement of credit freezes on the credit files of consumers for a fee.  Additionally, for a fee, Experian provides consumers with a copy of their credit report.

99.   A credit or security freeze, also known as a "credit report freeze", a "credit report lock down", a "credit lock down", "security lock", or "credit lock", prevents a credit reporting company from releasing an individual's credit report to potential extenders of credit.  Because a credit freeze effectively stops any access to the credit report for the extension of new credit, it places a lock on access to an individual's credit file and a block in the process of issuing credit based on the contents of a credit report.  Individuals who freeze their credit reports must typically unfreeze their credit reports before they apply for credit themselves.

100.  Experian's credit freezes are purchased by consumers who wish to protect their credit information and are concerned about the risk and dangers of identity theft — the very same group of consumers LifeLock exploits through its ubiquitous advertising campaign.  Likewise, consumers concerned with detecting, preventing and protecting themselves from identity theft also purchase their credit reports from Experian to search for unauthorized activity.

101.  Furthermore, because LifeLock continually renews its customers' fraud alerts every 90 days, LifeLock transmutes temporary fraud alerts into quasi-credit freezes that persist until the customer cancels his or her subscription.  In fact, the name "LifeLock" suggests the term "credit lock" — a popular term for a credit freeze.  Upon information and belief, some consumers who desire to purchase Experian's credit freeze service become LifeLock subscribers in the belief that LifeLock's service is equivalent of or an alternative to, Experian's credit freeze service.  Customers subscribing to LifeLock's service are induced to believe that they do not need any other identity theft protection service.

102.  Upon information and belief, LifeLock instructs its customers and potential customers who have credit freezes on their credit files to remove those credit freezes.

103.  Experian and LifeLock also compete in that Experian offers to and does provide consumers with a copy of their credit report for a fee, while LifeLock markets its paid service as including the provision of access to a credit report.  Because LifeLock provides its customers access to their credit report, LifeLock customers are unlikely to purchase a copy of their credit report from Experian and Experian is thereby deprived of the revenue associated with the provision of paid credit reports to those consumers.

104.  As a result of the acts of LifeLock and DOES 1-10, Experian, as a competitor of LifeLock and DOES 1-10, has suffered, and will continue to suffer,

damage to its business reputation and goodwill and the loss of sales and profits. Such damages include, but are not limited to:

     (i)    Damage to Experian's reputation regarding its process for allowing consumers to place fraud alerts in consumers' Experian credit file;

     (ii)    Losses from reduced orders for credit reports by consumers to whom Experian is required to provide a free credit report upon receipt of a request for a fraud alert;

     (iii)    Losses from reduced orders by consumers for credit freezes placed by Experian on consumers' credit files; and

     (iv)    Additional expenditures and costs due to LikeLock's improper placement of fraud alerts on behalf of its customers.

105. Additionally, Experian has incurred, and will continue to incur, liability for costs and attorney's fees.

106. Upon information and belief, the above-described acts by LifeLock and DOES 1-10 were willful and have been engaged in knowing them to be deceptive such as to warrant the trebling of damages in order to provide just compensation.

107. Upon information and belief, LifeLock and DOES 1-10 have unfairly profited from the actions alleged herein, and will continue to be unjustly enriched unless and until such conduct is enjoined.

108. By reason of acts by LifeLock and DOES 1-10 alleged herein, Experian has suffered, and will continue to suffer, irreparable harm, for which Experian has no adequate remedy at law, unless and until the conduct by LifeLock and DOES 1-10 is enjoined.

## FIFTH CAUSE OF ACTION

### (California Business and Professions Code § 17500 against LifeLock and DOES 1 through 10)

109. Experian repeats, realleges, and incorporates by reference, the allegations contained in Paragraph 1 through 108, inclusive.

