Thomas R. Malcolm (State Bar No. 39248)
trmalcolm@jonesday.com
Richard J. Grabowski (State Bar No. 125666)
rgrabowski@jonesday.com
Marc K. Callahan (State Bar No. 156616)
mkcallahan@jonesday.com
Matthew A. Berliner  (State Bar No. 224384)
mberliner@jonesday.com
Corbett H. Williams (State Bar No. 246458)
chwilliams@jonesday.com
JONES DAY
3 Park Plaza, Suite 1100
Irvine, California  92614
Telephone:   (949) 851-3939
Facsimile:   (949) 553-7539

Attorneys for Plaintiff
EXPERIAN INFORMATION
SOLUTIONS, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EXPERIAN INFORMATION SOLUTIONS, INC., a corporation,<br><br>Plaintiff,<br><br>v.<br><br>LIFELOCK, INC., a corporation; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. SACV08-00165 AG (MLGx)<br><br>Assigned for all purposes to: Judge Andrew Guilford<br><br>DEMAND FOR JURY TRIAL<br><br>**SECOND AMENDED COMPLAINT FOR:**<br><br>1.  Concealment/Suppression of Fact;<br><br>2.  Intentional Misrepresentation;<br><br>3.  Negligent Misrepresentation;<br><br>4.  Violation of Lanham Act;<br><br>5.  Violation of California Business & Professions Code § 17500;<br><br>6.  Unlawful and Fraudulent Business Practices in Violation of California Business & |

Professions Code § 17200;

7.  Unfair Business Practices in
    Violation of California Business
    & Professions Code § 17200;

8.  Unjust Enrichment/Restitution.

## JURISDICTION AND VENUE

1.     This Court has original jurisdiction over this matter, under 28 U.S.C. § 1331, in that it is a civil action arising under a law of the United States, specifically 15 U.S.C. § 1125, and 15 U.S.C. § 1681 *et seq.*

2.     This Court has original jurisdiction over this matter, under 28 U.S.C. § 1332, in that it is a civil action between citizens of different states in which the matter in controversy exceeds, exclusive of costs and interest, seventy-five thousand ($75,000.00) dollars.

3.     Venue is proper in the Central District of California, under 28 U.S.C. §1391(a), in that all of the defendants are subject to personal jurisdiction in this District at the time the action is commenced and a substantial part of the events or omissions on which the claims in this matter are based occurred in this District.

## INTRODUCTION

4.     This action arises out of LifeLock, Inc.'s ("LifeLock") illegal and unfair submission of requests for placement of "fraud alerts" on the credit files maintained by Experian Information Solutions, Inc. ("Experian") and other consumer reporting agencies.  In conjunction therewith, LifeLock is engaged in unfair competition and a pattern of false and misleading advertising and fraud, which has and continues to mislead and damage Experian and consumers.

5.     Under the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA"), any consumer who asserts a good faith suspicion that he or she has been or is about to become a victim of fraud or related crime, including identity theft, may request that a national consumer reporting agency (such as Experian) place an

1   "initial fraud alert" in his or her credit file for at least 90 days.  These initial alerts

2   are a temporary measure to be requested only when the consumer actually suspects

3   that identity theft has occurred or is about to occur.  If the consumer thereafter

4   confirms that fraud has occurred, the FCRA provides for an "extended" fraud alert

5   when the consumer provides a police report or other "identity theft report".

6       6.    Because the placement of initial fraud alerts is limited by statute to only

7   those consumers who actually believe that fraud has occurred or is imminent, a

8   prospective issuer of credit is required by law to take reasonable steps to confirm

9   the identity of the person making the request before opening a new credit account

10  or increasing a credit limit in the name of that consumer.

11      7.    Under the FCRA, an initial fraud alert is available to any eligible

12  consumer — for free — from a national consumer reporting agency.  Consumers

13  can place a free initial fraud alert simply and quickly through a toll-free telephone

14  number, the Internet or mail.  However, the FCRA mandates that a request for an

15  initial fraud alert *must be made directly by the consumer or by an individual acting*

16  *on behalf of or as a personal representative of a consumer*.  The FCRA does not

17  permit the submission of a request for placement of an initial fraud alert by

18  corporations such as LifeLock.  Despite this prohibition, LifeLock has

19  surreptitiously requested the placement of hundreds of thousands of fraud alerts on

20  Experian's files by posing as the consumer.

21      8.    Once an initial fraud alert is placed, it triggers costly statutory

22  obligations for consumer reporting agencies such as Experian.  First, Experian and

23  the other credit reporting agencies are required to mail a notice to each consumer

24  each time a fraud alert is placed explaining various rights that the consumer has,

25  including the right to receive a free credit report by virtue of the placement of a

26  fraud alert.  Experian is then mandated to provide a free credit report to any such

27  consumer who requests one.  Although costly for the credit reporting agencies,

28  these requirements make sense in the context of a statute that was designed to

1    protect consumers who have an actual and legitimate concern that fraud has

2    occurred or is imminent.  However, as described more fully below, such obligations

3    were never intended to be triggered by a private company seeking to profit by

4    illegally placing fraud alerts on behalf of consumers who do not have a genuine

5    suspicion of imminent fraud.

6         9.     Befitting a company whose co-founder has spent time in jail after

7    having been arrested for financial fraud and who has been barred by the FTC for

8    life from engaging in certain credit reporting related activities, LifeLock's business

9    model consists of a scheme to "game the system," which is imbued with illegal

10   activity, fraud and deception at every level:

11        a.     As a corporation, LifeLock is not legally entitled to request fraud alerts

12               on behalf of consumers, but continues to do so thousands of times per month;

13        b.     LifeLock deceives Experian (and other consumer reporting agencies)

14               by actively concealing that its requests are being submitted by a corporation;

15        c.     LifeLock misleads consumers into believing that it is authorized to

16               request fraud alerts from credit reporting agencies when it is not;

17        d.     Although initial fraud alerts are designed to be temporary, 90 day

18               measures for people who actually discover or suspect fraud, LifeLock

19               deceives consumer reporting agencies into implementing an indefinite or

20               perpetual state of "initial" alert by submitting a "new" fraud alert request on

21               or about every 90 days;

22        e.     LifeLock misleads consumers into believing that the FCRA authorizes

23               the repeated, sequential and perpetual placement of initial fraud alerts when it

24               does not;

25        f.     LifeLock submits requests for alerts on or about every 90 days where

26               neither LifeLock nor the consumer has a good faith suspicion that fraud has

27               occurred or is imminent.

28

10.    LifeLock actively advertises that its customers "…will receive an email from us stating that your credit reports have been ordered on your behalf from the major credit bureaus." What LifeLock does not adequately disclose to the consumer is that it is charging the consumer to obtain his or her one free annual report to which they are entitled under law. Rather than *pay* for a credit report at each of the major credit bureaus, LifeLock goes to the "centralized source" that the major credit bureaus were required to jointly establish in order to provide consumers with the free annual credit report. LifeLock then requests the consumer's one free annual report from each of the major credit bureaus by posing as that consumer. Thereafter, when a LifeLock customer goes to the centralized source to obtain a copy of his or her free annual credit report, that request is denied because LifeLock already used it.

11.    LifeLock's scheme damages Experian (and other consumer reporting agencies), consumers, and the economy as a whole. LifeLock's scheme costs Experian millions of dollars every year in processing large numbers of improper initial fraud alerts, mailing mandatory notices to consumers, and providing free credit reports to consumers who are not eligible for such reports. The consuming public has been harmed too. LifeLock's scheme creates the impression that consumers must pay for the protections provided by initial fraud alerts, potentially deterring those who legitimately need fraud alerts but who cannot afford LifeLock's subscription fees. LifeLock's fraudulent scheme harms the economy as well. LifeLock's practices threaten to clog the credit system with stale and unnecessary fraud alerts, potentially devaluing the efficacy of necessary alerts as LifeLock "cries wolf" on behalf of thousands of unthreatened customers. Further, LifeLock's practices also unnecessarily slow the extension of credit, impose additional costs and burdens on businesses, and may lead to unnecessary denials of legitimate applications for credit, thereby forcing consumers to make repeated applications for credit and harming their credit scores in the process.

12.   As a result of LifeLock's wrongful conduct, Experian seeks: (i) an injunction precluding LifeLock from requesting fraud alerts with Experian or any other major credit reporting agency; (ii) restitution of the costs to Experian for LifeLock's wrongful conduct; (iii) disgorgement of profits earned by LifeLock as a result of its illegal practices; (iv) compensatory and punitive damages; and (v) an injunction precluding LifeLock from continuing to engage in false and misleading advertising regarding (a) its services and (b) the efficacy and availability of fraud alerts (for free) from Experian, TransUnion and Equifax.

## **PARTIES**

13.   Experian is an Ohio corporation having its principal place of business at 475 Anton Boulevard, Costa Mesa, California 92626.

14.   LifeLock is a Delaware corporation with its principal place of business located at 60 Salado Pkwy, Tempe, Arizona 85281.

15.   The true names and capacities, whether individual, corporate, associate or otherwise, of the defendants named as DOES 1 through 10, inclusive, are unknown to Experian who, therefore, sues those defendants by such fictitious names. Experian is informed and believes and thereon alleges that each of the defendants sued herein as DOES 1 through 10 are and were the agents and/or employees of each and every other defendant and were at all relevant times acting within the course and scope of such agency and employment, and/or are legally responsible in some manner for the events and happenings herein referred to and caused injuries and damages proximately thereby to Experian as herein alleged. Experian will seek to amend its complaint to allege the true names and capacities of such defendants when ascertained.

16.   Experian is informed and believes and thereon alleges that, at all relevant times, each Defendant was acting as the agent, employee, principal, officer, partner, joint venturer, director or other representative of one or more of the other Defendants, and, in committing the acts and/or omissions mentioned herein,

1  was acting within the course and scope of such employment, agency, partnership,

2  joint venture, or other relationship, and with the knowledge and consent of the

3  remaining Defendants.

4  ## BACKGROUND

5  ## THE FCRA AND THE FRAUD ALERT SYSTEM

6       17.   The FCRA provides for three types of fraud alerts, which are available

7  to consumers based upon the consumers' risk of becoming, or having been, an

8  actual victim of fraud, including identity theft.  *See* 15 U.S.C. §§ 1681c-1(a)(1),

9  1681c-1(b)(1), 1681c-1(c).  These fraud alerts are not available as a matter of right

10  to all consumers, but only upon a showing that the consumer falls within a

11  particular risk category, entitling them to receive a fraud alert.

12       18.   Under 15 U.S.C. § 1681c-1(a), a consumer can request an "initial" 90-

13  day fraud alert, which is designed as a temporary, stopgap measure for a consumer

14  who suspects he or she has been or is in imminent danger of becoming a victim of

15  fraud.  Such alerts are available to consumers "[u]pon the direct request of a

16  consumer, or an individual acting on behalf of or as a personal representative of a

17  consumer, who asserts in good faith a suspicion that the consumer has been or is

18  about to become a victim of fraud or related crime, including identity theft…" and

19  the provision of "appropriate proof of the identity of the requester."  15 U.S.C.

20  § 1681c-1(a)(1).

21       19.   Once a consumer requests an initial alert and asserts his or her good

22  faith suspicion, the credit reporting agency must:  (i) include a fraud alert in that

23  consumer's file for at least 90 days (15 U.S.C. § 1681c-1(a)(1)(A)); (ii) refer the

24  fraud alert to each of the other credit reporting agencies (15 U.S.C. § 1681c-

25  1(a)(1)(B)); (iii) disclose to the consumer that the consumer may receive a free

26  copy of his credit report (15 U.S.C. § 1681c-1(a)(2)(A)); and (iv) provide the

27  consumer with a credit report free of charge upon the request of the consumer

28  (15 U.S.C. § 1681c-1(a)(2)(B)).

