1  Mark Holscher (S.B.N. 139582)
   mark.holscher@kirkland.com
2  Diana M. Torres (S.B.N. 162284)
   diana.torres@kirkland.com
3  KIRKLAND & ELLIS LLP
   777 South Figueroa Street, Suite 3700
4  Los Angeles, California 90017
   Telephone: 213-680-8400
5  Facsimile: 213-680-8500

6  Jeff E. Scott (S.B.N. 126308)
   scottj@gtlaw.com
7  Jordan D. Grotzinger (S.B.N. 190166)
   grotzingerj@gtlaw.com
8  GREENBERG TRAURIG, LLP
   2450 Colorado Avenue, Suite 400E
9  Santa Monica, CA 90404
   Telephone: 310-586-7700
10 Facsimile: 310-586-7800

11 Attorneys for Defendant and Counterclaimant
   LIFELOCK, INC.
12

13              UNITED STATES DISTRICT COURT

14             CENTRAL DISTRICT OF CALIFORNIA

15            SOUTHERN DIVISION – SANTA ANA

16

17 EXPERIAN INFORMATION              ) Case No.: SA-CV-08-00165 AG (MLGx)
   SOLUTIONS, INC., a corporation,   )
18                                    )
                                      ) **PUBLIC VERSION**
19                                    )
          Plaintiff,                  ) **MEMORANDUM OF POINTS AND**
20 v.                                 ) **AUTHORITIES IN SUPPORT OF**
                                      ) **DEFENDANT LIFELOCK, INC.'S**
21                                    ) **MOTION FOR**
                                      ) **RECONSIDERATION**
22 LIFELOCK, INC., a corporation; and )
   DOES 1 through 10, inclusive,      )
23                                    ) Date: July 13, 2009
          Defendant,                  ) Time: 10:00 a.m.
24                                    ) Before: Hon. Andrew J. Guilford
   AND RELATED COUNTERCLAIM.          )
25                                    )
                                      )
26                                    )
                                      )
27

28

────────────────────────────────────────
**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT LIFELOCK, INC.'S MOTION FOR RECONSIDERATION**

# TABLE OF CONTENTS

Page(s)

INTRODUCTION AND SUMMARY ........................................................... 1

RELEVANT PROCEDURAL HISTORY ................................................... 4

ARGUMENT ................................................................................................ 6

I.    Legal Standard on Reconsideration ................................................. 6

II.   Evidence Recently Produced By Experian Establishes That Experian Competes With LifeLock, Requiring Experian To Prove Anticompetitive Conduct ........... 6

    A.    Experian Has Now Produced Concrete Evidence That It Directly Competes With LifeLock ..................................................... 6

    B.    Cel-Tech  Requires That Experian Prove That Its Competitor LifeLock Violated The Antitrust Laws Or Committed Other Anti-Competitive Conduct In Order To Prevail Under The Unfair Prong Of The UCL ..................................................................................... 9

III.  Substantial New Evidence Undermines Experian's Claim That LifeLock's Practices Violate An "Established Public Policy" ............................. 11

    A.    Experian Has Now Produced Evidence Showing That Its Own Practices Contradict Its Professed Belief In The Existence Of An "Established Public Policy" Prohibiting Corporations From Requesting Fraud Alerts ........................................................... 12

    B.    Newly Produced Evidence Shows That Experian Knows When LifeLock Requests Fraud Alerts ............................................. 16

IV.   New Testimony From Third Parties, And An Eminent Expert's Thorough Examination Of The FCRA's Underlying Policy Goals Warrant Reconsideration Of The Court's Ruling .......................................... 17

    A.    Independent Third Parties Believe The Provision Of Fraud Alert Services By Corporations Furthers Public Policy .................... 18

    B.    The Statutory Language And Substantial Legislative History When Viewed As A Whole Reveal That Experian's Public Policy Interpretation Is Wrong ......................................................... 22

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT LIFELOCK, INC.'S MOTION FOR RECONSIDERATION**

V.    Finding A Violated Public Policy Does Not End The Inquiry............................23

CONCLUSION ................................................................................................25

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
LIFELOCK, INC.'S MOTION FOR RECONSIDERATION**

1
# TABLE OF AUTHORITIES

2
## CASES

3
*Birkenfeld v. City of Berkeley,*
    17 Cal. 3d 129 (1976).................................................................................24

4

5
*British Airways v. Boeing,*
    585 F.2d 946 (9th Cir. 1978)........................................................................10

6
*C.A.R. Transp. Brokerage Co., Inc. v. Darden Restaurants, Inc.,*
    213 F.3d 474 (9th Cir. 2000)........................................................................10

7

8
*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.,*
    20 Cal.4th 163 (1999)................................................................10, 11, 12, 23

9
*City of L.A., Harbor Div. v. Santa Monica Baykeeper,*
    254 F.3d 882 (9th Cir. 2001)..........................................................................6

10

11
*Gregory v. Albertson's, Inc.,*
    104 Cal. App. 4th 845 (2002).......................................................10, 11, 23

12
*LaLonde v. County of Riverside,*
    204 F.3d 947 (2000).....................................................................................10

13

14
*Nat'l Auto. Ins. Co. v. Winter,*
    58 Cal. App. 2d 11 (1943)............................................................................24

15
*People v. Casa Blanca Convalescent Homes, Inc.,*
    159 Cal. App. 3d 509 (1984)........................................................................11

16

17
*Persinger v. Holst,*
    639 N.W.2d 594 (Mich. Ct. App. 2001).......................................................24

18
*Schnall v. Hertz Co.,*
    78 Cal. App. 4th 1144 (2000).......................................................................23

19

20
*Scripps Clinic v. Superior Court,*
    108 Cal. App. 4th 917 (2003).......................................................................11

21
*Twin City Pipe Line Co. v. Harding Glass Co.,*
    283 U.S. 353 (1931).....................................................................................24

22

23
*United States v. Jerry,*
    487 F.2d 600 (3d Cir. 1973)...........................................................................6

24
## STATUTES

25
15 U.S.C. § 1681 et seq.............................................................................passim

26
15 U.S.C. § 6101..............................................................................................19

27
18 U.S.C. § 2710(b)(d)....................................................................................19

28
47 U.S.C. § 551(c) ...........................................................................................19

-i-
## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT LIFELOCK, INC.'S MOTION FOR RECONSIDERATION

Cal. Bus. & Prof. Code § 17200 ...................................................................passim

Fed. R. Civ. P. 56(e)..................................................................................10

**OTHER AUTHORITIES**

H.R. Rep. No. 108-263 .............................................................................24

**RULES**

69 Fed. Reg. 23370 ..................................................................................24

69 Fed. Reg. 23374 ..................................................................................24

Local Rule 7-18.........................................................................................6

**TREATISES**

Restatement (Third) Agency § 1.01cmt. c.................................................24

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
LIFELOCK, INC.'S MOTION FOR RECONSIDERATION**

1    LifeLock moves for reconsideration of this Court's May 19 summary judgment

2    order based on subsequently produced documents from Experian's own files that (1)

3    prove that Experian competes with LifeLock, mandating a different legal standard for

4    a Section 17200 "unfairness" claim than the one applied by the Court; (2) raise a fact

5    issue as to the principal contention by Experian during the hearing, namely that

6    Experian cannot discern when "fraud alerts" originate from LifeLock; and (3) show

7    that Experian pursued its own plans to sell fraud alert services while airbrushing

8    advertisements that were inconsistent with its litigation assertion that corporate-placed

9    fraud alerts violate public policy.  This motion is also based on new evidence from

10   consumer-protection experts and a former FTC official involved in the enactment of

11   the governing law, who opine that the public policy found by the Court is not

12   consistent with the legislative history or underlying goals of the governing statute.