110. From on or about, June 2005, LifeLock and DOES 1-10 have engaged in website, television, radio, and print advertising to the public offering identity theft protection. Such advertisements are false and/or misleading representations in that they:

    (i)    misrepresent, and create the overall net impression, that LifeLock can place fraud alerts on behalf of consumers, when the FCRA does not require credit reporting agencies to honor requests made by corporations;

    (ii)    misrepresent, and create the overall net impression that everyone is entitled to receive a fraud alert, when the FCRA only allows individuals who "assert[] in good faith a suspicion that the consumer has been or is about to become a victim of fraud or related crime" to place an initial fraud alert on their credit files;

    (iii)    misrepresent, and create the overall net impression, that consumers are entitled to receive automatic renewals of fraud alerts without an assertion of a good faith suspicion that the consumer has been or is about to become a victim of fraud or related crime;

    (iv)    misrepresent, and create the overall net impression, that consumers are entitled to receive automatic renewals of fraud alerts without disclosing that the FCRA requires consumers to provide an identity theft report in order to receive extended alerts;

(v)    misrepresent, and create the overall net impression, that LifeLock can protect against all types of fraud including computer hacking, and accessing a bank account using stolen passwords when fraud alerts are only effective against fraud that requires accessing a credit report;

(vi)    misrepresent, and create the overall net impression, that LifeLock "locks" a credit file of a consumer, when, in fact, it only requests the placement of a fraud alert in the credit file, and does not restrict access to the credit file in any way;

(vii)    misrepresent, and create the overall net impression that fraud alerts must be purchased through LifeLock, and that the fraud alerts placed by LifeLock are different or more effective than fraud alerts that consumers can place themselves directly through the credit bureaus;

(viii)    misrepresent, and create the overall net impression, that consumers cannot obtain fraud alerts effectively or easily from any other source, and that obtaining fraud alerts without subscribing to LifeLock is a time-consuming, difficult process, when in fact it is easier to obtain a fraud alert directly with the credit bureaus than it is with LifeLock;

(ix)    misrepresent, and create the overall net impression, that LifeLock is allowed to place fraud alerts directly with Experian, when in fact Experian has attempted to block the placement of fraud alerts by LifeLock, and LifeLock disguises its identity and fraudulently misrepresents to Experian that LifeLock is the consumer;

(x)    misrepresent, and create the overall net impression, that consumers will receive a telephone call when the consumers'

personal information is used to apply for new credit, when there is no requirement under the FCRA that initial fraud alerts require creditors to place a telephone call to consumers.

111.  LifeLock and DOES 1-10 engaged in the advertising herein alleged with the intent to induce members of the public to believe that they had the authority to place fraud alert requests on their behalf and/or to induce Experian and members of the public to believe that it had the authority to place fraud alert requests on behalf of its subscribers.

112.  Experian has suffered injury in fact and has lost money and property as a result of the false advertising by LifeLock and DOES 1-10.

113.  In making or disseminating the statements herein alleged, LifeLock and DOES 1-10 knew or with the exercise of reasonable care should have known that the statements were untrue/false and/or misleading and so acted in violation of Sections 17500 *et seq.* of the Business and Professions Code.

114.  In making or disseminating the statements herein alleged, LifeLock and DOES 1-10 did not intend to sell the products as advertised.

115.  Unless restrained by this Court, LifeLock and DOES 1-10 will continue to engage in untrue/false and misleading advertising, as alleged above, in violation of Section 17500 *et seq.* of the Business and Professions Code, thus tending to render judgment in the instant action ineffectual.  Experian has no adequate remedy at law in that LifeLock and DOES 1-10 will continue to engage in untrue and misleading advertising, as alleged above, in violation of Section 17500 *et seq.* of the Business and Professions Code, thus engendering a multiplicity of judicial proceedings.

### SIXTH CAUSE OF ACTION

**(California Business and Professions Code § 17200 against LifeLock and DOES 1 through 10)**

116.  Experian repeats, realleges, and incorporates by reference, the allegations contained in Paragraph 1 through 115, inclusive.

117.  From on or about, June 2005, LifeLock and DOES 1-10 engaged in that acts and practices herein alleged while doing business, in that such acts and practices were done in the course of selling its LifeLock product to consumers in California, and throughout the United States.