20.   Under 15 U.S.C. § 1681c-1(b), a consumer who is the actual victim of a documented case of identity theft can obtain an "extended" fraud alert.  Extended alerts are available "[u]pon the direct request of a consumer, or an individual acting on behalf of or as a personal representative of a consumer, who submits an identity theft report to a consumer reporting agency…"  15 U.S.C. § 1681c-1(b)(1).

21.   Once a consumer requests an extended alert and provides an identity theft report, the credit reporting agency must:  (i) include a fraud alert in the consumer's file for the next seven (7) years (15 U.S.C. § 1681c-1(b)(1)(A)); (ii) for the next five (5) years, "exclude the consumer from any list of consumers provided by the agency to any third party to offer credit or insurance to the consumer that was not initiated by the consumer" (15 U.S.C. § 1681c-1(b)(1)(B)); (iii) refer the fraud alert to each of the other credit reporting agencies (15 U.S.C. § 1681c-1(b)(1)(C)); (iv) disclose to the consumer that the consumer may receive a free copy of his credit report (15 U.S.C. § 1681c-1(b)(2)(A)); and (v) provide the consumer with a credit report free of charge upon the request of the consumer (15 U.S.C. § 1681c-1(b)(2)(B)).

22.   Section 15 U.S.C. § 1681c-1(c) allows an "active duty military consumer" to obtain a 12-month fraud alert.  Active duty alerts are available "[u]pon the direct request of a consumer, or an individual [not a corporate entity] acting on behalf of or as a personal representative of an active duty military consumer…"  15 U.S.C. § 1681c-1(c).  This is the only type of alert permitted under the FCRA that allows consumers to obtain a fraud alert without any type of showing that they are, or are likely to become, a victim of fraud.

23.   The FCRA provides that whenever a consumer reporting agency receives a request for an initial fraud alert, the agency must "refer the information regarding the alert" to each of the other credit reporting agencies.  15 U.S.C. § 1681c-1(a)(B).  When a credit reporting agency receives a referral from another credit reporting agency, it must follow the procedures for handling the fraud alert

"as though the agency received the request from the consumer directly." 15 U.S.C. § 1681c-1(e).  Because Experian has no way of determining whether an initial fraud alert that was referred to Experian from another credit reporting agency was legal (*i.e.*, a request from "a consumer, or an individual acting on behalf of or as a personal representative of a consumer") or illegal (*i.e.*, through LifeLock), without seeking verification directly from each consumer, Experian:  (i) places an initial fraud alert on the consumer's file; (ii) notifies the consumer of the availability of a free credit report; and (iii) within three (3) days, provides a free credit report to the consumer upon the consumer's request.

24.    The FCRA specifically provides that credit reporting agencies must honor a request for an initial fraud alert from "a consumer, or an individual acting on behalf of or as a personal representative of a consumer."  15 U.S.C. §§ 1681c-1(a)(1).  The FCRA does not require the credit reporting agencies to accept fraud alerts placed by corporations (such as LifeLock) on behalf of consumers.

25.    "Initial" fraud alerts place limits on potential creditors who use a credit report to establish a "new credit plan," grant an "extension of credit," issue an "additional credit card" on an existing account, or "grant an increase in credit limit" on an existing account.  15 U.S.C. § 1681c-1(h)(1)(B).  When an initial fraud alert appears on a consumer's credit report, the creditor must "utilize[] reasonable procedures to form a reasonable belief that the user knows the identity of the person making the request."  15 U.S.C. § 1681c-1(h)(1)(B).  The consumer may provide a contact phone number in placing a fraud alert; however, there is no requirement that the creditor call the consumer directly to verify that the consumer has authorized the credit application.  Instead of calling the consumer, the creditor may "take reasonable steps to verify the consumer's identity and confirm that the application or a new credit plan is not the result of identity theft."  15 U.S.C. § 1681c-1(h)(1)(B)(ii).

26.    Fraud alerts are only effective against certain types of fraud.  While they can be useful to prevent the opening of certain new accounts that require a credit report to be pulled, they are ineffective to prevent identity theft involving the opening of accounts that do not require a credit report.  Fraud alerts provide no protection to individuals against the fraudulent use of existing accounts, such as the unauthorized use of a credit card, and they provide little or no protection against an identity theft that already is in progress.

27.    A fraud alert places a significant burden on creditors before they may grant credit.  For example, it imposes upon them an obligation "to take reasonable steps to verify the consumer's identity and confirm that the application for a new credit plan is not the result of identity theft." 15 U.S.C. § 1681(h)(1)(B).  These measures are in addition to the procedures that many creditors have in place for verifying a consumer's identity prior to granting credit.

28.    Fraud alerts can have unintentional negative effects on individuals, and their ability to obtain credit.  Creditors can simply deny a credit application if a consumer's credit report has a fraud alert, rather than implement procedures that satisfy the verification requirements.  For creditors that implement verification procedures, they must deny a credit application if the creditor is unable to verify the legitimacy of the application at the time of processing.  Thus, unnecessary fraud alerts can result in increased denials of credit to consumers who neither are the victims of identity theft, nor are about to become victims of identity theft.  Denials such as these can lead to repeated applications for credit which, in turn, may reduce a consumer's credit score or credit rating.  Further, the cumulative effect of placing unwarranted and unauthorized fraud alerts on consumers' files places undue and unnecessary burdens on the credit granting industry as a whole, and results in even broader implications for the economy.

29.    Under 15 U.S.C. § 1681j(a), each of the national credit reporting agencies must provide every consumer with a free credit report once per year upon

the request of the consumer.  The free credit report is available to consumers through a "centralized source" located at www.annualcreditreport.com and established jointly by the three national credit reporting agencies.  The credit reporting agencies are required to provide the free annual credit report "only if the request from the consumer is made using the centralized source established for such purpose…"  15 U.S.C. § 1681j(a)(1)(B).  The free credit reports are available online immediately, or are mailed to consumers at their address on file with the credit reporting agencies for consumers who request their credit reports by telephone, or in writing.

**EXPERIAN**

30.    Experian is a consumer credit reporting agency under the FCRA.  As a consumer credit reporting agency, Experian acts as a conduit of credit information that is pertinent to prudent credit granting and related decisions.  Experian gathers credit information originated by others, and makes that information available to parties engaged in credit-related transactions.  Experian essentially acts as a storehouse of credit information by storing, retrieving, and furnishing data as allowed by the FCRA and similar state laws.

31.    Under 15 U.S.C. § 1681c-1, Experian allows individuals to request "initial" fraud alerts — the exact same fraud alerts LifeLock charges to request — quickly and easily over its website located at www.experian.com or through a toll-free number (which is posted on Experian's website) and without cost.  The request process can be completed in a matter of minutes; the process is completely free of charge; Experian automatically generates a notice to consumers that they can request a free credit report and provides credit reports for those who make that request; online consumers who request a report may immediately view their credit report over the Internet; telephone consumers who request a report will receive a credit report in the mail; those who request an extended alert may request two free

1    reports in the twelve month period after they submit an identity theft report; and

2    Experian automatically refers all fraud alerts to the other credit reporting agencies.

3    **LIFELOCK**

4    32.    Todd Davis and Robert J. Maynard, Jr. founded LifeLock in 2005.

5    Although LifeLock has touted its founders as "seasoned veterans of the banking

6    credit and security industries," who "did solid research for more than three years"

7    to develop its system, LifeLock does not disclose less auspicious information about

8    its founding and, specifically, about its founding-member, Maynard.  According to

9    newspaper reports, Maynard developed the idea for LifeLock while sitting in a jail

10    cell after having been arrested for reneging on a $16,000.00 casino marker taken

11    out at the Mirage Hotel in Las Vegas.  Maynard, who initially held the title of Chief

12    Operating Officer, and later Marketing Director, had been banned for life by the

13    FTC from "advertising, promoting, offering for sale, selling, performing, or

14    distributing any product or service relating to credit improvement services."  That

15    lifetime ban resulted from Maynard's previous scheme involving the operation of a

16    credit repair clinic.  The credit repair industry is notorious for a multitude of

17    unsavory practices and characters.  This fact is particularly relevant here given that

18    the legislative history to the FCRA confirms that the statute was drafted to

19    specifically exclude companies, like credit repair clinics, from requesting the

20    placement of fraud alerts on consumer credit files:  The legislative history states

21    that the statute "use[s] the word 'individual' instead of 'person' to ensure that the

22    provision would only apply to specific individuals such as a consumer's authorized

23    family members or guardians (or attorneys acting as personal representatives),

24    authorized representatives from bona fide military service organizations, **and not to**

25    **companies and entities such as credit repair clinics**." *See* H.R. Rep. No. 108-

26    263 at 40 (Sept. 4, 2003) (emphasis added).

27    33.    Nevertheless, under the scheme developed by Maynard and his

28    partners, LifeLock charges consumers to request placement of initial fraud alerts,

1  even though they are available for free from a consumer reporting agency upon
2  direct request of the consumer.  LifeLock currently charges $10 per month or $110
3  per year.

4      34.    Under the FCRA, LifeLock is not authorized to request placement of an
5  initial fraud alert on a consumer's credit file; instead, only the consumer, or an
6  individual acting on behalf of or as a representative of the consumer, may submit
7  requests for the placement of initial fraud alerts.  But LifeLock improperly requests
8  fraud alerts for consumers.  Worse yet, LifeLock does so for consumers who are not
9  even eligible for such alerts.

10      35.    The FCRA requires that the consumer or personal representative "assert
11  in good faith a suspicion that the consumer has been or is about to become a victim
12  of fraud or related crime, including identity theft…"  LifeLock submits requests
13  where neither it nor its customers have such a belief.  LifeLock's advertising and
14  customer intake process dilutes this standard by convincing consumers that fraud
15  alerts may be set as a proactive, preventive measure to combat identity theft rather
16  than in reaction to a good faith suspicion that they are or are about to become a
17  victim of identity theft (as required by the FCRA).  For example, LifeLock's
18  website repeatedly touts LifeLock as "proactive identity theft protection," and even
19  suggests that the desire to stop receiving junk mail "alone is worth the price."
20  LifeLock's order form asks consumers to state "why do you think you or your
21  family members will become a victim of identity theft?"  Among the answers
22  scripted by LifeLock (which allow consumers to enroll in LifeLock) are responses
23  that are not assertions "in good faith that the consumer has been or is about to
24  become a victim of fraud…" — to wit:  (i) "I have heard media reports that give me
25  a reason"; or (ii) "One of my friends or family members is a victim of identity
26  theft."  Worse, LifeLock allows customers who did not, or refuse to, disclose their
27  reason to enroll (provided they pay LifeLock a fee).

28

36.   LifeLock's scheme also includes automatically renewing initial fraud alerts, and continuing to renew them, so long as the consumer continues to pay LifeLock a subscription fee.  This conduct effectively converts "initial" fraud alerts into perpetual or indefinite "initial" alerts.  The FCRA does not authorize indefinite fraud alerts under any of the three categories of alerts established by Congress.

37.   LifeLock does not require that its customers affirmatively assert — concurrently with making each request for an initial fraud alert — that they believe that they are or about to become victims of fraud or related crime, including identity theft.  Instead, after misleading consumers into believing that lesser fears or concerns constitute a good faith suspicion of identity theft, LifeLock seeks the consumer's agreement to notify LifeLock if that suspicion ever changes.  The FCRA does not authorize the placement of an initial fraud alert where that request is based upon the consumer's failure to retract an assertion that the consumer was or was about to become a victim of fraud or related crime, including identity theft, which was made in connection with a prior request for an initial fraud alert.