13   ## INTRODUCTION AND SUMMARY

14       On November 10, 2008, more than nine months before the close of discovery

15   and before the pleadings had been settled, plaintiff Experian moved for partial

16   summary judgment on its seventh cause of action for "unfair" competition under

17   California Business & Professions Code § 17200 ("Section 17200" or "the UCL").

18   Experian asserted that LifeLock violated Section 17200 because public policy

19   prohibited corporations from placing fraud alert requests on behalf of consumers.

20       As of the date of its filing, Experian had provided no discovery.  By the time

21   LifeLock filed its opposition, Experian had produced only 217 pages of documents

22   and answered thirteen interrogatories.  It was on this record that the Court on January

23   12 heard argument.

24       The Court's tentative Order found that Experian's motion should be denied.

25   Nonetheless, on May 19, 2009, this Court reversed its tentative ruling and entered

26   partial summary judgment against LifeLock, finding as a matter of law that LifeLock

27   violated Section 17200 because of a public policy interpolated from two sections of

28   FACTA, the amendment to the Fair Credit Reporting Act ("the FRCA"), and related

-1-

1  legislative history.

2        Experian had claimed that it suffered from LifeLock's "unfair" practice because

3  it was forced to bear the costs of toll free phone calls and other administrative

4  expenses involved in the placement of fraud alerts on the credit profiles of LifeLock's

5  customers.  It is undisputed that the FRCA allows credit reporting agencies to sell

6  consumer credit profiles but allows consumers to place certain restrictions, such as

7  fraud alerts and "opt-outs" on their files.  At oral argument, Experian cried foul at

8  LifeLock's placement of fraud alert requests on behalf of its customers because,

9  Experian claimed, LifeLock supposedly "masqueraded" as a consumer when it

10  requested fraud alerts, forcing Experian to incur the costs of those fraud alerts.  The

11  implication, of course, was that Experian would have ignored such fraud alert

12  requests, and thus avoided the costs associated with them, had Experian known they

13  were being submitted by a corporation, rather than directly by the consumer.

14        Two-and-a-half months after the Court took Experian's motion under

15  submission, Experian produced 194,000 pages of documents that tell a starkly

16  different story.  Those documents clearly show that, as fraud alerts were becoming an

17  increasingly popular safeguard for consumers concerned about identity theft, Experian

18  recognized the opportunity and partnered with a company called "IdentityTruth,"

19  which was already providing fraud alert requests for its subscribers.  Experian itself

20  also began providing fraud alert services, through "Experian Consumer Direct" or

21  "ECD."  *See infra* Parts II.A, III.A.  These facts are critical, not only because they

22  reveal the hypocrisy of Experian's position, but because, as explained below, the legal

23  standard for a competitor claim is very different — and more strict — than that

24  applied by the Court in its summary judgment ruling.  *See infra* Part II.B.

25        Experian, through ECD, provided the same fraud alert services LifeLock

26  provides and knowingly accepted the same type of fraud alert requests from

27  IdentityTruth right up until February 2008 — precisely when it filed this lawsuit.

28  (Torres Decl. ¶ 17, Ex. 1 (Puckett Dep.) at 98:7–15; *id.* Ex. 3 (Williams Dep.) at 35:9–

-2-

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
LIFELOCK, INC.'S MOTION FOR RECONSIDERATION**

16.) As Experian's newly produced documents show, this date was no coincidence. In January 2008, Experian was searching for a way to facilitate the placement of over 1500 new fraud alert requests per day by its business partner, IdentityTruth. (*Id.* ¶ 20, Ex. 14 at 188.)  Experian filed this suit on February 13, 2008.  A few days later, in an email dated February 21, 2008, Don Girard, Manager of the Experian's Corporate Affairs Group, realized the effect Experian's double standard could have on this lawsuit ███████████████████████████████████████████████████

██████████████████████████████████████████. (*Id.* ¶ 23, Ex. 17 at 198–201.)  At the same time, ████████████████ called a halt to Experian's placement of fraud alerts for ECD. *See infra* Part II.A.

While Experian scurried to stop its fraud alert operations because of "██████ ████████████████████" it began a behind-the-scenes study of plans for future competition with LifeLock.  Newly-produced documents from 2008 show that Experian was seeking to capitalize on growing consumer demand for fraud alert protection, a market that the documents characterize as a "████████████████████" Thus, while Experian lawyers were espousing Potemkin "public policies" to this Court, its executives were internally planning to take on LifeLock in the same market selling the same service that it now vilifies. *See infra* Part II.A.

As a competitor — a fact conclusively established by Experian's recently produced documents — Experian's claim of unfair competition must meet a stricter test than the one applied by the Court in its summary judgment order: Experian must plead and prove anticompetitive conduct, and cannot survive merely by showing a legislatively-declared policy.  Experian cannot meet that stricter standard, and made no attempt to do so.  For that reason alone, the Court's May 19 Order should be reconsidered. *See infra* II.

Moreover, substantial new testimony from experts and third parties who have come forward following this Court's May 19 order show that LifeLock serves a critical need:

-3-

- Todd Zywicki, Director of Policy and Planning, United States Federal Trade Commission ("FTC"), 2003— 2004, who testifies in his accompanying declaration that Experian's purported "public policy" is contrary to the FCRA's purposes and was never envisioned by the FTC (the agency charged with the statute's enforcement);

- Tom Stone, Executive Director, FBI-LEEDA, Inc., who testifies in his accompanying declaration that the provision of fraud alert services like those offered by LifeLock are an important supplement to law enforcement's efforts to fight identity theft;

- Chris Jay Hoofnagle, (unpaid) expert, Lecturer in Residence at Berkeley Law School, and director of the Berkeley Center for Law & Technology's Information Privacy Programs, who explains how companies that place fraud alert requests on behalf of consumers perform a valuable service by enabling consumers to take advantage of their rights under a complex and often unmanageable series of statutory schemes.

In the face of this compelling evidence, the Court should reconsider its ruling and find that public policy is not violated through the offering of fraud alert request services by corporations like LifeLock with the expertise to protect America's consumers. To do otherwise would reward Experian's attempt to use the Court to obtain a competitive advantage by seeking summary judgment before the Court learned of the crucial facts that preclude summary judgment here.

## RELEVANT PROCEDURAL HISTORY

On November 10, 2008, before the pleadings had been settled, Experian moved for summary judgment on its own unfair competition claim. (Dkt. No. 66.) As of that date the parties had not produced documents, had not taken depositions, and had not provided substantive written discovery responses. (Declaration of Jordan Grotzinger ("Grotzinger Decl.") ¶ 3.) LifeLock immediately served discovery directed at Experian's motion and received 217 pages of documents and vague responses to its first set of interrogatories. (*Id.* ¶¶ 4–6.) On December 8, 2008, LifeLock filed its opposition, arguing, among other things, that (1) Experian's motion was premature and should be denied so that LifeLock could take necessary discovery, (2) there was a disputed issue of fact as to whether Experian and LifeLock are competitors, which in

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LIFELOCK, INC.'S MOTION FOR RECONSIDERATION**

1  turn determined whether Experian's "unfair" UCL claim requires proof of

2  anticompetitive conduct, (3) there is no public policy prohibiting LifeLock from

3  requesting fraud alerts on behalf of its subscribers, and (4) Experian is not injured by

4  LifeLock's submission of such requests.  (Dkt. No. 77.)  Experian replied on

5  December 15, 2008.  (Dkt. No. 82.)  On that same day, it produced another 39 pages

6  of documents.  (Grotzinger Decl. ¶ 7.)