118.  LifeLock and DOES 1-10 have violated California Business and Professions Code § 17200 *et seq.* by engaging in unlawful, unfair and fraudulent conduct including, but not limited, to:

    (i)    misrepresenting, and creating the overall net impression, that LifeLock can place fraud alerts on behalf of consumers, when the FCRA does not require credit reporting agencies to honor requests made by corporations;

    (ii)    misrepresenting, and creating the overall net impression that everyone is entitled to receive a fraud alert, when the FCRA only allows individuals who "assert[] in good faith a suspicion that the consumer has been or is about to become a victim of fraud or related crime" to place an initial fraud alert on their credit files;

    (iii)    misrepresenting, and creating the overall net impression, that consumers are entitled to receive automatic renewals of fraud alerts without an assertion of a good faith suspicion that the consumer has been or is about to become a victim of fraud or related crime;

    (iv)    misrepresenting, and creating the overall net impression, that consumers are entitled to receive automatic renewals of fraud

1      alerts without disclosing that the FCRA requires consumers to

2      provide an identity theft report in order to receive

3      extended alerts;

4   (v)  misrepresenting, and creating the overall net impression, that

5      LifeLock can protect against all types of fraud including

6      computer hacking, and accessing a bank account using stolen

7      passwords when fraud alerts are only effective against fraud that

8      requires accessing a credit report;

9   (vi)  misrepresenting, and creating the overall net impression, that

10      LifeLock "locks" a credit file of a consumer, when, in fact, it

11      only requests the placement of a fraud alert in the credit file, and

12      does not restrict access to the credit file in any way;

13   (vii)  misrepresenting, and creating the overall net impression that

14      fraud alerts must be purchased through LifeLock, and that the

15      fraud alerts placed by LifeLock are different or more effective

16      than fraud alerts that consumers can place themselves directly

17      through the credit bureaus;

18   (viii) misrepresenting, and creating the overall net impression, that

19      consumers cannot obtain fraud alerts effectively or easily from

20      any other source, and that obtaining fraud alerts without

21      subscribing to LifeLock is a time-consuming, difficult process,

22      when in fact it is easier to obtain a fraud alert directly with the

23      credit bureaus than it is with LifeLock;

24   (ix)  misrepresenting, and creating the overall net impression, that

25      LifeLock is allowed to place fraud alerts directly with Experian,

26      when in fact Experian has attempted to block the placement of

27      fraud alerts by LifeLock, and LifeLock disguises its identity and

28

fraudulently misrepresents to Experian that LifeLock is the consumer;

(x)     misrepresenting, and creating the overall net impression, that consumers will receive a telephone call when the consumers' personal information is used to apply for new credit, when there is no requirement under the FCRA that initial fraud alerts require creditors to place a telephone call to consumers.

119. In doing so, LifeLock and DOES 1-10 have:

(i)     violated California Civil Code § 1770(a)(5) by representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have;

(ii)     violated California Civil Code § 1770(a)(7) by representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(iii)     violated California Civil Code § 1770(a)(8) by disparaging the goods, services, or business of another by false or misleading representations of fact;

(iv)     violated California Civil Code § 1770(a)(9) by advertising goods or services with intent not to sell them as advertised;

(v)     violated California Civil Code § 1770(a)(14) by representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;

(vi)     violated 18 U.S.C. § 1343 by transmission of the misrepresentations identified in Paragraphs 38 through 42 by means of telephone or other interstate wire in furtherance of a scheme to defraud Experian and the other credit reporting

agencies;

    (vii)  violated California's False Advertising Law, California Business and Professions Code § 17500;

    (viii)  violated the Lanham Act, 15 U.S.C. § 1125(a).

120.  LifeLock and DOES 1-10 have violated California Business and Professions Code § 17200 *et seq.* by engaging in unlawful, unfair and fraudulent conduct including, but not limited to, making the misrepresentations to Experian and other consumer reporting agencies identified in paragraphs 38 through 42 above.

121.  In doing so, LifeLock and DOES 1-10 have:

    (i)  violated California Civil Code § 1770(a)(2) by misrepresenting the source, sponsorship, approval or certification of goods or services;

    (ii)  violated California Civil Code § 1770(a)(3) by misrepresenting the affiliation, connection, or association with, or certification by, another;

    (iii)  violated of 18 U.S.C. § 1343 by transmission of the misrepresentations identified in Paragraphs 48 through 58 by means of telephone or other interstate wire in furtherance of a scheme to defraud Experian and the other credit reporting agencies;

    (iv)  violated the Lanham Act, 15 U.S.C. § 1125(a).

122.  The acts and practices alleged herein constitute unlawful, unfair and/or deceptive business practices as set forth in Business and Professions Code § 17200 *et seq.*

123.  LifeLock and DOES 1-10 continue to engage in such unlawful, unfair and/or deceptive business practices as identified herein to the present day, including

1   in its dealings with Experian, and there is a substantial risk that the wrongful acts

2   will continue in the future, thus warranting (and necessitating) injunctive relief.