38.   In order to place fraud alerts on behalf of consumers with Experian, LifeLock has engaged in systematic fraud and concealment.  Experian has established an automated system over a toll free number to allow consumers to quickly and easily place fraud alerts for free.  Experian's automated phone system requires its users to input information following a series of prompts.  Although the precise wording of the prompts has varied over time, the substance has not.  These prompts require, among other things, the caller to respond affirmatively to statements such as:  (i) "if you believe your credit information is being used fraudulently, press 3"; (ii) "to add an alert to your credit report through our automated system, press 2"; and (iii) "if you suspect you are a victim of fraud and want to add a temporary initial fraud security alert to your account, press 1."  The prompts also ask the caller to enter personal information, such as "enter your social

security number," "enter your 5 digit ZIP code now," and "enter the numeric portion of your address now."

39.    After calling Experian's telephone system, LifeLock responds affirmatively to these prompts by pressing the corresponding number and by entering in the requested information.  This is fraud:  (i) *LifeLock* did not believe that its own credit information was being used fraudulently or that it was a victim of fraud; (ii) *LifeLock* was not seeking to add an alert to its credit reports; (iii) *LifeLock* was not seeking a temporary alert (but was seeking to craft an indefinite or perpetual alert for someone else); and (iv) *LifeLock* did not enter its own social security number, ZIP code or address.

40.    Experian's automated system also includes a prompt for personal representatives requesting a fraud alert on the behalf of another to press the appropriate number, with corresponding instructions to submit a written request to Experian.  LifeLock did not respond affirmatively to that prompt or make the written submission that Experian's instructions required.

41.    Further, LifeLock did not have a good faith suspicion that the consumer had been or was about to become a victim of fraud or related crime, including identity theft.  LifeLock knew that, in many cases, the consumers on whose behalf it was surreptitiously and illegally requesting the placement of initial fraud alerts were instead acting on desires to proactively prevent identity theft, generalized concern about identity theft, the suspected victimization of a person other than the consumer, on the basis of media reports about identity theft, or even a desire not to receive junk mail.

42.    Additionally, many of LifeLock's customers were not affirmatively asserting, at the time that LifeLock made the request for the placement of a fraud alert, that they had been or were about to become a victim of fraud.  Instead, the customers had simply failed to retract assertions made months or years previously in connection with a prior request for an initial fraud alert.

43.   In addition to making express misrepresentations to Experian to induce Experian to place fraud alerts on behalf of LifeLock, LifeLock engaged in an elaborate scheme to disguise its activities, including laundering the fraud alerts through the other national credit reporting agencies.

44.   LifeLock requested the placement of large numbers of fraud alerts, as many as thousands per day, through Experian's toll-free number using a single telephone number based in Canada.  This caused Experian to incur significant costs in maintaining its toll-free number, which is toll-free to consumers, but which Experian must pay for on a per call basis.

45.   After Experian discovered that the calls were placed by LifeLock, not consumers as LifeLock had represented, Experian attempted to block calls from this number.  LifeLock then attempted to disguise its activities by placing calls through another phone bank, this time in Pennsylvania, which Experian again discovered and attempted to block.  LifeLock then resorted to larger banks of telephone numbers in an attempt to further disguise its activities; Experian once again discovered LifeLock's activities and attempted to block the calls.  Upon information and belief, Experian's efforts to completely block all of LifeLock's improper phone calls into Experian's system have been unsuccessful, and LifeLock continues to improperly use Experian's phone system to place fraud alerts on behalf of consumers.

46.   LifeLock also continues to request the placement of fraud alerts with Experian by laundering these alerts through TransUnion and/or Equifax.  LifeLock games the automatic referral system for fraud alerts established in 15 U.S.C. § 1681c-1(a)(1)(B) by fraudulently representing to TransUnion and/or Equifax that LifeLock is a "consumer" or "individual" placing a fraud alert on its own credit file, and concealing its identity as a corporation from TransUnion and Equifax.  TransUnion and Equifax then automatically forward such alerts to Experian.  When Experian receives those alerts, Experian:  (i) is unable to determine whether the

referred alerts were placed by LifeLock or whether they were placed by consumers; and (ii) must honor the fraud alerts as if placed by consumers directly with Experian.  If Experian could effectively determine which fraud alerts were placed by LifeLock, Experian would block such requests.

47.    In order to maximize the number of consumers who request LifeLock to place fraud alerts with Experian, LifeLock has engaged in a campaign to mislead consumers into enrolling in its service.  LifeLock markets its product through its websites, including www.lifelock.com, through press releases and news outlets, and through television and radio commercials.  The representations made in LifeLock's marketing are false, misleading, and fail to disclose material facts regarding the service offered by LifeLock.

48.    **LifeLock Misrepresents Its Authority And Ability To Place or Request Alerts.**  LifeLock misrepresents and creates the overall net impression that LifeLock can place or request the placement of fraud alerts on behalf of consumers even though the FCRA does not require credit reporting agencies to honor requests made by corporations.  Specific misrepresentations include, *inter alia*:

> (i)    "[W]e will, upon enrollment…request that Equifax, Experian and TransUnion, or other credit bureau [sic] as may become appropriate, place fraud alerts on your consumer to the extent permitted by 15 U.S.C. § 1681c-1." (LifeLock Website at the webpage address: www.lifelock.com/about-us/about-lifelock/terms-and-conditions, dated Jan. 26, 2008.)

> (ii)   "[W]e…use integrity and operate within the law." (LifeLock Website at the webpage address: www.lifelock.com/lifelock-for-people/who-we-are/who-uses-lifelock, dated Jan. 26, 2008.)

49.    **LifeLock Misrepresents What Constitutes A Sufficient Good Faith Belief Regarding Identity Theft.**  LifeLock induces consumers to enroll in its service by misleading them as to what constitutes a "good faith…suspicion that the

1    consumer has been or is about to become a victim of fraud or related crime,

2    including identity theft."  LifeLock creates the net impression that general concerns

3    about identity theft or the desire to proactively prevent identity theft are a sufficient

4    basis to place a fraud alert.  They are not.  LifeLock's website repeatedly touts

5    LifeLock as "proactive identity theft protection." (LifeLock Website at the webpage

6    address: www.lifelock.com, dated Jan. 26, 2008.)  LifeLock's website includes

7    testimonials from customers who do not express any suspicion that they were or

8    were about to become the victim of identity theft:  "I had seen a new report about

9    LifeLock. The CEO gave out his social security number on TV!  The reporter tried

10   to use it to open new accounts and couldn't.  That's when I signed up." (LifeLock

11   Website at the webpage address: www.lifelock.com, dated Jan. 26, 2008.)

12   LifeLock's advertisements and website suggest that a desire to end junk mail is a

13   sufficient reason to cause LifeLock to place fraud alerts:  "[A]ll that mail is just so

14   irritating.  Many of our clients tell us that this alone is worth the price." (LifeLock

15   Website at the webpage address: www.lifelock.com/lifelock-for-people, dated

16   Jan. 26, 2008.)  LifeLock's website even includes testimonials from individuals

17   who enrolled in LifeLock even though they were skeptical that they needed

18   protection from identity theft:  "When I first learned about a company called

19   LifeLock that protects families from identity theft, my husband was skeptical.  I

20   signed us up anyway, and forgot about it." (LifeLock Website at the webpage

21   address: www.lifelock.com, dated Jan. 26, 2008.)  LifeLock's order form asks

22   consumers to state, "why do you think you or your family members will become a

23   victim of identity theft?"  Among the answers scripted by LifeLock are responses

24   that are not assertions "in good faith that the consumer has been or is about to

25   become a victim of fraud…" such as:  (i) "I have heard media reports that give me a

26   reason"; or (ii) "One of my friends or family members is a victim of identity theft."

27   LifeLock also allows customers who did not, or refuse to, disclose their reason

28   to enroll.

50. **LifeLock Misrepresents That Everyone Is Entitled To Fraud Alerts As A Preventative Measure.** LifeLock misrepresents, and creates the overall net impression, that all individuals are entitled to receive a fraud alert. They are not. The FCRA only allows individuals who "assert[] in good faith a suspicion that the consumer has been or is about to become a victim of fraud or related crime" to place an initial fraud alert on their credit files. LifeLock also makes such specific misrepresentations, including, *inter alia*:

> (i)   "[P]roactive identity theft protection." (LifeLock Website at the webpage address: www.lifelock.com, dated Jan. 26, 2008.)
>
> (ii)  "The key that everybody can do is go out and place a fraud alert with the major credit bureaus." (Statement by Todd Davis, CEO of LifeLock, Inc., in article titled "Fraud alerts can protect ID," www.azstarnet.com/business/202488, Sept. 22, 2008.)
>
> (iii) "Any individual with an identity worth protecting can benefit from LifeLock proactive identity theft services." (LifeLock Website at the webpage address: www.lifelock.com/lifelock-for-people/who-we-are/who-uses-lifelock, dated Jan. 26, 2008.)
>
> (iv)  "LifeLock, the industry leader in proactive identity theft protection, offers a proven solution that prevents your identity from being stolen before it happens." (LifeLock Website at the webpage address: www.lifelock.com, dated Jan. 26, 2008.)
>
> (v)   "This is the kind of preventative measures all companies should be taking for their employees and the people they serve." (LifeLock press release dated January 8, 2008, located at www.lifelock.com/about-us/2008-press-release-narfe-premier-federal-credit-union-selects-lifelock-to-provide-protection-to-employees-and-members.)

51.   **LifeLock Misrepresents That Consumers Are Entitled To Automatic Renewals.**  LifeLock misrepresents and creates the overall net impression that consumers are entitled to receive automatic renewals of fraud alerts without an assertion of a good faith suspicion that the consumer has been or is about to become a victim of fraud or related crime.

52.   **LifeLock Misrepresents To Consumers The Scope Or Effectiveness Of Fraud Alerts.**  LifeLock misrepresents and creates the overall net impression that LifeLock can protect against all types of fraud including computer hacking and accessing a bank account using stolen passwords when fraud alerts only are effective against fraud that requires accessing a credit report.  LifeLock also makes such specific misrepresentations, including, *inter alia*:

> (i)   "Here's a report I have on John Sheiper, a young hacker — sent out a virus, put more than 250,000 computers to work stealing passwords to bank accounts from people around the world." (LifeLock radio advertisement.)

> (ii)   "This very second, someone could be using your identity to…clear out your bank accounts …Stop it from happening now. Call LifeLock…" (LifeLock radio advertisement.)

> (iii)   "You'll find out how to lock down your identity making it virtually impossible for identity thieves to wreak havoc on your good name…" (LifeLock radio advertisement.)

53.   **LifeLock Misrepresents That Fraud Alerts Prevent Access To Credit Reports.**  LifeLock misrepresents and creates the overall net impression that LifeLock "locks" the credit file of a consumer, when in fact it only requests the placement of a fraud alert in the credit file, and does not restrict access to the credit file in any way.  Such specific misrepresentations include, *inter alia*:

> (i)   The use of the name "LifeLock;"

> (ii)   "As our name states, we're the lock, and you hold the key;"

1                  (LifeLock Website at the webpage address:

2                  www.lifelock.com/lifelock-for-people/who-we-are/how-we-do-

3                  it/how-is-lifelock-different-from-a-credit-monitoring-system,

4                  dated Jan. 26, 2008.)