7        On January 12, 2009, the Court held its hearing on Experian's motion.  The

8  tentative order provided by the Court before argument stated that, "[i]f Plaintiff

9  demonstrated anything, it is only that Plaintiff and other consumer reporting agencies

10  are not required to place fraud alerts requested by companies like Defendant."  (*Id.*

11  Ex. D at 5.)  The Court took oral argument, and without any support by the facts —

12  much less any evidence in the record — Experian's counsel argued a theory not

13  presented in the motion: that LifeLock's conduct was unfair because it "masqueraded"

14  as a consumer when requesting the placement of fraud alerts on behalf of its

15  subscribers.  Specifically, counsel for Experian argued that, "due to the electronic

16  nature of these [fraud alert] requests, it's impossible to call out the LifeLocks of the

17  world from a legitimate consumer."  (*Id.* Ex. E at 6:9–11; *see also* at 5:19–6:11, 7:3–

18  5, 9:25–1, 13:15–22, 25:19.)  This argument struck a chord with the Court, prompting

19  the Court to state, "you're giving me great pause for thought because, when you talk

20  about, electronically, it's impossible for you to parse out the good from the bad, then

21  we get into 17200 situations, and maybe we get into public policies."  (*Id.* at 13:7–11.)

22  Then, on May 19, 2009, the Court issued its final order, reversing its tentative ruling

23  and finding that public policy prohibited corporations from requesting fraud alerts on

24  behalf of consumers.  (Dkt. No. 88 at 5.)

25        As set forth more fully below, new evidence produced by Experian and

26  evidence proffered by expert third parties who have come forward since this Court's

27  ruling undermine the contentions Experian made in persuading the Court to enter

28  partial summary judgment against LifeLock, and unquestionably raise triable issues of

-5-

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
LIFELOCK, INC.'S MOTION FOR RECONSIDERATION**

1    material fact warranting reconsideration.

2                                **ARGUMENT**

3    **I.  Legal Standard on Reconsideration**

4              Local Rule 7-18 provides that a motion for reconsideration may be made on the

5    grounds of (a) a newly discovered difference in fact or law that was previously

6    unknown to the moving party; (b) the emergence of new facts or a change in the law;

7    or (c) a court's failure to consider the facts or law presented.  Moreover, a federal

8    district court maintains a plenary power "to grant relief from erroneous interlocutory

9    orders," for any reason the court deems appropriate and just, so long as the court

10   maintains jurisdiction over the matter.  *City of L.A., Harbor Div. v. Santa Monica*

11   *Baykeeper*, 254 F.3d 882, 887 (9th Cir. 2001) (quoting *United States v. Jerry*, 487

12   F.2d 600, 604 (3d Cir. 1973)).  The cases interpreting this local rule have held that the

13   burden on the moving party is high.  LifeLock believes that the newly discovered facts

14   presented here, however, warrant reversal of the Court's partial summary judgment

15   order.

16

17   **II.   Evidence Recently Produced By Experian Establishes That Experian**
         **Competes With LifeLock, Requiring Experian To Prove Anticompetitive**
18       **Conduct**

19        **A.     Experian Has Now Produced Concrete Evidence That It Directly**
                **Competes With LifeLock**

20             Although it pleads that it is LifeLock's competitor in its false-advertising claim,

21   in moving for summary judgment, Experian postured itself as merely a CRA that

22   suffered injury from the allegedly unfair practice of corporations, like LifeLock, who

23   request fraud alerts be placed on the credit profiles of their customers.  Under the

24   FCRA, the CRAs, who are allowed to profit from the sale of consumer credit profiles,

25   must place fraud alerts on a consumer's profile if the consumer so requests, and incur

26   all related costs.  15 U.S.C. § 1681c-1(a)(1).  Because LifeLock, rather than a

27   consumer directly, was requesting the placement of fraud alerts on behalf of its

28   subscribers, Experian claimed that it was being victimized by incurring the

                                      -6-
             **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
                **LIFELOCK, INC.'S MOTION FOR RECONSIDERATION**

1  administrative expense of these fraud alerts.

2       In reality, while it litigated this case, Experian was plotting to, and in fact did,

3  enter the market for identity theft protection, in all-out competition with LifeLock.

4  On March 27 — two and a half months after the hearing on its summary judgment

5  motion and after having produced virtually no discovery — Experian produced nearly

6  200,000 pages of documents, including critically important emails showing its

7  competitive endeavors. (Grotzinger Decl. ¶ 10.) First, Experian produced documents

8  showing that, through its sister company, ECD, Experian sold two identity-protection

9  products that offered fraud alerts. (*See* Torres Decl. ¶ 10, Ex. 3 (Williams Dep.) at

10  21:21–22:9 ("Family Secure" product), 48:1–14 ("ChildSecure" product)). While

11  Experian now bewails the burden from LifeLock's fraud alert requests, ▮▮▮▮▮▮

12  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*See* Torres Decl. ¶ 8, Ex. 7 at 93.)

14  Indeed, when it came to fraud alerts from sister company ECD, Experian was willing

15  initially to commit "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16  ▮▮▮▮▮▮▮. (*Id.* at 97.)

17       There can be no question that Experian viewed LifeLock as a rival at this time:

18  in a newly-produced email dated October 23, 2007, Experian outlined ways in which

19  it had tried to block competitors of its ECD business — specifically, LifeLock —

20  from placing fraud alert requests, including by erecting numerous barriers to which it

21  did not subject its own ECD subscribers. In another internal document dated

22  December, 2007, Experian examined the competitive landscape for ECD, noting that

23  "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" and that "▮▮▮▮▮▮

24  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" ("Torres Decl. ¶ 16, Ex. 11 at 132–33.)