3       124. Experian has suffered injury in fact and has lost money and property as

4   a result of the unfair competition by LifeLock and DOES 1-10.

5       125. Pursuant to California Business and Professions Code Section 17203,

6   Experian is entitled to equitable relief, including restitution of all profits LifeLock

7   and DOES 1-10 have retained as a consequence of the unlawful business practices,

8   in which Experian has an interest and to which Experian is entitled as a result of the

9   unlawful and unfair business practices.

10       126. Experian is also entitled to injunctive relief preliminary and

11   permanently restraining LifeLock from continuing the unlawful and unfair business

12   practices described herein.

13   **SEVENTH CAUSE OF ACTION**

14   **(Unjust Enrichment/Restitution against LifeLock and**

15   **DOES 1 through 10)**

16       127. Experian repeats, realleges, and incorporates by reference, the

17   allegations contained in Paragraph 1 through 126, inclusive.

18       128. LifeLock and DOES 1-10 have been unjustly enriched at Experian's

19   expense by gaming the FCRA, defrauding Experian and consumers, and laundering

20   fraud alerts through the other credit reporting agencies to Experian's harm and

21   detriment and to LifeLock's benefit.

22       129. LifeLock and DOES 1-10 neither are "consumers" nor "individual[s]

23   acting on behalf of or as a personal representative of a consumer," and are not

24   authorized and/or permitted by the FCRA to submit fraud alerts to Experian directly

25   or to cause fraud alerts to be referred to Experian by submitting requests for fraud

26   alerts to other consumer reporting agencies. LifeLock and DOES 1-10 have done

27   so, and continue to do so, without statutory authorization or permission, while

28   concealing, misrepresenting and laundering both their identities as the party

1    requesting the placement of the fraud alert and their corporate status from Experian

2    and other consumer reporting agencies.

3         130. LifeLock and DOES 1-10 have submitted, and continue to submit,

4    requests for initial fraud alerts without possessing a good faith suspicion that the

5    consumer has been or is about to become a victim of fraud or related crime,

6    including identity theft.  In fact, LifeLock and DOES 1-10 have mislead their

7    customers into believing that they are eligible for fraud alerts on the basis of a

8    desire to proactively prevent identity theft, if a friend or family member has been a

9    victim of identity theft, or on the basis of media reports about identity theft.

10        131. LifeLock and DOES 1-10 sequentially submit requests that additional

11   "initial" fraud alerts be placed in a consumer's file in order to indefinitely extend

12   the lifespan of the fraud alert.  The FCRA does not authorize and/or permit

13   LifeLock and DOES 1-10 to request the repeated, sequential placement of initial

14   alerts based on the same set of circumstances.  The FCRA requires that extended

15   alerts be requested on the basis of an identity theft report, rather than the suspicion

16   that the consumer has been or is about to become a victim of fraud or related crime,

17   including identity theft.  The FCRA does not authorize perpetual or indefinite

18   fraud alerts.

19        132. LifeLock and DOES 1-10 do not obtain their customers' affirmative

20   assertions that, concurrent with the request for additional initial fraud alerts, the

21   consumer has a good faith suspicion that the consumer has been or is about to

22   become a victim of fraud or related crime, including identity theft.  Instead,

23   LifeLock and DOES 1-10 request additional fraud alerts whenever their customers

24   do not notify LifeLock that they no longer hold such a suspicion.

25        133. LifeLock and DOES 1-10 have solicited consumers with misleading

26   and false advertising regarding LifeLock's authority to place initial fraud alerts on

27   consumers' files, consumers' eligibility for initial fraud alerts, the nature and effect

28

1  of initial fraud alerts, and the ease in which a customer may request an initial fraud

2  alert directly from the consumer reporting agencies for free.