5         (iii)    "Our goal was to lock down every individual's private

6                  information so no one except that individual can approve of its

7                  use." (LifeLock Website at the webpage address:

8                  www.lifelock.com/lifelock-for-people/who-we-are/who-is-

9                  lifelock, dated Jan. 26, 2008.)

10        (iv)    "Which would you rather have, a lock on your door keeping the

11                  thieves out, or an alarm telling you after the thief has ripped you

12                  off." (LifeLock Website at the webpage address:

13                  www.lifelock.com/lifelock-for-people/how-we-do-it/how-is-

14                  lifelock-different-from-a-credit-monitoring-system, dated

15                  Jan. 26, 2008.)

16       54.    **LifeLock Creates The Impression That Obtaining Fraud Alerts**

17 **Through Credit Bureaus Is More Difficult.** LifeLock misrepresents and creates

18 the overall net impression that consumers cannot obtain fraud alerts effectively or

19 easily from any other source, and that obtaining fraud alerts without subscribing to

20 LifeLock is a time-consuming, difficult process, when in fact it is easier to obtain a

21 fraud alert directly with the credit bureaus than it is with LifeLock. Such specific

22 misrepresentations include, *inter alia,* "Think of it this way: all of us can change

23 our own oil, but most of us have it done by specialists. We'd like to think that what

24 we do is more complicated than changing oil, but you get the idea." (LifeLock

25 Website at the webpage address: www.lifelock.com/lifelock-for-people, dated

26 Jan. 26, 2008.) In fact, consumers can place fraud alerts with all three national

27 consumer reporting agencies with a simple and free telephone call to Experian.

28

55.   **LifeLock Misrepresents That Fraud Alerts Are Set Within An Hour**.  LifeLock misrepresents, and creates the overall net impression, that it requests that fraud alerts are set within an hour of a customer's order of the LifeLock service.  On information and belief, LifeLock has had insufficient resources to timely request the placement of fraud alerts, resulting in delays before it requests the placement of fraud alerts.  As a result, many thousands of customers have enrolled in LifeLock without LifeLock having timely requested the placement of a fraud alert, leaving individuals who believed they had been or were about to become a victim of identity theft unprotected by a fraud alert.  Not only does LifeLock fail to disclose these delays to its customers, it instructed its customer services representatives not to inform customers calling to complain that their alerts had not been set.

56.   **LifeLock Misrepresents That Only It Can Place Fraud Alerts.**  LifeLock misrepresents, and creates the overall net impression, that only it can place fraud alerts, that fraud alerts must be purchased through LifeLock, and that the fraud alerts placed by LifeLock are different or more effective than fraud alerts that consumers can place themselves directly through the credit bureaus.  LifeLock claims, for example:  "At LifeLock, We Guarantee Your Good Name.  No one else does because no one else can." (LifeLock Website at the webpage address: www.lifelock.com, dated Jan. 26, 2008.)

57.   **LifeLock Misrepresents That It May Place Fraud Alerts Directly With Experian.**  LifeLock misrepresents, and creates the overall net impression, that it may place fraud alerts with Experian, does not disclose to consumers that Experian has attempted to block the placement of fraud alerts by LifeLock, or that LifeLock has placed fraud alerts with Experian by disguising its identity and fraudulently misrepresenting to Experian that it was the consumer.  Such specific misrepresentations include, *inter alia*:

(i)   "[W]e ask the credit bureaus to set fraud alerts on your behalf.

Usually, this is done through our automated systems and the alerts are set within an hour." (LifeLock Website at the webpage address:  www.lifelock.com/lifelock-for-people, dated Jan. 26, 2008.)

(ii) "[W]e will, upon enrollment…request that Equifax, Experian and TransUnion, or other credit bureau [sic] as may become appropriate, place fraud alerts on your consumer to the extent permitted by 15 U.S.C. § 1681c-1." (LifeLock Website at the webpage address: www.lifelock.com/about-us/about-lifelock/terms-and-conditions, dated Jan. 26, 2008.)

58. **LifeLock Misrepresents That Creditors Will Call Consumers To Verify The Identity Of The Consumer.**  LifeLock misrepresents and creates the overall net impression, that consumers will receive a telephone call when the consumers' personal information is used to apply for new credit, even though there is no requirement under the FCRA that initial fraud alerts require creditors to place a telephone call to consumers.  Such representations include, *inter alia*:

(i) "Once fraud alerts have been placed, you will receive a phone call – most people register their cell phone numbers – anytime someone tries to open a credit line in your name." (Statement by Todd Davis, CEO of LifeLock, Inc., in article titled "Fraud alerts can protect ID,"  www.azstarnet.com/business/202488, Sept. 22, 2008.)

(ii) "If its you trying to open the account, then you'll get the call while you're standing there." (Statement by Todd Davis, CEO of LifeLock, Inc., in article titled "Fraud alerts can protect ID," www.azstarnet.com/business/202488, Sept. 22, 2008.)

(iii) "You should receive a phone call from the bank asking if you are actually the person applying for credit in your name." (LifeLock

1              Website at the webpage address:  www.lifelock.com/lifelock-for-

2              people/what-we-do/how-does-lifelock-protect-my-identity, dated

3              Jan. 26, 2008.)

4       (iv)   "If it's not you or if you don't answer, then the credit application

5              is declined at the other end…" (Statement by Todd Davis, CEO

6              of LifeLock, Inc., in article titled "Fraud alerts can protect ID,"

7              www.azstarnet.com/business/202488, Sept. 22, 2008.)

8       (v)   "When someone seeks to open a new account, the creditor will

9              call to confirm that it's really you through a series of identifying

10            questions." (Statement by Todd Davis, CEO of LifeLock, Inc., in

11            article titled "Protecting identity among the tell-all generation,"

12            www.startribune.com/templates/Print_This_Story?sid=1191451,

13            Aug. 14, 2007.)

14     59.   **LifeLock Fails To Adequately Disclose To Consumers The Source**

15 **Of The Credit Report Ordered By LifeLock.**  LifeLock represents to consumers

16 that its service includes a credit report from each of the three credit bureaus every

17 12 months.  LifeLock fails to adequately disclose, however, that the credit report

18 ordered by LifeLock on behalf of the consumer is the free annual credit report to

19 which consumers are entitled; fails to adequately disclose that LifeLock's ordering

20 of the credit report makes the consumer ineligible to order the report for the next 12

21 months; fails to adequately disclose that ordering the free credit report from

22 www.annualcreditreport.com is duplicative of the free credit report consumers are

23 entitled to when placing a fraud alert under 15 U.S.C. § 1681c-1(a)(2)(B).

24     60.   **LifeLock Fails to Adequately Disclose It Has Been Ineffective To**

25 **Prevent The Theft Of Its Chief Executive Officer's Identity**.  LifeLock

26 misrepresents the overall effectiveness of its service and has failed to disclose that

27 its own C.E.O. and spokesperson, Todd Davis, has repeatedly been the victim of

28 identity theft while subscribing to LifeLock's service.  A major component of

1    LifeLock's ubiquitous advertising has been Todd Davis' public disclosure of his

2    social security number—creating the (false) impression that LifeLock has prevented

3    his identity from being appropriated.  Until a spate of media reports revealed that a

4    Texas man successfully obtained a $500.00 cash loan using Mr. Davis' personal

5    information, LifeLock failed to disclose and/or adequately disclose that fact.  Many

6    advertisements still do not disclose that fact.  Additionally, media reports state that

7    more than twenty people have applied for, and in some cases received, driver's

8    licenses in Mr. Davis' name.  Currently, LifeLock misrepresents and creates the

9    overall net impression on its website that Mr. Davis' identity has been stolen only

10   once, when these published reports indicate that he may have been a victim more

11   than twenty times.

12        61.   **LifeLock Misrepresents That It Is A "Proven Solution" To Identity**

13   **Theft And Fails To Disclose To Consumers That Independent Investigations**

14   **Have Shown Its Service To Be Ineffective**.  LifeLock falsely represents and

15   creates the overall net impression that it is the "proven solution" to identity theft.  It

16   fails to disclose that independent news sources have tested the effectiveness of its

17   service first-hand, have found it ineffective, and have rated it "poor" at preventing

18   identity theft.  For example, in a test by a CBS affiliate in Denver, a reporter posing

19   as an identity thief was issued a major credit card using the personal information of

20   a colleague who had a enrolled in LifeLock's service.  Moreover, in a

21   comprehensive review of identity protection services, PCWorld gave LifeLock its

22   lowest possible rating — "poor" — and again, a tester was able to obtain credit

23   without having to verify his identity after becoming a LifeLock customer.

24   (http://www.pcworld.com/zoom?id=145077&page=7&type=table&zoomIdx=1;

25   http://cbs4denver.com/investigates/credit.protection.identity.2.662760.html).

26        62.   On February 11, 2008, Experian sent LifeLock a letter via express mail

27   informing LifeLock that Experian only was required to honor requests for fraud

28   alerts made by "consumers" or "individuals," not corporate entities such as

LifeLock; informing LifeLock that its practice of automatically renewing such fraud alerts violated the FCRA's statutory scheme; and demanding that LifeLock cease and desist placing fraud alerts on behalf of consumers with any of the three credit bureaus and renewing such fraud alerts. Experian further informed LifeLock that if it continued in the activities described above, Experian would seek all available remedies against LifeLock. Undeterred, LifeLock continues to engage in its illegal and fraudulent activities.

## FIRST CAUSE OF ACTION

### (Concealment/Suppression of Fact against LifeLock and DOES 1 through 10)

63. Plaintiff repeats, re-alleges and incorporates herein by reference the allegations of paragraphs 1 through 62, inclusive, above.

64. From on or about, June 2005, LifeLock and DOES 1-10 have surreptitiously submitted requests for initial fraud alerts to Experian and other consumer reporting agencies.

65. In submitting requests for initial fraud alerts to Experian, and other consumer reporting agencies, LifeLock and DOES 1-10 actively have concealed and suppressed, and continue to conceal and suppress:

(i) their corporate status and identity as the party submitting the requests;

(ii) that the party submitting the request for the initial fraud alert was neither the consumer nor an individual acting on behalf of or as a personal representative of a consumer;

(iii) that they did not, at the time they surreptitiously requested the placement of initial fraud alerts, have a good faith a suspicion that the consumer on whose behalf they requested the alert "had been or was about to become a victim of fraud or related crime, including identity theft;"

       (iv)    that the consumers on whose behalf they had surreptitiously requested the placement of initial fraud alerts were not, at the time of the request, "assert[ing] in good faith a suspicion that the consumer has been or is about to become a victim of fraud or related crime, including identity theft;"

       (v)    that they were placing fraud alerts on behalf of consumers based on assertions regarding the consumers' belief about identity theft which did not constitute a "good faith…suspicion that the consumer has been or is about to become a victim of fraud or related crime," including a desire to proactively prevent identity theft, a generalized concern about identity theft, because an individual they knew had been a victim of identity theft, on the basis of media reports about identity theft, or a desire not to receive junk mail;

       (vi)    that the additional requests for initial fraud alerts they surreptitiously submitted were not based on a concurrent, affirmative assertion by the consumer that he or she had been or was about to become a victim of fraud, and that such requests are instead based on the consumer not retracting an assertion made in connection with a prior request for an initial fraud alert;

       (vii)    that their intent was to sequentially place initial fraud alert requests to create an indefinite or perpetual fraud alert.