25  Experian continued its fraud alert services in direct competition with LifeLock until

26  February 2008, the same month it filed this lawsuit, when it stopped "▮▮▮▮▮▮

27  ▮▮▮▮." (*See* Torres Decl. ¶ 17, Ex. 1 (Puckett Dep.) at 98:7–15; *id.* Ex. 3 (Williams

28  Dep.) at 35:9–16.)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
LIFELOCK, INC.'S MOTION FOR RECONSIDERATION**

1    Although Experian stopped accepting fraud alerts when it filed this lawsuit, it
2    continued to devise means by which to compete with LifeLock.  From at least January
3    2008 through August 2008, Experian had a team of high-ranking business people
4    exploring "consumer-focused" business opportunities. (*See* Torres Decl. ¶ 29, Ex. 22
5    at 220, 222, 227, 230, 233, 236; *see also id.* ¶ 27, Ex. 6 (Lundy Dep.) at 30:13–31:15
6    (███████████████████████████████████████████████████████████████
7    ████████████████████"); *id.* ¶ 28, Ex. 21 at 216–17 (meeting agenda discussing
8    investigation into the current consumer identity and consumer credit management
9    market which lists LifeLock as competition).)  An internal marketing presentation said
10   that "Consumers are taking ownership of their information" and becoming
11   increasingly interested in placing restrictions on the use of their credit profiles. (*See*
12   *id.* Ex. 22 at 227; *id.* Ex. 6 (Lundy Dep.) at 37:9–15 (identifying the author's
13   functional area as marketing).)  In August 2008, Experian predicted that the market
14   for fraud alert placements would increase by 44% in 2009. (*See id.* Ex. 22 at 233.)
15   Experian identified "██████████████████████████████████████████████████
16   ████████████" as one of its "████████████████████████████" (*See* Torres Decl. Ex. 6
17   (Lundy Dep.) at 37:2–8, 42:2–43:1; *id.* ¶ 30, Ex. 23 at 267; *see also id.* ¶ 31, Ex. 24 at
18   279, 296 (August 2008 presentation entitled "Consumer Focused Initiatives
19   Scorecard" describing "Identity Theft Prevention" as a possible future business
20   opportunity and listing LifeLock as "Direct Competition").)
21       A September 2008 internal Experian document makes the point succinctly:
22
23
24
25   **[IMAGE OF EXPERIAN CONFIDENTIAL DOCUMENT REDACTED]**
26
27
28

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
LIFELOCK, INC.'S MOTION FOR RECONSIDERATION**

1   (Torres Decl. Ex. 26 at 317 (highlighting added).)

2           Lest there be any question about Experian's view of competition even today,

3   ECD presently advertises its competition with LifeLock, comparing its features with

4   that of LifeLock and TrustedID:



16   (Torres Decl. Ex. 27

17   (https://www.protectmyid.com/Default.aspx?PageTypeID=HomePage17))

18           Not only Experian's documents, but witnesses deposed after the Court's ruling

19   have confessed to this competition.  For example, ECD's corporate designee testified:



22   (Torres Decl. ¶ 35, Ex. 3 (Williams Dep. at 59–60); *see also id.* Ex. 6 (Lundy Dep.) at

23   56–57); *id.* Ex. 5 (Girard Dep.) at 15, 35–36, 38–39.)

25   **B.**    **_Cel-Tech_ Requires That Experian Prove That Its Competitor LifeLock Violated The Antitrust Laws Or Committed Other Anti-Competitive Conduct In Order To Prevail Under The Unfair Prong Of The UCL**

27   Evidence of Experian's status as a competitor to LifeLock should have been

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LIFELOCK, INC.'S MOTION FOR RECONSIDERATION**

1    fatal to Experian's motion for summary judgment. Because it has the burden of proof

2    at trial, Experian "ha[d] the initial burden of establishing the absence of a genuine

3    issue of fact on each issue material to its case" on summary judgment. *C.A.R. Transp.*

4    *Brokerage Co., Inc. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000). It

5    was required to come forward with sufficient evidence that would "entitle it to a

6    directed verdict if the evidence went uncontroverted at trial." *Id.* Even if the Court

7    determined that Experian met that burden, LifeLock was nonetheless entitled to defeat

8    summary judgment by presenting evidence showing that a genuine issue of fact

9    remains for trial. *See* Fed. R. Civ. P. 56(e); *British Airways v. Boeing*, 585 F.2d 946,

10   950-52 (9th Cir. 1978). LifeLock was also entitled to have all facts and all inferences

11   construed in the light most favorable to it. *LaLonde v. County of Riverside*, 204 F.3d

12   947, 954 (2000).

13        By prematurely moving for summary judgment before providing previously-

14   requested discovery about the competitive nature of its relationship with LifeLock,

15   Experian deprived LifeLock of evidence that establishes a triable issue of material

16   fact. The Court's summary judgment order determined that Experian could establish

17   that LifeLock violated the "unfair" prong of the UCL by showing that LifeLock

18   violated a public policy that is "'tethered to [a] specific constitutional, statutory, or

19   regulatory provision[]." (Dkt. No. 88 at 4 (citing *Gregory v. Albertson's, Inc.*, 104

20   Cal. App. 4th 845, 854 (2002)). But that test does not apply where the plaintiff and

21   defendant are competitors. In *Cel-Tech Communications, Inc. v. Los Angeles Cellular*

22   *Telephone Co.*, 20 Cal.4th 163 (1999), the California Supreme Court "adopt[ed[ the

23   following test:"

24        When a plaintiff who claims to have suffered injury from a direct
          competitor's "unfair" act or practice invokes section 17200, the word
25        "unfair" in that section means conduct that threatens an incipient
          violation of an *antitrust law*, or violates the policy or spirit of one of
26        *those laws* because its effects are comparable to or the same as a
          violation of the law, or otherwise significantly threatens or harms
27        competition.

28   *Cel-Tech*, 20 Cal. 4th at 163, 186–87 (emphasis added). The *Cel-Tech* court

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
LIFELOCK, INC.'S MOTION FOR RECONSIDERATION**

1    articulated this test because it recognized that a broad interpretation of "unfairness"

2    between competitors could frustrate the purposes of antitrust law. *Cel-Tech*, 20 Cal.

3    4th at 185.  As the *Cel-Tech* court explained, "[i]n some cases, it may even lead to the

4    enjoining of *pro*competitive conduct and thereby undermine consumer protection, the

5    primary purpose of the antitrust laws." *Cel-Tech* admonished that there is a "need for

6    California businesses to know, to a reasonable certainty, what conduct California law

7    prohibits and what it permits." *Cel-Tech*, 20 Cal. 4th at 185.  "An undefined standard

8    of what is 'unfair' fails to give businesses adequate guidelines as to what conduct may

9    be challenged and thus enjoined and may sanction arbitrary or unpredictable decisions

10   about what is fair or unfair." *Id.* at 185.  Accordingly, a competitor alleging a

11   violation of the UCL under the "unfair" prong must prove conduct that threatens an

12   incipient violation of an *antitrust law*, or violates the policy or spirit of one of *those*

13   *laws. Id.* at 187.

14        Experian's delay in providing discovery deprived LifeLock of the ability to

15   demonstrate that, at the very least, a triable issue of material fact as to whether

16   Experian was a competitor to LifeLock.  Because of this, when the Court granted

17   summary judgment in favor of Experian, it did not hold Experian to the standard

18   required by *Cel-Tech* for cases in which a competitor alleges a violation of the UCL

19   under the "unfair" prong as Experian does here.  (*See* Dkt. No. 88 at 4 (citing *Scripps*

20   *Clinic v. Superior Court*, 108 Cal. App. 4th 917 (2003) (consumer claim); *Gregory*

21   (same); *People v. Casa Blanca Convalascent Homes, Inc.*, 159 Cal. App. 3d 509

22   (1984) (pre-*Cel-Tech*)).)  But the plain images and clear deposition testimony in this

23   section establish that Experian does compete with LifeLock, which in turn compels

24   reconsideration of the Court's order — as Experian has not and cannot meet the test

25   required under *Cel-Tech* for claims of unfair competition brought by a competitor.