3      134. LifeLock and DOES 1-10 have been unjustly enriched by, and

4  improperly benefited from, its conduct in that:  (i) the FCRA contemplates that

5  fraud alerts will be placed without charge to the requesting consumer, but LifeLock

6  and DOES 1-10 have charged, received and retained monies paid by consumers for

7  the placement of fraud alerts; (ii) LifeLock and DOES 1-10 are profiting at the

8  expense of Experian, who bears all of the costs and burdens of placing and

9  maintaining the fraud alert in the consumer's file, referring fraud alerts to other

10  consumer reporting agencies, and providing the consumer with notices and the free

11  credit report to consumers who request such a report; (iii) LifeLock and DOES 1-10

12  are profiting from services and work it has wrongly induced Experian to perform,

13  and (iv) LifeLock and DOES 1-10 are profiting from the placement of fraud alerts

14  for consumers who are not eligible for such alerts, and the provision of free credit

15  reports to consumers who are not eligible for such reports.

16      135. It would be unjust and unconscionable to permit LifeLock and DOES

17  1-10 to be enriched at the expense of Experian and to retain the benefits that were

18  wrongfully obtained through Experian.

19      136. LifeLock and DOES 1-10 have improperly benefited from fraudulent

20  activities, and thus Experian seeks restitution from LifeLock and DOES 1-10 in the

21  amount LifeLock and DOES 1-10 have been unjustly enriched and an order

22  disgorging all profits, benefits and other compensation obtained by LifeLock and

23  DOES 1-10.

24                    **PRAYER**

25      WHEREFORE, Plaintiff prays judgment against Defendants, and each of

26  them, as follows:

27              FIRST CAUSE OF ACTION

28      1.    For actual damages in an amount to be proven at trial;

| | | |
|---|---|---|
| 1 | 2. | For restitution to the extent permitted by law; |
| 2 | 3. | For injunctive relief, enjoining Defendants from submitting requests |
| 3 | | for fraud alerts to Experian, Trans Union and Equifax; |
| 4 | 4. | For costs of suit herein incurred; and |
| 5 | 5. | For such other and further relief as the Court may deem proper. |

SECOND CAUSE OF ACTION

| | | |
|---|---|---|
| 7 | 1. | For actual damages in an amount to be proven at trial; |
| 8 | 2. | For restitution to the extent permitted by law; |
| 9 | 3. | For injunctive relief, enjoining Defendants from submitting requests |
| 10 | | for fraud alerts to Experian, Trans Union and Equifax; |
| 11 | 4. | For punitive damage; |
| 12 | 5. | For costs of suit herein incurred; and |
| 13 | 6. | For such other and further relief as the Court may deem proper. |

THIRD CAUSE OF ACTION

| | | |
|---|---|---|
| 15 | 1. | For actual damages in an amount to be proven at trial; |
| 16 | 2. | For restitution to the extent permitted by law; |
| 17 | 3. | For injunctive relief, enjoining Defendants from submitting requests |
| 18 | | for fraud alerts to Experian, Trans Union and Equifax; |
| 19 | 4. | For costs of suit herein incurred; and |
| 20 | 5. | For such other and further relief as the Court may deem proper. |

FOURTH CAUSE OF ACTION

| | | |
|---|---|---|
| 22 | 1. | For actual damages in an amount to be proven at trial; |
| 23 | 2. | For restitution to the extent permitted by law; |
| 24 | 3. | For injunctive relief, enjoining Defendants from placing and/or |
| 25 | | making, or authorizing the placing or making of, any advertisements |
| 26 | | and/or representations which contain false and misleading statements, |
| 27 | | regarding Defendants' ability and authority to place fraud alerts, the |
| 28 | | need for a good faith belief in placing fraud alerts, the availability of |

1    fraud alerts as a proactive, preventative measure, that consumers are

2    entitled to automatic renewals of fraud alerts, the efficacy of fraud

3    alerts against all types of fraud, that fraud alerts prevent access to credit

4    reports, the difficulty of obtaining fraud alerts through credit bureaus,

5    that LifeLock places fraud alerts directly with Experian, that

6    consumers can only receive the protection afforded by fraud alerts by

7    purchasing LifeLock's service, that creditors will call consumers who

8    have a fraud alert on their file, the source of the credit report provided

9    by LifeLock, and, any other advertising false or misleading advertising

10   regarding fraud alerts, and enjoining the use of the LifeLock name.

11   4.   For treble damages, as provided by law;

12   5.   For costs of suit herein incurred; and

13   6.   For such other and further relief as the Court may deem proper.