66.    LifeLock and DOES 1-10 concealed and suppressed, and continue to conceal and suppress, these facts by, *inter alia*:

       (i)    not providing proof of its identity as the requesting party in connection with the requests for initial fraud alerts it placed;

       (ii)    using a phone number other than those registered to LifeLock to place calls to Experian's toll-free number;

     (iii)   employing third parties and foreign phone banks to place requests for initial fraud alerts;

     (iv)   changing phones and/or numbers used to place requests for initial fraud alerts after prior phones and phone numbers had been detected and attempted to be blocked by Experian;

     (v)   by responding affirmatively, inputting information in response to, and continuing to use the automated system, after automated prompts that ask:  (i) "if you believe your credit information is being used fraudulently, press 3"; (ii) "to add an alert to your credit report through our automated system, press 2"; (iii) "if you suspect you are a victim of fraud and want to add a temporary initial fraud security alert to your account, press 1"; and (iv) the caller to enter personal information, such as "enter your social security number," "enter your 5 digit ZIP code now," and "enter the numeric portion of your address now;"

     (vi)   completing the request for placement of initial fraud alerts over the phone, rather than submitting documents establishing that the requesting party was a bona fide personal representative of the consumer as prompted by the automated system;

     (vii)   submitting requests for initial fraud alerts to other credit reporting agencies, thereby requiring the other agencies to refer the alerts to Experian and laundering the identity of the party making the initial request.

67.   LifeLock and DOES 1-10 made the non-disclosures, concealments and suppressions of fact alleged herein with the intent to induce Experian (and the other consumer reporting agencies) to act in reliance thereon, including placing fraud alerts in the files of the customers of LifeLock and DOES 1-10, providing free credit reports to customers of LifeLock and DOES 1-10, and to refer the requests to

the other consumer reporting agencies, and with the intention of depriving Experian of property or otherwise causing injury.

68.   At the time that LifeLock and DOES 1-10 made the failures to disclose and suppression of fact herein alleged, Experian was unaware of these facts, and would not have acted as it did if it had known the undisclosed, concealed or suppressed facts.

69.   As a proximate result of LifeLock's and DOES 1-10 failure to disclose, concealment and suppression of fact, Experian has incurred, and continues to incur, costs and has suffered, and continues to suffer, damages.

70.   In doing the things aforementioned, LifeLock and DOES 1-10 have been guilty of malice, oppression, and fraud, and Experian is, therefore, entitled to recover punitive damages.

71.   By reason of acts by LifeLock and DOES 1-10 alleged herein, Experian has suffered, and will continue to suffer, irreparable harm, for which Experian has no adequate remedy at law, unless and until the conduct by LifeLock and DOES 1-10 is enjoined.

## SECOND CAUSE OF ACTION

### (Intentional Misrepresentation against LifeLock and DOES 1 through 10)

72.   Plaintiff repeats, re-alleges and incorporates herein by reference the allegations of paragraphs 1 through 62, and 64 through 71, inclusive, above.

73.   From on or about, June 2005, during the course of requesting the placement of thousands of initial fraud alerts on consumers' files through the toll-free number maintained by Experian, LifeLock and DOES 1-10 misrepresented: (i) the identity of the parties requesting the placement of fraud alerts; (ii) that they were individuals seeking placement of a fraud alert in their own files; (iii) that they were individuals with a good faith belief that they had been the victim of fraud; and (iv) that they had a good faith suspicion that the consumer had been or was about to

1   become a victim of fraud or related crime, including identity theft.  Experian did

2   not discover LifeLock's wrongful conduct until 2007.

3       74.   LifeLock and DOES 1-10 made these misrepresentations by way of

4   responding affirmatively to, or entering information in response to, the prompts by

5   Experian's automated telephone system for the placement of fraud alerts by

6   individuals.  Although the precise wording of the prompts has varied over time, the

7   substance has not.  These prompts require, among other things, the caller to respond

8   affirmatively to statements such as:  (i) "if you believe your credit information is

9   being used fraudulently, press 3"; (ii) "to add an alert to your credit report through

10  our automated system, press 2"; and (iii) "if you suspect you are a victim of fraud

11  and want to add a temporary initial fraud security alert to your account, press 1."

12  The prompts also ask the caller to enter personal information, such as "enter your

13  social security number," "enter your 5 digit ZIP code now," and "enter the numeric

14  portion of your address now."

15      75.   The representations of LifeLock and DOES 1-10 in response to these

16  prompts were false.  In fact, LifeLock and DOES 1-10:  (i) did not believe that their

17  credit information was being used fraudulently or that they were a victim of fraud;

18  (ii) were not seeking to add an alert to their credit reports; (iii) were not seeking a

19  temporary alert, but were seeking to craft an indefinite or perpetual alert; and

20  (iv) entered social security numbers, ZIP codes or addresses, which were not

21  their own.

22      76.   Further, LifeLock and DOES 1-10 did not have a good faith suspicion

23  that the consumer on whose behalf they were surreptitiously requesting a fraud alert

24  had been or was about to become a victim of fraud or related crime, including

25  identity theft.  LifeLock and DOES 1-10 knew that, in many cases, the consumers

26  on whose behalf they were surreptitiously requesting the placement of initial fraud

27  alerts, were instead acting on desires to proactively prevent identity theft,

28  generalized concerns about identity theft, the suspected victimization of a person

1   other than the consumer, on the basis of media reports about identity theft, or even

2   the desire not to receive junk mail.

3        77.   Further, many of the customers of LifeLock and DOES 1-10 were not

4   affirmatively asserting that, at the time that LifeLock and DOES 1-10 made the

5   request for the placement of a fraud alert, they had been or were about to become a

6   victim of fraud.  Instead, the customers simply had failed to retract assertions made

7   months or years previously in connection with a prior request for an initial

8   fraud alert.

9        78.   Upon information and belief, LifeLock and DOES 1-10 have made

10  similar misrepresentations in the course of placing alerts through the automated

11  systems maintained by other consumer reporting agencies, including Equifax and

12  TransUnion.

13       79.   At the time they made these misrepresentations, LifeLock and DOES 1-

14  10 knew that these representations were false.

15       80.   LifeLock and DOES 1-10 made, and continue to make, the

16  representations herein alleged with the intention of inducing Experian, TransUnion

17  and Equifax to place fraud alerts in the credit files of the customers of LifeLock and

18  DOES 1-10, send notice to consumers that they are entitled to a free credit report,

19  send a free credit report to customers who request one and "refer the information

20  regarding the fraud alert to each of the credit reporting agencies," and, once

21  referred, treat the referral "as though the agency received the request from the

22  consumer directly."

23       81.   Experian was unaware of the falsity of the misrepresentations made by

24  LifeLock and DOES 1-10, and acted in justifiable reliance upon those

25  misrepresentations, in that Experian, *inter alia,* placed initial fraud alerts in the files

26  of customers of LifeLock and DOES 1-10, sent notice to consumers that they are

27  entitled to a free credit report, and generated and mailed free credit reports to those

28  customers who requested such reports.

82.     Experian was unaware of the falsity of the misrepresentations made by LifeLock and DOES 1-10 to Equifax and TransUnion, and acted in justifiable reliance upon those representations, in that Experian was required to place fraud alerts on consumers' files which were referred to Experian from TransUnion and Equifax.

83.     LifeLock and DOES 1-10 made the intentional misrepresentations herein alleged with the intention of depriving Experian of property or otherwise causing injury.

84.     As a proximate result of the intentional misrepresentations of LifeLock and DOES 1-10, Experian has incurred, and continues to incur, costs and has suffered, and continues to suffer, damages.

85.     In doing the things aforementioned, LifeLock and DOES 1-10 were guilty of malice, oppression, and fraud, and Experian is, therefore, entitled to recover punitive damages.

86.     By reason of acts by LifeLock and DOES 1-10 alleged herein, Experian has suffered, and will continue to suffer, irreparable harm, for which Experian has no adequate remedy at law, unless and until the conduct by LifeLock and DOES 1-10 is enjoined.

### THIRD CAUSE OF ACTION

**(Negligent Misrepresentation against LifeLock and**

**DOES 1 through 10)**

87.     Experian repeats, realleges, and incorporates by reference the allegations contained in Paragraph 1 through 62, 64 through 71, and 73 through 86, inclusive.

88.     At the time LifeLock and DOES 1-10 made the representations herein alleged, LifeLock and DOES 1-10 did not have reasonable ground for believing that those representations were true.

89.   LifeLock and DOES 1-10 made, and continue to make, the misrepresentations herein alleged with the intention of inducing Experian, TransUnion and Equifax to place fraud alerts in the credit files of the customers of LifeLock and DOES 1-10, send those costumers a free credit report and "refer the information regarding the fraud alert to each of the credit reporting agencies," and, once referred, treat the referral "as though the agency received the request from the consumer directly."

90.   Experian was unaware of the falsity of the representations made by LifeLock and DOES 1-10, and acted in justifiable reliance upon the truth of those representations, in that Experian, *inter alia,* placed initial fraud alerts in the files of customers of LifeLock and DOES 1-10, sent notice to consumers that they are entitled to a free credit report, and generated and mailed free credit reports to those customers who requested such reports.

91.   Experian was unaware of the falsity of the representations made by LifeLock and DOES 1-10 to Equifax and TransUnion, and acted in justifiable reliance upon those representations, in that Experian was required to place fraud alerts on consumers' files which were referred to Experian from TransUnion and Equifax.

92.   As a result of Experian's reliance upon the truth of the representations of LifeLock and DOES 1-10, and as a direct, proximate and foreseeable result of the above-described conduct, Experian sustained compensatory, incidental and consequential damages in an amount to be proven at trial.

93.   By reason of the acts by LifeLock and DOES 1-10 alleged herein, Experian has suffered, and will continue to suffer, irreparable harm, for which Experian has no adequate remedy at law, unless and until the conduct by LifeLock and DOES 1-10 is enjoined.

1

## **FOURTH CAUSE OF ACTION**

2

### **(Lanham Act against LifeLock and**

3

### **DOES 1 through 10)**

4      94.    Experian repeats, realleges, and incorporates by reference the

5    allegations contained in Paragraph 1 through 62, 64 through 71, 73 through 86, and

6    88 through 93, inclusive.

7      95.    Since in or about June 2005, the website, television commercials and

8    radio advertisements of LifeLock and DOES 1-10 are commercial

9    advertisements/promotional materials that have been placed into interstate

10   commerce by LifeLock and DOES 1-10 in connection with the sale and/or

11   marketing of its fraud alert placement service.