26

27   **III.   Substantial New Evidence Undermines Experian's Claim That LifeLock's Practices Violate An "Established Public Policy"**

28        Even if Experian were entitled to have its "unfair" competition claim judged

-11-

1    under the standard applicable to consumers rather than the standard applicable to

2    competitors, new evidence undermines the existence of the asserted public policy.  As

3    the California Supreme Court held in *Cel-Tech*, even in non-competitor cases,

4    "'"[p]ublic policy' as a concept is notoriously resistant to precise definition, and . . .

5    courts should venture into this area, if at all, with great care and due deference to the

6    judgment of the legislative branch, 'lest they mistake their own predilections for

7    public policy which deserves recognition at law.'"'  *Cel-Tech*, 20 Cal. 4th at 185

8    (quoting *Gantt v. Sentry Ins.*, 1 Cal. 4th 1083, 1095 (1992)).

9        The new evidence produced by Experian months after the summary judgment

10    hearing undermines Experian's assertion that LifeLock's fraud alert service violates

11    the type of "established" public policy required by law.  First, Experian has now

12    produced evidence showing that Experian itself knowingly placed fraud alerts

13    requested by corporations — until it filed its lawsuit against LifeLock.  Second,

14    Experian has now produced evidence raising a fact issue as to the centerpiece story of

15    "unfairness" urged by its counsel at the hearing, *i.e.*, that it did not know when

16    LifeLock, rather than an individual consumer directly, was requesting the fraud alert

17    because LifeLock was "masquerading" as a consumer and therefore did not know

18    when it theoretically could refuse to place the alert requested.  And, third, new

19    evidence, including the declaration of the official in charge of policy at the FTC

20    during the enactment of "FACTA," amendments to the FCRA, along with

21    declarations from privacy, consumer, and law enforcement groups, shows that the

22    policy advocated by Experian would be detrimental to the public and hence contrary

23    to the public policies inherent in consumer protection laws in general and FACTA in

24    particular.

25    **A.    Experian Has Now Produced Evidence Showing That Its Own**

26    **Practices Contradict Its Professed Belief In The Existence Of An**

27    **"Established Public Policy" Prohibiting Corporations From Requesting Fraud Alerts**

28        Reading Experian's motion papers, one would assume that Experian has

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
LIFELOCK, INC.'S MOTION FOR RECONSIDERATION**

1    consistently objected to the practice of corporations requesting fraud alerts on behalf

2    of their subscribers.  In fact, at deposition in January, Experian's corporate designee

3    testified inaccurately that ███████████████████████████████████████████

4    ████████████████████████.  (Torres Decl. Ex. 1 (Puckett Dep.) at 21:6–23:3.)  Such

5    a long-standing policy by a good corporate citizen would make sense if there were, as

6    Experian claimed, an "established public policy" against such a practice.  The only

7    fraud alert requests from corporations that Experian claimed to have placed were those

8    that it placed unknowingly.  (Id.; Dec. 8, 2008 Grotzinger Decl. Ex. 1 (Experian's

9    Resp. to LifeLock's 1st Set of Interrogs.) at 13, 15.)  But Experian's recently-

10   produced internal documents and new deposition testimony portray a starkly different

11   situation, showing that Experian was in the business of accepting for-profit fraud alert

12   requests placed by companies on behalf of consumers.

13        First, as discussed above, LifeLock has learned that Experian readily accepted

14   fraud alerts from its "sister company" ECD.  (See Torres Decl. Ex. 3 (Williams

15   Deposition at 99:10–18.)  It did so knowingly — in fact, as Experian's witness

16   revealed last week, Experian ████████████████████████████.  (See Torres Decl.

17   Ex. 3 (Williams Dep.) at 41–42.)  Experian's fraud alert services ended in February

18   2008, "███████████████████" (id. ¶ 17, Ex. 1 (Puckett Dep.) at 93:2–6), when ██

19   ████████████████████████████████████████████████████████████

20   ████████████."  (Id. Ex. 3 (Williams Dep.) at 35:19.)  That announcement

21   caused no astonishment or repercussions of the sort that might be expected upon the

22   revelation that a long-standing business practice runs afoul of a supposed "public

23   policy" under the industry's governing statute.  (See id. at 52:6–19.)  Indeed, Mr.

24   Williams, on behalf of ECD, ████████████████████████████████████████

25   ██████.  (See id. Ex. 3 (Williams Dep.) at 35:9–24).)

26        Other new evidence shows that ECD was not the only corporation from which

27   Experian accepted fraud alert requests.  Another email, dated June 2007, shows that

28   Experian accepted fraud alert requests from Debix, a corporate competitor to

-13-

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
LIFELOCK, INC.'S MOTION FOR RECONSIDERATION**

1  LifeLock.  That email exchange shows that Debix contacted Experian in mid 2007

2  seeking help in placing fraud alerts on behalf of consumers who had no credit files.

3  Rather than objecting that public policy prohibited Debix's placement of these

4  requests, Experian replied simply that, "[i]f there is no file, we cannot set a fraud

5  alert."  When Debix later asked Experian for help resolving the 9% of Debix-

6  requested fraud alerts that were rejected by Experian's system, Experian did not object

7  on the grounds of public policy or anything else, but merely said it was "working on

8  this."  (Torres Decl. ¶ 19, Ex. 13 at 184; *see also id.* Ex. 12 at 182 (reflecting an April

9  3, 2007 email where Mr. Lundy states that he "Definitely want[ed] to pursue" an

10  agreement with Identity Theft 911 whereby Identity Theft 911 would pay for live-

11  agent service to their customers who wanted to place fraud alerts).)

12      Other newly-produced email messages, dated in the weeks surrounding

13  Experian's filing of this lawsuit, show that Experian had also readily accepted fraud

14  alerts from IdentityTruth, with which Experian had (and still has) a business

15  relationship.  In a January 21, 2008 email, Steven Domenikos, CEO of IdentityTruth,

16  told Experian's Marcie Goldberg that IdentityTruth was placing fraud alert requests

17  for more than 1500 new customers per day and was hoping to obtain assistance from

18  Experian in setting up a direct connection so that those customers could do so

19  themselves through IdentityTruth's portal.  Rather than object to the fact that its

20  business partner was placing 1500 new fraud alert requests with Experian each day,

21  Ms. Goldberg asked Dan Hegarty, Experian's Vice President of Specialized Sales,

22  whether Experian could assist IdentityTruth.  Mr. Hegarty, in turn, said that Experian

23  was unable to provide direct access for IdentityTruth's customers via the web but was

24  attempting to get IdentityTruth itself direct access via Experian's "NCAC" division.

25  (Torres Decl. Ex. 14 at 188.)  Mr. Domenikos later asked if IdentityTruth could send

26  its fraud alert requests via a batch file or an IVR or voicemail system with automated

27  prompts so that IdentityTruth could request large numbers of fraud alerts at one time.