14                    FIFTH CAUSE OF ACTION

15   1.   For restitution to the extent permitted by law;

16   2.   For disgorgement of profits;

17   3.   For injunctive relief, enjoining Defendants from placing and/or

18   making, or authorizing the placing or making of, any advertisements

19   and/or representations which contain false and misleading statements

20   regarding Defendants' ability and authority to place fraud alerts, the

21   need for a good faith belief in placing fraud alerts, the availability of

22   fraud alerts as a proactive, preventative measure, that consumers are

23   entitled to automatic renewals of fraud alerts, the efficacy of fraud

24   alerts against all types of fraud, that fraud alerts prevent access to credit

25   reports, the difficulty of obtaining fraud alerts through credit bureaus,

26   that LifeLock places fraud alerts directly with Experian, that

27   consumers can only receive the protection afforded by fraud alerts by

28   purchasing LifeLock's service, that creditors will call consumers who

1    have a fraud alert on their file, the source of the credit report provided

2    by LifeLock, and, any other advertising false or misleading advertising

3    regarding fraud alerts, and enjoining the use of the LifeLock name.

4.   For costs of suit herein incurred; and

5.   For such other and further relief as the Court may deem proper.

SIXTH CAUSE OF ACTION

1.   For restitution to the extent permitted by law;

2.   For disgorgement of profits;

3.   For injunctive relief, enjoining Defendants from submitting fraud alerts
     on behalf of consumers to Experian, Trans Union and Equifax; and
     enjoining Defendants from placing and/or making, or authorizing the
     placing or making of, any advertisements and/or representations which
     contain false and misleading statements regarding Defendants' ability
     and authority to place fraud alerts, the need for a good faith belief in
     placing fraud alerts, the availability of fraud alerts as a proactive,
     preventative measure, that consumers are entitled to automatic
     renewals of fraud alerts, the efficacy of fraud alerts against all types of
     fraud, that fraud alerts prevent access to credit reports, the difficulty of
     obtaining fraud alerts through credit bureaus, that LifeLock places
     fraud alerts directly with Experian, that consumers can only receive the
     protection afforded by fraud alerts by purchasing LifeLock's service,
     that creditors will call consumers who have a fraud alert on their file,
     the source of the credit report provided by LifeLock, and, any other
     advertising false or misleading advertising regarding fraud alerts, and
     enjoining the use of the LifeLock name.

4.   For costs of suit herein incurred; and

5.   For such other and further relief as the Court may deem proper.

1

<u>SEVENTH CAUSE OF ACTION</u>

2      1.      For restitution to the extent permitted by law;

3      2.      For disgorgement of profits;

4      3.      For costs of suit herein incurred; and

5      4.      For such other and further relief as the Court may deem proper.

6

7    Dated:  June 9, 2008               JONES DAY

8

9                              By: *Richard J. Grabowski*

10                                  Richard J. Grabowski

11                               Attorneys for Plaintiff
EXPERIAN INFORMATION

12                               SOLUTIONS, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **DEMAND FOR JURY TRIAL**

2          Plaintiff Experian Information Solutions, Inc. hereby demands trial by jury.

3

4    Dated:  June 9, 2008                          JONES DAY

5

6                                                  By _Richard J. Grabowski_

7                                                     Richard J. Grabowski

8                                                  Attorneys for Plaintiff
                                                   EXPERIAN INFORMATION
9                                                  SOLUTIONS, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PROOF OF SERVICE BY U.S. MAIL

I am a citizen of the United States and employed in Orange County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 3 Park Plaza, Suite 1100, Irvine, California 92614. On February 9, 2008, I served a true and correct copy of the within documents:

### FIRST AMENDED COMPLAINT

by placing the document listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Irvine, California addressed as set forth below:

Mary Azcuenaga, Esq.  
John Fedele, Esq.  
Heller Ehrman LLP  
1717 Rhode Island Avenue NW  
Washington, DC  20036-3023  
Tel:  (202) 912-2000

Malaika Eaton, Esq.  
Heller Ehrman LLP  
701 Fifth Avenue, Suite 6100  
Seattle, WA  98104-7098  
Tel:  (206) 447-0900

Helen Cho Eckert, Esq.  
Heller Ehrman LLP  
333 South Hope Street, 39th Floor  
Los Angeles, CA  90071-1406  
Tel:   (213) 689-0200

*Attorneys for* LifeLock, Inc.

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on February 9, 2008, at Irvine, California.

_Kim Sarshar_

Kim Sarshar

LAI-2913767v1