12     96.    Many of the material descriptions and/or representations of fact

13   contained in its advertisements are false and/or misleading, and therefore

14   misrepresent the nature or qualities of goods/commercial activities of LifeLock and

15   DOES 1-10.  Such representations are false and/or misleading in that they:

16            (i)     misrepresent, and create the overall net impression, that

17                    LifeLock can place fraud alerts on behalf of consumers, when

18                    the FCRA does not require credit reporting agencies to honor

19                    requests made by corporations;

20            (ii)    misrepresent, and create the overall net impression, that

21                    everyone is entitled to receive a fraud alert, when the FCRA only

22                    allows individuals who "assert[] in good faith a suspicion that

23                    the consumer has been or is about to become a victim of fraud or

24                    related crime" to place an initial fraud alert on their credit files;

25            (iii)   misrepresent, and create the overall net impression, that

26                    consumers are entitled to receive automatic renewals of fraud

27                    alerts without an assertion of a good faith suspicion that the

28

consumer has been or is about to become a victim of fraud or related crime;

(iv)    misrepresent, and create the overall net impression, that consumers are entitled to receive automatic renewals of fraud alerts without disclosing that the FCRA requires consumers to provide an identity theft report in order to receive extended alerts;

(v)    misrepresent, and create the overall net impression, that LifeLock can protect against all types of fraud including computer hacking, and accessing a bank account using stolen passwords when fraud alerts are only effective against fraud that requires accessing a credit report;

(vi)    misrepresent, and create the overall net impression, that LifeLock "locks" a credit file of a consumer, when, in fact, it only requests the placement of a fraud alert in the credit file, and does not restrict access to the credit file in any way;

(vii)    misrepresent, and create the overall net impression, that its service is the proven solution to identity theft and fails to disclose that that its own C.E.O. and spokesperson, Todd Davis, has repeatedly been the victim of identity theft while subscribing to LifeLock's service.  Moreover, LifeLock fails to disclose that independent news sources, that have tested the effectiveness of its service first-hand, have found it ineffective and have rated it "poor" at preventing identity theft;

(viii)    misrepresent, and create the overall net impression, that fraud alerts must be purchased through LifeLock, and that the fraud alerts placed by LifeLock are different or more effective than

fraud alerts that consumers can place themselves directly through the credit bureaus;

(ix)   misrepresent, and create the overall net impression, that consumers cannot obtain fraud alerts effectively or easily from any other source, and that obtaining fraud alerts without subscribing to LifeLock is a time-consuming, difficult process, when in fact it is easier to obtain a fraud alert directly with the credit bureaus than it is with LifeLock;

(x)   misrepresent, and create the overall net impression, that LifeLock is allowed to place fraud alerts directly with Experian, when in fact Experian has attempted to block requests for the placement of fraud alerts by LifeLock, and LifeLock disguises its identity and fraudulently misrepresents to Experian that LifeLock is the consumer;

(xi)   misrepresent, and create the overall net impression, that consumers will receive a telephone call when the consumers' personal information is used to apply for new credit, when there is no requirement under the FCRA that initial fraud alerts require creditors to place a telephone call to consumers; and

(xii)   misrepresent, and create the overall net impression, that LifeLock requests that fraud alerts will be set within an hour of a customer's order of the LifeLock service. On information and belief, LifeLock has had insufficient resources to timely request the placement of fraud alerts, resulting in delays before it requests the placement of fraud alerts.

97.   The above-described acts of LifeLock and DOES 1-10 constitute false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

98.   The above-described acts of LifeLock and DOES 1-10 actually deceived or have the tendency to deceive a substantial segment of consumers who see or hear such representations.

99.   The above-described acts of LifeLock and DOES 1-10 are material, in that they are likely to influence a consumer's purchasing decision.

100.  LifeLock markets itself as an industry leader in identity theft protection and prevention.  Experian is a competitor of LifeLock in that Experian and LifeLock compete for the same dollars from the same customers seeking to reduce the risk that they will become the victim of identity theft.

101.  LifeLock and Experian offer competing services.  LifeLock charges its customers a monthly and/or annual fee to request the placement of fraud alerts, to maintain those fraud alerts, and to provide its customers access to credit reports. Experian offers the placement of credit freezes on the credit files of consumers for a fee.  Additionally, for a fee, Experian provides consumers with a copy of their credit report.

102.  A credit or security freeze, also known as a "credit report freeze", a "credit report lock down", a "credit lock down", "security lock", or "credit lock", prevents a credit reporting company from releasing an individual's credit report to potential extenders of credit.  Because a credit freeze effectively stops any access to the credit report for the extension of new credit, it places a lock on access to an individual's credit file and a block in the process of issuing credit based on the contents of a credit report.  Individuals who freeze their credit reports must typically unfreeze their credit reports before they apply for credit themselves.

103.  Experian's credit freezes are purchased by consumers who wish to protect their credit information and are concerned about the risk and dangers of identity theft — the very same group of consumers LifeLock exploits through its ubiquitous advertising campaign.  Likewise, consumers concerned with detecting,

1   preventing and protecting themselves from identity theft also purchase their credit

2   reports from Experian to search for unauthorized activity.

3       104.  Furthermore, because LifeLock continually renews its customers' fraud

4   alerts every 90 days, LifeLock transmutes temporary fraud alerts into quasi-credit

5   freezes that persist until the customer cancels his or her subscription.  In fact, the

6   name "LifeLock" suggests the term "credit lock" — a popular term for a credit

7   freeze.  Upon information and belief, some consumers who desire to purchase

8   Experian's credit freeze service become LifeLock subscribers in the belief that

9   LifeLock's service is equivalent of or an alternative to, Experian's credit freeze

10  service.  Customers subscribing to LifeLock's service are induced to believe that

11  they do not need any other identity theft protection service.

12      105.  Upon information and belief, LifeLock instructs its customers and

13  potential customers who have credit freezes on their credit files to remove those

14  credit freezes.

15      106.  Experian and LifeLock also compete in that Experian offers to and does

16  provide consumers with a copy of their credit report for a fee, while LifeLock

17  markets its paid service as including the provision of access to a credit report.

18  Because LifeLock provides its customers access to their credit report, LifeLock

19  customers are unlikely to purchase a copy of their credit report from Experian and

20  Experian is thereby deprived of the revenue associated with the provision of paid

21  credit reports to those consumers.

22      107.  As a result of the acts of LifeLock and DOES 1-10, Experian, as a

23  competitor of LifeLock and DOES 1-10, has suffered, and will continue to suffer,

24  damage to its business reputation and goodwill and the loss of sales and profits.

25  Such damages include, but are not limited to:

26          (i)    Damage to Experian's reputation regarding its process for

27                 allowing consumers to place fraud alerts in consumers' Experian

28                 credit file;

1          (ii)    Losses from reduced orders for credit reports by consumers to

2                 whom Experian is required to provide a free credit report upon

3                 receipt of a request for a fraud alert;

4          (iii)   Losses from reduced orders by consumers for credit freezes

5                 placed by Experian on consumers' credit files; and

6          (iv)   Additional expenditures and costs due to LikeLock's improper

7                 placement of fraud alerts on behalf of its customers.

8    108.   Additionally, Experian has incurred, and will continue to incur,

9 liability for costs and attorney's fees.

10    109.   Upon information and belief, the above-described acts by LifeLock

11 and DOES 1-10 were willful and have been engaged in knowing them to be

12 deceptive such as to warrant the trebling of damages in order to provide just

13 compensation.

14    110.   Upon information and belief, LifeLock and DOES 1-10 have unfairly

15 profited from the actions alleged herein, and will continue to be unjustly enriched

16 unless and until such conduct is enjoined.

17    111.   By reason of acts by LifeLock and DOES 1-10 alleged herein,

18 Experian has suffered, and will continue to suffer, irreparable harm, for which

19 Experian has no adequate remedy at law, unless and until the conduct by LifeLock

20 and DOES 1-10 is enjoined.

21

22

23

24

25

26

27

28

1

2 **FIFTH CAUSE OF ACTION**

3 **(California Business and Professions Code § 17500 against LifeLock and**

4 **DOES 1 through 10)**

5      112.   Experian repeats, realleges, and incorporates by reference, the

6 allegations contained in Paragraph 1 through 62, 64 through 71, 73 through 86, 88

7 through 93, and 95 through 111 inclusive.

8      113.   From on or about, June 2005, LifeLock and DOES 1-10 have engaged

9 in website, television, radio, and print advertising to the public offering identity

10 theft protection.  Such advertisements are false and/or misleading representations in

11 that they:

12         (i)    misrepresent, and create the overall net impression, that

13               LifeLock can place fraud alerts on behalf of consumers, when

14               the FCRA does not require credit reporting agencies to honor

15               requests made by corporations;

16         (ii)   misrepresent, and create the overall net impression that everyone

17               is entitled to receive a fraud alert, when the FCRA only allows

18               individuals who "assert[] in good faith a suspicion that the

19               consumer has been or is about to become a victim of fraud or

20               related crime" to place an initial fraud alert on their credit files;

21         (iii)  misrepresent, and create the overall net impression, that

22               consumers are entitled to receive automatic renewals of fraud

23               alerts without an assertion of a good faith suspicion that the

24               consumer has been or is about to become a victim of fraud or

25               related crime;

26         (iv)  misrepresent, and create the overall net impression, that

27               consumers are entitled to receive automatic renewals of fraud

28               alerts without disclosing that the FCRA requires consumers to

1                provide an identity theft report in order to receive

2                extended alerts;

3      (v)    misrepresent, and create the overall net impression, that

4                LifeLock can protect against all types of fraud including

5                computer hacking, and accessing a bank account using stolen

6                passwords when fraud alerts are only effective against fraud that

7                requires accessing a credit report;

8     (vi)    misrepresent, and create the overall net impression, that

9                LifeLock "locks" a credit file of a consumer, when, in fact, it

10              only requests the placement of a fraud alert in the credit file, and

11              does not restrict access to the credit file in any way;

12    (vii)  misrepresent, and create the overall net impression, that its

13             service is the proven solution to identity theft and fails to

14             disclose that that its own C.E.O. and spokesperson, Todd Davis,

15             has repeatedly been the victim of identity theft while subscribing

16             to LifeLock's service.  Moreover, LifeLock fails to disclose that

17             independent news sources, that have tested the effectiveness of

18             its service first-hand, have found it ineffective and have rated it

19             "poor" at preventing identity theft;

20   (viii) misrepresent, and create the overall net impression that fraud

21             alerts must be purchased through LifeLock, and that the fraud

22             alerts placed by LifeLock are different or more effective than

23             fraud alerts that consumers can place themselves directly through

24             the credit bureaus;

25     (ix)    misrepresent, and create the overall net impression, that

26             consumers cannot obtain fraud alerts effectively or easily from

27             any other source, and that obtaining fraud alerts without

28             subscribing to LifeLock is a time-consuming, difficult process,

1   when in fact it is easier to obtain a fraud alert directly with the
2   credit bureaus than it is with LifeLock;

3   (x)   misrepresent, and create the overall net impression, that
4         LifeLock is allowed to place fraud alerts directly with Experian,
5         when in fact Experian has attempted to block the placement of
6         fraud alerts by LifeLock, and LifeLock disguises its identity and
7         fraudulently misrepresents to Experian that LifeLock is
8         the consumer;

9   (xi)  misrepresent, and create the overall net impression, that
10        consumers will receive a telephone call when the consumers'
11        personal information is used to apply for new credit, when there
12        is no requirement under the FCRA that initial fraud alerts require
13        creditors to place a telephone call to consumers.

14  (xii) misrepresent, and create the overall net impression, that
15        LifeLock requests that fraud alerts will be set within an hour of a
16        customer's order of the LifeLock service.  On information and
17        belief, LifeLock has had insufficient resources to timely request
18        the placement of fraud alerts, resulting in delays before it
19        requests the placement of fraud alerts.

20      114.   LifeLock and DOES 1-10 engaged in the advertising herein alleged
21  with the intent to induce members of the public to believe that they had the
22  authority to place fraud alert requests on their behalf and/or to induce Experian and
23  members of the public to believe that it had the authority to place fraud alert
24  requests on behalf of its subscribers.

25      115.   Experian has suffered injury in fact and has lost money and property
26  as a result of the false advertising by LifeLock and DOES 1-10.

27      116.   In making or disseminating the statements herein alleged, LifeLock
28  and DOES 1-10 knew or with the exercise of reasonable care should have known

1   that the statements were untrue/false and/or misleading and so acted in violation of

2   Sections 17500 *et seq.* of the Business and Professions Code.

3       117.   In making or disseminating the statements herein alleged, LifeLock

4   and DOES 1-10 did not intend to sell the products as advertised.