28  Again, rather than object on public policy grounds, Experian's representatives sought

-14-

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**LIFELOCK, INC.'S MOTION FOR RECONSIDERATION**

1   to find a way to facilitate IdentityTruth's placement of large numbers of fraud alert

2   requests. (Torres Decl. Ex. 15 at 191.) As of February 8, 2008, just 5 days before

3   filing this lawsuit, Experian did "not yet" have an update for IdentityTruth. (Torres

4   Decl. Ex. 16 at 195.)

5       It was not until the days surrounding Experian's filing of this lawsuit that its

6   position changed. On February 21, 2008, eight days after Experian filed its complaint,

7   Experian reviewed IdentityTruth's publicity materials and for the first time objected to

8   IdentityTruth publicizing that it placed fraud alert requests for its customers. (Torres

9   Decl. Ex. 17 at 198–99.) Experian demanded that ███████████████████

10  ███████████████████████████████████████████████████

11  ███████. (*Id.* at 198–200.) Experian made these demands not because of any

12  public policy prohibiting fraud alert requests by corporations, but because of "██

13  ███████████." (*Id.* at 199–200). In fact, as Experian's Donald Girard stated

14  in an email dated February 21, 2008:

15  ████████████████████████████████████████

16  ████████████████████████████████████████

17  ████████████████████████████████████████

18  ████████████████████████

19  (Torres Decl. Ex. 17 at 199–200.) In IdentityTruth's own words, Experian ████

20  ███████████████████████████. (*Id.* at 200–201; *see also*

21  *id.* Ex. 18 at 203) (███████████████████████████████

22  ████████████████████████████████████████

23  ███████████████████████").)

24      In other words, until Experian filed this lawsuit, it knowingly, and for profit,

25  placed fraud alerts on behalf of its sister company, ECD, and IdentityTruth, and

26  actively engaged in ways to further capitalize on this burgeoning market. In the days

27  following the inception of this lawsuit, however, Experian abruptly stopped, and

28  ████████  ████████████████████████████████████

-15-

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
LIFELOCK, INC.'S MOTION FOR RECONSIDERATION**

1  ███████████████████████ in a misleading way to improve Experian's posture in

2  this case.  Such critical evidence, not produced by Experian until well·after the

3  summary judgment hearing, casts grave doubt on the "established public policy"

4  Experian persuaded this Court to adopt.

### B.    Newly Produced Evidence Shows That Experian Knows When LifeLock Requests Fraud Alerts

7        In the face of a tentative ruling against it, Experian's counsel argued at length

8  that LifeLock's placement of fraud alert requests was unfair because LifeLock was

9  "masquerading" as a consumer, preventing Experian from recognizing the fraud

10  alert's origins:

> [d]ue to the electronic requests, it's impossible to call out the LifeLocks
> of the world from a legitimate consumer."

(Jan. 12, 2009 Hr'g Tr. 6:9–11; *see id.* at 5:19–6:8, 7:3–5, 9:25–1, 13:15–22, 25:19.)

This argument struck a chord with the Court:

> [Y]ou're giving me great pause for thought because, when you talk
> about, electronically, it's impossible for you to parse out the good from
> the bad, then we get into 17200 situations, and maybe we get into public
> policies.

17  (*Id.* at 13:7–11; *see id.* at  9:7–9, 13:7–9, 13:19–23, 23:7–9.)  The Court took the

18  matter under submission and, four months later, with no further briefing, reversed its

19  tentative opinion in its entirety, finding that LifeLock's placement of fraud alert

20  requests violated an "established public policy" embodied in the FCRA that prohibited

21  corporations from requesting fraud alerts on behalf of individuals.

22        Experian's impromptu argument at the hearing has now been called into

23  question.  As part of its document production on March 27, 2009 — two months after

24  the hearing on its summary judgment motion — Experian produced an email written

25  in early 2008 by Lee Lundy, Experian's Vice President of Consumer Services.

26  (Torres Decl. Ex. 28.)  Mr. Lundy had been ████████████████████████████

27  █████████████████████████████████████████.  In that

28  email, Mr. Lundy states that:

-16-

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
LIFELOCK, INC.'S MOTION FOR RECONSIDERATION**

(Torres Decl. Ex. 28 at 334 (emphasis added).)  Likewise, Experian acknowledged in another recently produced document that "we can't currently refuse to add an alert even when it is a 'fake alert' like the ones being added by 'some companies.'" (*Id.* Ex. 30 at 340.)  These admissions, in documents produced well after the summary judgment hearing, appear to contradict the assertions made by Experian's counsel at the hearing when it successfully persuaded the Court that LifeLock's-submission of fraud alerts was unfair because it was unable to discern LifeLock from an individual consumer, and thereby suffered additional costs.[1]  At a minimum they raise a triable issue of fact on an issue that the Court apparently found pivotal.  Experian's failure to produce these documents until after summary judgment thus warrants reconsideration of the Court's ruling.

## IV.  New Testimony From Third Parties, And An Eminent Expert's Thorough Examination Of The FCRA's Underlying Policy Goals Warrant Reconsideration Of The Court's Ruling

The Court's May 19, 2009, summary judgment ruling has received substantial attention.  Fearing that the Court's ruling portends a significant detrimental impact on the nascent but important identity-protection industry, third parties have come forward and submitted sworn testimony to the Court demonstrating strongly that the public policy Experian persuaded this Court to find is actually contrary to true, long-established, and widely-accepted public policy.  In fact, a thorough examination of the policies behind FACTA, the 2003 to amendment to the FCRA, demonstrates that the public will be harmed, not served, if corporations are unable to place fraud alert requests with any one of the credit reporting agencies.  Based on this evidence, unavailable at the time of the summary judgment proceedings, this Court should

---

[1] LifeLock does not intend to suggest that counsel deliberately misled the Court. Indeed, Experian did not produce documents undermining this assertion until months after the hearing, and therefore there is no reason to believe that counsel was aware of the documents at the time of the argument.

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LIFELOCK, INC.'S MOTION FOR RECONSIDERATION

1  reconsider its ruling.

2      **A.    Independent Third Parties Believe The Provision Of Fraud Alert
3            Services By Corporations Furthers Public Policy**

4          In the few weeks since the Court's ruling, several third parties have come

5  forward to provide sworn testimony to the Court explaining the value provided by

6  corporations, such as LifeLock, that place fraud alert requests on behalf of consumers.

7  Still others voiced concern to Experian, as reflected in Experian's recently produced

8  documents.  (*See* Torres Decl. Exs. 30, 31.)

9          For example, privacy expert Chris Jay Hoofnagle, Lecturer in Residence at

10  Berkeley Law School, and Director of Information Privacy Programs at the Berkeley

11  Center for Law & Technology, was interviewed in the press about the Court's ruling,

12  and commented in favor of LifeLock's position:

13          The idea that we could some day see a market where we pay $10 a month
           to a company to opt us out of junk mail, to monitor our credit, to do all
14          sorts of privacy-enhancing steps that we don't have time to take . . . for
           that market to emerge, LifeLock's business model and similar ones have
15          to be legal.

16  Mr. Hoofnagle voiced this opinion without having had any contact with LifeLock.  As

17  Mr. Hoofnagle explains in the declaration he provided voluntarily, the market

18  incentivizes Experian's sale of as much personal information as possible, thereby

19  heightening the risk of identity theft for consumers.  As Mr. Hoofnagle explains, this

20  sale of consumer information directly facilitates identity theft: "every time a new

21  account identity theft occurs, it occurs because at some point, a consumer reporting

22  agency sold a consumer report to a credit grantor that failed to recognize the credit

23  applicant as an impostor."  (Hoofnagle Decl. ¶¶ 2, 14.)