5       118.   Unless restrained by this Court, LifeLock and DOES 1-10 will

6   continue to engage in untrue/false and misleading advertising, as alleged above, in

7   violation of Section 17500 *et seq.* of the Business and Professions Code, thus

8   tending to render judgment in the instant action ineffectual.  Experian has no

9   adequate remedy at law in that LifeLock and DOES 1-10 will continue to engage in

10  untrue and misleading advertising, as alleged above, in violation of Section 17500

11  *et seq.* of the Business and Professions Code, thus engendering a multiplicity of

12  judicial proceedings.

## SIXTH CAUSE OF ACTION

**(Unlawful and Fraudulent Business Practices in Violation of California**

**Business and Professions Code § 17200 against LifeLock and**

**DOES 1 through 10)**

17      119.   Experian repeats, realleges, and incorporates by reference, the

18  allegations contained in Paragraph 1 through 62, 64 through 71, 73 through 86, 88

19  through 93, 95 through 111, and 113 through 118, inclusive.

20      120.   From on or about, June 2005, LifeLock and DOES 1-10 engaged in

21  acts and practices herein alleged while doing business, in that such acts and

22  practices were done in the course of selling its LifeLock product to consumers in

23  California, and throughout the United States.

24      121.   LifeLock and DOES 1-10 have violated California Business and

25  Professions Code § 17200 *et seq.* by engaging in unlawful and fraudulent conduct

26  including, but not limited, to:

27          (i)    misrepresenting, and creating the overall net impression, that

28                 LifeLock can place fraud alerts on behalf of consumers, when

the FCRA does not require credit reporting agencies to honor requests made by corporations;

(ii) misrepresenting, and creating the overall net impression that everyone is entitled to receive a fraud alert, when the FCRA only allows individuals who "assert[] in good faith a suspicion that the consumer has been or is about to become a victim of fraud or related crime" to place an initial fraud alert on their credit files;

(iii) misrepresenting, and creating the overall net impression, that consumers are entitled to receive automatic renewals of fraud alerts without an assertion of a good faith suspicion that the consumer has been or is about to become a victim of fraud or related crime;

(iv) misrepresenting, and creating the overall net impression, that consumers are entitled to receive automatic renewals of fraud alerts without disclosing that the FCRA requires consumers to provide an identity theft report in order to receive extended alerts;

(v) misrepresenting, and creating the overall net impression, that LifeLock can protect against all types of fraud including computer hacking, and accessing a bank account using stolen passwords when fraud alerts are only effective against fraud that requires accessing a credit report;

(vi) misrepresenting, and creating the overall net impression, that LifeLock "locks" a credit file of a consumer, when, in fact, it only requests the placement of a fraud alert in the credit file, and does not restrict access to the credit file in any way;

(vii) misrepresenting, and creating the overall net impression, that its service is the proven solution to identity theft and failing to

1        disclose that that its own C.E.O. and spokesperson, Todd Davis,

2        has repeatedly been the victim of identity theft while subscribing

3        to LifeLock's service.  Moreover, LifeLock fails to disclose that

4        independent news sources, that have tested the effectiveness of

5        its service first-hand, have found it ineffective and have rated it

6        "poor" at preventing identity theft;

7    (viii)  misrepresenting, and creating the overall net impression that

8        fraud alerts must be purchased through LifeLock, and that the

9        fraud alerts placed by LifeLock are different or more effective

10       than fraud alerts that consumers can place themselves directly

11       through the credit bureaus;

12   (ix)  misrepresenting, and creating the overall net impression, that

13       consumers cannot obtain fraud alerts effectively or easily from

14       any other source, and that obtaining fraud alerts without

15       subscribing to LifeLock is a time-consuming, difficult process,

16       when in fact it is easier to obtain a fraud alert directly with the

17       credit bureaus than it is with LifeLock;

18   (x)  misrepresenting, and creating the overall net impression, that

19       LifeLock is allowed to place fraud alerts directly with Experian,

20       when in fact Experian has attempted to block the placement of

21       fraud alerts by LifeLock, and LifeLock disguises its identity and

22       fraudulently misrepresents to Experian that LifeLock is

23       the consumer; and

24   (xi)  misrepresenting, and creating the overall net impression, that

25       consumers will receive a telephone call when the consumers'

26       personal information is used to apply for new credit, when there

27       is no requirement under the FCRA that initial fraud alerts require

28       creditors to place a telephone call to consumers.

(xii)  misrepresenting, and creating the overall net impression, that LifeLock requests that fraud alerts will be set within an hour of a customer's order of the LifeLock service.  On information and belief, LifeLock has had insufficient resources to timely request the placement of fraud alerts, resulting in delays before it requests the placement of fraud alerts

122.   In doing so, LifeLock and DOES 1-10 have:

(i)  violated California Civil Code § 1770(a)(5) by representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have;

(ii)  violated California Civil Code § 1770(a)(7) by representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(iii)  violated California Civil Code § 1770(a)(8) by disparaging the goods, services, or business of another by false or misleading representations of fact;

(iv)  violated California Civil Code § 1770(a)(9) by advertising goods or services with intent not to sell them as advertised;

(v)  violated California Civil Code § 1770(a)(14) by representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;

(vi)  violated 18 U.S.C. § 1343 by transmission of the misrepresentations identified in Paragraphs 38 through 42 by means of telephone or other interstate wire in furtherance of a scheme to defraud Experian and the other credit reporting agencies;

1            (vii)   violated California's False Advertising Law, California Business

2                   and Professions Code § 17500;

3           (viii)  violated the Lanham Act, 15 U.S.C. § 1125(a).

4        123.   LifeLock and DOES 1-10 have violated California Business and

5 Professions Code § 17200 *et seq.* by engaging in unlawful, unfair and fraudulent

6 conduct including, but not limited to, making the misrepresentations to Experian

7 and other consumer reporting agencies identified in paragraphs 38 through 42

8 above.

9        124.   In doing so, LifeLock and DOES 1-10 have:

10           (i)     violated California Civil Code § 1770(a)(2) by misrepresenting

11                   the source, sponsorship, approval or certification of goods

12                   or services;

13           (ii)    violated California Civil Code § 1770(a)(3) by misrepresenting

14                   the affiliation, connection, or association with, or certification

15                   by, another;

16           (iii)   violated of 18 U.S.C. § 1343 by transmission of the

17                   misrepresentations identified in Paragraphs 48 through 58 by

18                   means of telephone or other interstate wire in furtherance of a

19                   scheme to defraud Experian and the other credit reporting

20                   agencies;

21           (iv)   violated the Lanham Act, 15 U.S.C. § 1125(a).

22        125.   The acts and practices alleged herein constitute unlawful, unfair and/or

23 deceptive business practices as set forth in Business and Professions Code § 17200

24 *et seq.*

25        126.   LifeLock and DOES 1-10 continue to engage in such unlawful, unfair

26 and/or deceptive business practices as identified herein to the present day, including

27 in its dealings with Experian, and there is a substantial risk that the wrongful acts

28 will continue in the future, thus warranting (and necessitating) injunctive relief.

127.   Experian has suffered injury in fact and has lost money and property as a result of the unfair competition by LifeLock and DOES 1-10.

128.   Experian is entitled to restitution and injunctive relief preliminary and permanently restraining LifeLock from continuing the unlawful and unfair business practices described herein.

## SEVENTH CAUSE OF ACTION

**(Unfair Business Practices in Violation of California Business and Professions Code § 17200 against LifeLock and DOES 1 through 10)**

129.   Experian repeats, realleges, and incorporates by reference, the allegations contained in Paragraph 1 through 62, inclusive.

130.   From on or about, June 2005, LifeLock and DOES 1-10 engaged in acts and practices herein alleged while doing business, in that such acts and practices were done in the course of selling its LifeLock product to consumers in California, and throughout the United States.

131.   The public policy inherent in 15 U.S.C. § 1681c-1 is, *inter alia*, that: (a) only specific individuals, not companies such as LifeLock, may request the placement of initial fraud alerts pursuant to 15 U.S.C. § 1681c-1; (b) initial fraud alerts may only be requested by, or on behalf, of individuals with a good faith suspicion that that individual has been or is about to become the victim of fraud or related crime, including identity theft; (c) the individual on whose behalf the initial fraud alert is requested hold, and affirmatively assert, the good faith suspicion that he or she is about to become a victim of fraud or related crime, including identity theft, contemporaneously each time that an initial fraud alert is requested by, or on behalf, of that individual; and (d) initial fraud alerts be temporary, not renewed in perpetuity.  Section 1681c-1 also represents a public policy against identity theft.

132.  LifeLock and DOES 1-10 have violated California Business and Professions Code § 17200 *et seq.* by engaging in unfair conduct including, but not limited, to:

(i)     requesting, from Experian, and other major credit reporting agencies, that fraud alerts be placed in the consumer files of its customers;

(ii)    requesting, from Experian, and other of the major credit reporting agencies, that fraud alerts be placed in the consumer files of its customers, when those customers lack a good faith suspicion that they have been or are about to become a victim of fraud or related crime, including identity theft and have not expressly asserted or held such a belief at the time LifeLock requested alerts on their behalf;

(iii)   requesting the serial renewal of fraud alerts on behalf of its customers; and

(iv)    committing identity theft in its placement of fraud alerts.  15 U.S.C. § 1681a(q)(3) defines identity theft as a fraud committed using the identifying information of another person.  By requesting the placement of a fraud alert under the pretense that it is the individual on whose behalf the fraud alert is being requested, LifeLock defrauds Experian using the personal information of another and commits identity theft.

133.  The acts and practices alleged herein constitute unfair business practices as set forth in Business and Professions Code § 17200 *et seq.*

134.    LifeLock and DOES 1-10 continue to engage in such unfair business practices as identified herein to the present day, including in its dealings with Experian, and there is a substantial risk that the wrongful acts will continue in the future, thus warranting (and necessitating) injunctive relief.

135.   Experian has suffered injury in fact and has lost money and property as a result of the unfair competition by LifeLock and DOES 1-10.

136.   Experian is entitled to restitution and injunctive relief preliminary and permanently restraining LifeLock from continuing the unlawful and unfair business practices described herein.

## EIGHTH CAUSE OF ACTION

### (Unjust Enrichment/Restitution against LifeLock and
### DOES 1 through 10)

137.   Experian repeats, realleges, and incorporates by reference, the allegations contained in Paragraph 1 through 61, 63 through 70, 72 through 85, 87 through 92, 94 through 110, and 112 through 117, 119 through, 128, 130 through 136, inclusive.

138.   LifeLock and DOES 1-10 have been unjustly enriched at Experian's expense by gaming the FCRA, defrauding Experian and consumers, and laundering fraud alerts through the other credit reporting agencies to Experian's harm and detriment and to LifeLock's benefit.

139.   LifeLock and DOES 1-10 neither are "consumers" nor "individual[s] acting on behalf of or as a personal representative of a consumer," and are not authorized and/or permitted by the FCRA to submit fraud alert requests to Experian directly or to cause fraud alerts to be referred to Experian by submitting requests for fraud alerts to other consumer reporting agencies.  LifeLock and DOES 1-10 have done so, and continue to do so, without statutory authorization or permission, while concealing, misrepresenting and laundering both their identities as the party requesting the placement of the fraud alert and their corporate status from Experian and other consumer reporting agencies.

140.   LifeLock and DOES 1-10 have submitted, and continue to submit, requests for initial fraud alerts without possessing a good faith suspicion that the consumer has been or is about to become a victim of fraud or related crime,

including identity theft.  In fact, LifeLock and DOES 1-10 have mislead their customers into believing that they are eligible for fraud alerts on the basis of a desire to proactively prevent identity theft, if a friend or family member has been a victim of identity theft, or on the basis of media reports about identity theft.