24          While consumers may obtain a number of protections for free, the complex

25  landscape of statutory privacy rights and self-regulatory privacy protections is difficult

26  to navigate.  Many people are not familiar with the myriad provisions they can invoke

27  to protect their privacy and their identity.  *See, e.g.*, 15 U.S.C. § 1681b(e) (opt-out of

28  "prescreened" offers), 1681s-3 (opt-out of affiliate sharing of information), 1681g(e)

-18-
**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
LIFELOCK, INC.'S MOTION FOR RECONSIDERATION**

1    (access to records generated when identity impostors open accounts), §1681c-2 (block

2    information generated by impostors from appearing on one's consumer report); (*see*

3    *also* Hoofnagle Decl. ¶ 18; Declaration of Todd Zywicki ("Zywicki Decl.") ¶¶ 25–

4    26.) And the FCRA is just one of many federal privacy laws and self-regulatory rules

5    available to consumers. *See, e.g.*, 15 U.S.C. § 6101 (do not call registry); 18 U.S.C.

6    § 2710(b)(d) (opt out of sale of customer lists by video rental stores); 47 U.S.C.

7    § 551(c) (opt-out from sale of subscriber lists by cable television providers); (*see also*

8    Hoofnagle Decl. ¶ 19). Indeed, given the complex regulatory scheme, even those with

9    knowledge of privacy risks associated with every day life and the various means

10   available to diminish those risks may lack the time and/or attention to detail necessary

11   to exercise these rights. (Hoofnagle Decl. ¶ 18; Zywicki Decl. ¶¶ 25–26.) In recent

12   years, companies with the expertise to help consumers navigate the increasingly

13   complex landscape of privacy rights have emerged, and are now doing so by asserting

14   rights on behalf, and with the consent, of consumers. LifeLock is part of that nascent

15   market of "privacy agents." (Hoofnagle Decl. ¶ 19.)

16        Identity theft, which results directly from the loss or compromise of private

17   information, is an increasingly dangerous problem affecting people young and old. As

18   Experian's own website advises:

19        Yes, identity theft is a serious crime. It continues to be one of the fastest
         growing crimes in America, with estimates of as many as 9 million
20       Americans having their identities stolen each year.

21   (Torres Decl. Ex. 37 (http://www.protectmyid.com/faq) (response to FAQ #2).)

22        One way in which consumers protect themselves against identity theft is by

23   requesting fraud alerts be placed on their credit files — i.e., the very files that

24   Experian sells. Fraud alerts impose an obligation upon credit grantors to use

25   reasonable efforts to verify the identity of a credit applicant before opening any new

26   lines of credit, issuing new cards, or increasing credit limits. (Dkt. No. 28 (2d Am.

27   Compl.) ¶ 25.) This extra protection makes it more difficult for identity theft to occur.

28   (Declaration of Tom Stone, FBI-LEEDA, Inc. ("Stone Decl.") ¶ 12.) In fact, a study

-19-

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
LIFELOCK, INC.'S MOTION FOR RECONSIDERATION**

1   published last month — believed to be the first ever to assess the efficacy of fraud

2   alerts in combating identity theft — has found that fraud alert services are the single

3   most effective way to prevent identity theft.  (Wyant Decl. ¶¶ 3–4, Ex. A at 7.)

4   Experian appears to have believed this to be true, as the documents it produced in late

5   March acknowledge that setting fraud alerts is a more effective means of combating

6   identity theft than credit freezing, which Experian's advertising promotes.  (Torres

7   Decl. Ex. 33 at 349;  *see also id.* Ex. 36 at 358.)

8          This Court's order finding the submission of fraud alert requests by

9   corporations to be against public policy could have a profound, negative effect on the

10  ability of society to protect against identity theft.  Identity thieves are creative, and law

11  enforcement simply does not have the technology and other resources to keep up with

12  the rampant identity theft occurring today.  (*See, .e.g.,* Stone Decl. ¶ 4; Hoofnagle

13  ¶ 14;  Zywicki Decl. ¶ 46.)  By seeking the protection provided by fraud alerts —

14  whether directly from the CRAs or through services such as LifeLock, consumers

15  enhance the ability of law enforcement to protect society from identity theft.  (Stone

16  Decl. ¶ 12; Zywicki Decl. ¶¶ 18, 23–25.)  The government — indeed, the FTC which

17  is charged with the FCRA's enforcement — advises consumers on its website of the

18  dangers of identity theft and of the availability of services to protect against it,

19  including services that:

20          allow you to "lock," "flag," or "freeze" your credit reports. Often, the
        companies advertising these services simply are offering to place a fraud
21      alert or credit freeze on your report. These services also may renew or
        update your alerts or freezes automatically, as long as you continue to
22      pay.

23  *See* FTC, "To Buy or Not To Buy: Identity Theft Spawns New Products and Services

24  To Help Minimize Risk," available at  http://www.ftc.gov/bcp/edu/pubs/consumer/

25  idtheft/idt05.shtm. While the FTC advises consumers that they can obtain many of

26  these protections for free, it also acknowledges that "[m]any people find value and

27  convenience in paying an outside party to help them exercise their rights and protect

28  their information."  *Id.*  Thus, companies that request fraud alerts on behalf of their

-20-

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
LIFELOCK, INC.'S MOTION FOR RECONSIDERATION**

customers provide a valuable service to both consumers and law enforcement, and cannot be operating in contravention of an "established public policy" arising out of a consumer protection statutory scheme like the FCRA and FACTA. (Stone Decl. ¶ 12; Hoofnagle Decl. ¶ 18.)

Notably, Todd Zywicki, Director of the Office of Policy Planning at the FTC during the consideration and enactment of the statutory provisions at issue here, agrees. According to now-Professor Zywicki, "corporations that provide initial and subsequent fraud alert request services "provide consumer value and further the purposes of the FCRA by making enhanced anti fraud protections available to those consumers who choose to pay for them." (Zywicki Decl. ¶ 18.) In Professor Zywicki's opinion, there is no statutory policy forbidding the submission of fraud alert placement requests by a corporation to a national credit reporting agency. (*Id.* ¶¶ 19, 41.) Moreover, as Professor Zywicki testifies, "there is no settled or established public policy that national credit reporting agencies are not required to process fraud alerts placed by corporations as opposed to individuals." (*Id.* ¶¶ 20, 62.) In his words, "any such public policy would have certain arbitrary, irrational, and anti-consumer consequences. These arbitrary, irrational, anti consumer consequences should be carefully explored and evaluated by the FTC before any conclusion is drawn that such a public policy under the FCRA is settled, established, or in place." (*Id.* ¶ 20.)

Professor Zywicki is uniquely positioned to testify about the public policies at issue here. In his position as the FTC's Director of the Office of Policy Planning from May 2003 to August 2004, Professor Zywicki reported directly to the FTC Chairman and was responsible for helping to conceive and execute the FTC's policies on issues of consumer protection, competition, and competition advocacy. (*Id.* ¶ 3.) He is not only a pre-eminent expert on the FCRA, he also was "intimately involved" in all aspects of the legislation and has first-hand knowledge of the FTC's public policy reasons for seeking to amend the FCRA in 2003. (*Id.* ¶¶ 4, 28.) In short, Professor Zywicki was at the center of the legislative discussions and analysis in the agency that

-21-

1   was most integral to the enactment, and charged with the primary enforcement, of the

2   FACTA provisions governing fraud alerts. (*Id.* ¶¶ 19, 39.) His contemporaneous

3   knowledge and his in-depth review of these issues — both then and now — convince

4   him that no such policy exists. (*Id.* ¶ 19.)