141.   LifeLock and DOES 1-10 sequentially submit requests that additional "initial" fraud alerts be placed in a consumer's file in order to indefinitely extend the lifespan of the fraud alert.  The FCRA does not authorize and/or permit LifeLock and DOES 1-10 to request the repeated, sequential placement of initial alerts based on the same set of circumstances.  The FCRA requires that extended alerts be requested on the basis of an identity theft report, rather than the suspicion that the consumer has been or is about to become a victim of fraud or related crime, including identity theft.  The FCRA does not authorize perpetual or indefinite fraud alerts.

142.   LifeLock and DOES 1-10 do not obtain their customers' affirmative assertions that, concurrent with the request for additional initial fraud alerts, the consumer has a good faith suspicion that the consumer has been or is about to become a victim of fraud or related crime, including identity theft.  Instead, LifeLock and DOES 1-10 request additional fraud alerts whenever their customers do not notify LifeLock that they no longer hold such a suspicion.

143.   LifeLock and DOES 1-10 have solicited consumers with misleading and false advertising regarding LifeLock's authority to place initial fraud alerts on consumers' files, consumers' eligibility for initial fraud alerts, the nature and effect of initial fraud alerts, and the ease in which a customer may request an initial fraud alert directly from the consumer reporting agencies for free.

144.   LifeLock and DOES 1-10 have been unjustly enriched by, and improperly benefited from, its conduct in that:  (i) the FCRA contemplates that fraud alerts will be placed without charge to the requesting consumer, but LifeLock and DOES 1-10 have charged, received and retained monies paid by consumers for

the placement of fraud alerts; (ii) LifeLock and DOES 1-10 are profiting at the expense of Experian, who bears all of the costs and burdens of placing and maintaining the fraud alert in the consumer's file, referring fraud alerts to other consumer reporting agencies, and providing the consumer with notices and the free credit report to consumers who request such a report; (iii) LifeLock and DOES 1-10 are profiting from services and work it has wrongly induced Experian to perform, and (iv) LifeLock and DOES 1-10 are profiting from the placement of fraud alerts for consumers who are not eligible for such alerts, and the provision of free credit reports to consumers who are not eligible for such reports.

145.   It would be unjust and unconscionable to permit LifeLock and DOES 1-10 to be enriched at the expense of Experian and to retain the benefits that were wrongfully obtained through Experian.

146.   LifeLock and DOES 1-10 have improperly benefited from fraudulent activities, and thus Experian seeks restitution from LifeLock and DOES 1-10 in the amount LifeLock and DOES 1-10 have been unjustly enriched and an order disgorging all profits, benefits and other compensation obtained by LifeLock and DOES 1-10.

## **PRAYER**

WHEREFORE, Plaintiff prays judgment against Defendants, and each of them, as follows:

## FIRST CAUSE OF ACTION

1.    For actual damages in an amount to be proven at trial;

2.    For restitution to the extent permitted by law;

3.    For injunctive relief enjoining Defendants from concealing material facts and information when requesting the placement of fraud alerts from Experian or any other consumer reporting agency, including but not limited to: their corporate status; that they are acting on behalf of a consumer; and that the consumer on whose behalf they act does not

1    possess a good faith suspicion that he or she has been or is about to

2    become a victim of fraud or related crime, including identity theft and

3    has not asserted such a suspicion contemporaneously with the request

4    for a fraud alert;

5    4.    For punitive damages;

6    5.    For costs of suit herein incurred; and

7    6.    For such other and further relief as the Court may deem proper.

8    SECOND CAUSE OF ACTION

9    1.    For actual damages in an amount to be proven at trial;

10   2.    For restitution to the extent permitted by law;

11   3.    For injunctive relief enjoining Defendants from misrepresenting

12   material facts and information when requesting the placement of fraud

13   alerts from Experian or any other consumer reporting agency,

14   including but not limited to: their corporate status; that they are acting

15   on behalf of a consumer; and that the consumer on whose behalf they

16   act does not possess a good faith suspicion that he or she has been or is

17   about to become a victim of fraud or related crime, including identity

18   theft and has not asserted such a suspicion contemporaneously with the

19   request for a fraud alert;

20   4.    For punitive damages;

21   5.    For costs of suit herein incurred; and

22   6.    For such other and further relief as the Court may deem proper.

23   THIRD CAUSE OF ACTION

24   1.    For actual damages in an amount to be proven at trial;

25   2.    For restitution to the extent permitted by law;

26   3.    For injunctive relief enjoining Defendants from misrepresenting

27   material facts and information when requesting the placement of fraud

28   alerts from Experian or any other consumer reporting agency,

including but not limited to: their corporate status; that they are acting on behalf of a consumer; and that the consumer on whose behalf they act does not possess a good faith suspicion that he or she has been or is about to become a victim of fraud or related crime, including identity theft and has not asserted such a suspicion contemporaneously with the request for a fraud alert;

4. For costs of suit herein incurred; and

5. For such other and further relief as the Court may deem proper.

<u>FOURTH CAUSE OF ACTION</u>

1. For actual damages in an amount to be proven at trial;

2. For restitution to the extent permitted by law;

3. For injunctive relief, enjoining Defendants from placing and/or making, or authorizing the placing or making of, any advertisements and/or representations which contain false and misleading statements, regarding Defendants' ability and authority to place fraud alerts, the need for a good faith belief in placing fraud alerts, the availability of fraud alerts as a proactive, preventative measure, that consumers are entitled to automatic renewals of fraud alerts, the efficacy of fraud alerts against all types of fraud, that fraud alerts prevent access to credit reports, the difficulty of obtaining fraud alerts through credit bureaus, that LifeLock places fraud alerts directly with Experian, that consumers can only receive the protection afforded by fraud alerts by purchasing LifeLock's service, that creditors will call consumers who have a fraud alert on their file, the source of the credit report provided by LifeLock, and, any other advertising false or misleading advertising regarding fraud alerts, and enjoining the use of the LifeLock name.

4. For treble damages, as provided by law;

5. For costs of suit herein incurred; and

1     6.    For such other and further relief as the Court may deem proper.

2            <u>FIFTH CAUSE OF ACTION</u>

3     1.    For restitution to the extent permitted by law;

4     2.    For injunctive relief, enjoining Defendants from placing and/or
making, or authorizing the placing or making of, any advertisements
and/or representations which contain false and misleading statements
regarding Defendants' ability and authority to place fraud alerts, the
need for a good faith belief in placing fraud alerts, the availability of
fraud alerts as a proactive, preventative measure, that consumers are
entitled to automatic renewals of fraud alerts, the efficacy of fraud
alerts against all types of fraud, that fraud alerts prevent access to credit
reports, the difficulty of obtaining fraud alerts through credit bureaus,
that LifeLock places fraud alerts directly with Experian, that
consumers can only receive the protection afforded by fraud alerts by
purchasing LifeLock's service, that creditors will call consumers who
have a fraud alert on their file, the source of the credit report provided
by LifeLock, and, any other advertising false or misleading advertising
regarding fraud alerts, and enjoining the use of the LifeLock name.

19    3.    For costs of suit herein incurred; and

20    4.    For such other and further relief as the Court may deem proper.

21            <u>SIXTH CAUSE OF ACTION</u>

22    1.    For restitution to the extent permitted by law;

23    2.    For injunctive relief, enjoining Defendants from submitting requests
for fraud alerts on behalf of consumers to Experian, TransUnion and
Equifax; and enjoining Defendants from placing and/or making, or
authorizing the placing or making of, any advertisements and/or
representations which contain false and misleading statements
regarding Defendants' ability and authority to place fraud alerts, the

need for a good faith belief in placing fraud alerts, the availability of fraud alerts as a proactive, preventative measure, that consumers are entitled to automatic renewals of fraud alerts, the efficacy of fraud alerts against all types of fraud, that fraud alerts prevent access to credit reports, the difficulty of obtaining fraud alerts through credit bureaus, that LifeLock places fraud alerts directly with Experian, that consumers can only receive the protection afforded by fraud alerts by purchasing LifeLock's service, that creditors will call consumers who have a fraud alert on their file, the source of the credit report provided by LifeLock, and, any other advertising false or misleading advertising regarding fraud alerts, and enjoining the use of the LifeLock name.

3.   For costs of suit herein incurred; and

4.   For such other and further relief as the Court may deem proper.

SEVENTH CAUSE OF ACTION

1.   For restitution to the extent permitted by law;

2.   For injunctive relief, enjoining Defendants from submitting requests for fraud alerts on behalf of consumers to Experian, TransUnion and Equifax.

3.   For costs of suit herein incurred; and

4.   For such other and further relief as the Court may deem proper.

EIGHTH CAUSE OF ACTION

1.   For restitution to the extent permitted by law;

2.   For disgorgement of profits;

3.   For costs of suit herein incurred; and

4.   For such other and further relief as the Court may deem proper.

1

2     Dated:  June 18, 2008                    JONES DAY

3

4                                              By:  /s/ Richard J. Grabowski

5                                                   Richard J. Grabowski

6                                              Attorneys for Plaintiff
                                               EXPERIAN INFORMATION
7                                              SOLUTIONS, INC.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **DEMAND FOR JURY TRIAL**

2       Plaintiff Experian Information Solutions, Inc. hereby demands trial by jury.

3

4    Dated:  June 18, 2008                    JONES DAY

5

6                                            By: _/s/ Richard J. Grabowski_____
                                                 Richard J. Grabowski
7

8                                            Attorneys for Plaintiff
                                             EXPERIAN INFORMATION
9                                            SOLUTIONS, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I, Kim Edmonds, declare:

I am a citizen of the United States and employed in Orange County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 3 Park Plaza, Suite 1100, Irvine, California 92614. On June 18, 2008, I served a copy of the following:

**SECOND AMENDED COMPLAINT FOR:**

**1.      Concealment/Suppression of Fact;**

**2.      Intentional Misrepresentation;**

**3.      Negligent Misrepresentation;**

**4.      Violation of Lanham Act;**

**5.      Violation of California Business & Professions Code § 17500;**

**6.      Unlawful and Fraudulent Business Practices in Violation of California Business & Professions Code § 17200;**

**7.   Unfair Business Practices in Violation of California Business & Professions Code § 17200;**

**8.      Unjust Enrichment/Restitution; and**

**DEMAND FOR JURY TRIAL**

BY ELECTRONIC TRANSMISSION.

I am familiar with the United States District Court, Central District of California's practice for collecting and processing electronic filings. Under that practice, documents are electronically filed with the court. The court's CM/ECF system will generate a Notice of Electronic Filing (NEF) to the filing party, the assigned judge, and any registered users in the case. The NEF will constitute service of the document. Registration as a CM/ECF user constitutes consent to electronic service through the court's transmission facilities. Under said practice, the following CM/ECF users were served:

LAI-2954453v1

1

2    Mary Azcuenaga, Esq.                    Helen Cho Eckert
     John Fedele, Esq.                       Heller Ehrman
3    Heller Ehrman LLP                       333 South Hope Street 39th Floor
     1717 Rhode Island Avenue NW             Los Angeles, CA 90071-1406
4    Washington, DC  20036-3023              Email: helen.cho@hellerehrman.com
     Email:
5    mary.azcuenaga@hellerehrman.com

6    Malaika M Eaton
     Heller Ehrman
7    701 Fifth Avenue Suite 6100
     Seattle, WA 98104
8    Email:
     malaika.eaton@hellerehrman.com

9
                        *Attorneys for* LifeLock, Inc.
10

11         Executed on June 18, 2008, at Irvine, California.

12

13                              */s/ Kim Edmonds*
                                Kim Edmonds
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAI-2954453v1                          - 60 -