5   **B.    The Statutory Language And Substantial Legislative History When
        Viewed As A Whole Reveal That Experian's Public Policy**

6   **Interpretation Is Wrong**

7           In coming to its determination of a public policy tethered to the FCRA, the

8   Court relied exclusively on two sentences in the House Report to FACTA. The Court

9   found that the "clear terms of the legislative history" reveal that "any request for a

10  fraud alert 'must' be made by 'an individual,' and not by a company like Lifelock."

11  (Dkt. No. 88 at 5 (quoting H.R. Rep. No. 108-263 at 40 (Sept. 4, 2003)).)

12          Experian's interpretation is based on a misreading of the statute and a

13  misunderstanding of the legislative process. As set forth in the meticulous, measured

14  testimony of Professor Zywicki, neither the statutory working nor the legislative

15  history quoted by Experian support the asserted "policy." Professor Zywicki explains

16  the untoward consequences that would follow from importing into a statutory

17  provision about what consumer-reporting agencies *must* do, a new prohibition on what

18  others *may* do. (*See* Zywicki Decl. ¶¶ 44–50.) He also demonstrates that the

19  legislative history quoted by Experian is, by its own terms, directed at interpretation of

20  *draft* provisions, so that the commentary was limited in subject to each individual

21  provision, because the final statute after amendment might not contain all the

22  provisions being discussed by different sections of the legislative history. Thus, an

23  argument like Experian's, which conflates the commentary about two separate

24  provisions, is an illegitimate extrapolation beyond the legislative intent that was even

25  knowable at the time. (*See id.* ¶¶ 51-54.) Professor Zywicki's 28-page analysis

26  vitiates entirely Experian's inaccurate assertion that there is a statutory policy

27  forbidding corporations like LifeLock from submitting requests for fraud alerts to

28  CRAs.

-22-

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
LIFELOCK, INC.'S MOTION FOR RECONSIDERATION**

1   In light of the serious policy implications this Court's Order could have if

2   allowed to stand, the Court should strongly consider Professor Zywicki's highly

3   relevant testimony and not allow Experian to succeed in obtaining summary judgment

4   eight months before the expert disclosure date.

5   **V.    Finding A Violated Public Policy Does Not End The Inquiry**

6   Even if the Court's determination that LifeLock violated a public policy against

7   corporations submitting fraud alerts on behalf of consumers were correct, a violation

8   of that single policy is insufficient to establish "unfairness" within the meaning of the

9   UCL. *See Schnall v. Hertz Co.*, 78 Cal. App. 4th 1144, 1166–67, 1170 (2000)

10  (finding a potentially violated legislatively-declared policy, but recognizing

11  defendant's right to introduce evidence of the utility of its practices to justify its

12  conduct): *Gregory*, 104 Cal. App. 4th at 854-55 ("[A]ppellant asks us to apply the

13  policy against urban blight to circumstances where it would impinge on a separate

14  state policy[.]; finding that the violation was not unfair). In *Gregory*, for example, the

15  court noted that, where a plaintiff alleges a violation of the UCL under the "unfair"

16  prong, countervailing policies must be balanced before a violation of the UCL may be

17  found. 104 Cal. App. 4th at 854-55. Indeed, *Cel-Tech* itself recognizes that even after

18  a public policy is established, factual issues remain about whether violation of that

19  policy is "unfair." *Cel-Tech*, 20 Cal. 4th at 188–90 (remanding for presentation of

20  evidence on whether non-compliance with policy is "unfair"; noting the importance of

21  overall context).

22  As in *Cel-Tech*, *Schnall*, and *Gregory*, even if there is a public policy against

23  corporations submitting fraud alert requests, that alone does not establish that

24  LifeLock has violated the UCL. There are many countervailing and substantial public

25  policies that support LifeLock's activities: protecting consumers from financial fraud,[2]

26

27  [2] *See, e.g.*, H.R. Rep. No. 108-263 at 22 (describing the first purpose of FACTA — including the new fraud alerts — as being to "provide[] consumers with the tools they

28  need to fight identity theft and to ensure the accuracy of their credit reports").

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
LIFELOCK, INC.'S MOTION FOR RECONSIDERATION**

permitting individuals to freely contract with companies for services,[3] permitting companies to freely contract with each other,[4] permitting individuals to freely select individuals or companies to act as their agents.[5]  The FTC, in fact, indicated its belief that fraud alerts are important each and every time a consumer has been or is about to be the victim of identity theft, and that:

> [T]he harm that would result from a delay in the placement of a[ Fraud] Alert would be greater than the harm resulting from an alert that is improperly placed in a consumer's file.

FTC, Notice of Proposed Rulemaking, 69 Fed. Reg. 23370, 23374 (Apr. 28, 2004).

There are even public statements by congressional leaders confirming the benefit of *LifeLock* specifically.  In the words of Rep. Harry E. Mitchell:

> Lifelock . . . has become a nationwide industry leader in helping consumers to proactively protect their personal information and render it useless to criminals.

(Speech Commemorating National I.D. Theft Prevention Week (Mar. 4, 2008).)

    Before this Court granted summary judgment, LifeLock was entitled to a fact-intensive consideration of its business activities in conjunction with the various public policies implicated by them, with all facts construed in the light most favorable to LifeLock.  Given all of the significant public policies at issue in this case, the Court should reconsider its ruling to allow for that type of factual assessment.

---

[3] *See, e.g., Nat'l Auto. Ins. Co. v. Winter*, 58 Cal. App. 2d 11, 20–21 (1943) ("[C]ompetent persons ordinarily have the utmost liberty of contracting, and their agreements voluntarily and fairly made will be held valid and enforced in the courts . . . 'in the absence of a clear showing that some definite public detriment will probably result from its performance.'" (quoting *Twin City Pipe Line Co. v. Harding Glass Co.*, 283 U.S. 353, 358 (1931)).

[4] *Birkenfeld v. City of Berkeley*, 17 Cal. 3d 129, 160 (1976) (holding that the state's power to regulate contracts only "extends to objectives in furtherance of the public peace, safety, morals, health and welfare").

[5] *See, e.g.*, Restatement (Third) Agency § 1.01 cmt. c ("The chief justifications for the principal's accountability for the agent's acts are the principal's ability to select and control the agent and to terminate the agency relationship[.]"); *Persinger v. Holst*, 639 N.W.2d 594, 599 (Mich. Ct. App. 2001) ("A mentally competent principal has the superior knowledge and ability to choose an agent that best meets her expectations, needs, and desires.").

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LIFELOCK, INC.'S MOTION FOR RECONSIDERATION**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CONCLUSION

In light of the substantial new evidence that has come to light since the summary judgment hearing, the Court should reconsider its order and allow for a full presentation of the evidence at trial before ruling on Experian's claim that LifeLock has violated an "established public policy" and has therefore violated California's UCL.

DATED:  June 22, 2009

KIRKLAND & ELLIS LLP


By:    /s/ Mark Holscher
        Mark Holscher
        Diana Torres

GREENBERG TRAURIG, LLP


By:        /s/ Jordan Grotzinger
        Jordan Grotzinger

Attorneys for Defendant LifeLock. Inc.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
LIFELOCK, INC.'S MOTION FOR RECONSIDERATION