Mark Holscher (SBN 139582)
mark.holscher@kirkland.com
Diana M. Torres (SBN 162284)
diana.torres@kirkland.com
KIRKLAND & ELLIS LLP
777 South Figueroa Street
Los Angeles, California 90017
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

Jeff E. Scott (SBN 126308)
scottj@gtlaw.com
Jordan D. Grotzinger (SBN 190166)
grotzingerj@gtlaw.com
GREENBERG TRAURIG, LLP
2450 Colorado Ave., Suite 400E
Santa Monica, CA 90404-5524
Telephone: (310) 586-7700
Facsimile: (310) 586-7800

Attorneys for Defendant and Counterclaimant
LIFELOCK, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION – SANTA ANA

| | |
|---|---|
| EXPERIAN INFORMATION SOLUTIONS, INC., a corporation,<br><br>Plaintiff,<br>v.<br>LIFELOCK, INC., a corporation; and DOES 1 through 10, inclusive,<br><br>Defendant.<br><br>AND RELATED COUNTERCLAIM. | Case No.: SA-CV-08-00165 AG (MLG)<br><br>DECLARATION OF CHRIS JAY HOOFNAGLE IN SUPPORT OF DEFENDANT LIFELOCK, INC.'S MOTION FOR RECONSIDERATION<br><br>Date: July 13, 2009<br>Time: 10:00 a.m.<br>Before: Hon. Andrew J. Guilford |

I, Chris Jay Hoofnagle, declare and state as follows:

1. I am familiar with and have personal knowledge of the matters set forth in this declaration and if called upon to do so, could and would testify competently thereto, except where my knowledge is based upon information and belief, and as to those matters, I understand and believe them to be true.

**Summary**

2. Identity theft is a serious consumer problem, one that is prevalent and until recently, practically unavoidable. Most marketplace mechanisms operate to incentivize the sale of personal information, which in many contexts, heightens the risk of identity theft for consumers. In recent years, a "privacy agent" market has emerged to address these problems. Lifelock, Inc., is one such privacy agent; one of its services initiates free fraud alerts on behalf of its customers, for a fee, in order to reduce the risk of identity theft. This Court's Order Granting Motion for Partial Summary Judgment could have profound, adverse effects on the larger market for privacy-enhancing services.

3. Privacy agents help consumers navigate an increasingly complex landscape of privacy rights, and do so by asserting these rights on behalf of consumers, with their affirmative consent. Only experts have the knowledge and time to track these rights and to effectively assert them. Privacy agents have this expertise, and consumers should be able to hire them, in order to express strong privacy preferences effectively. The aforementioned order, however, has the potential to cripple this nascent privacy agent market and reduce consumers' ability to prevent identity theft and to limit the commercial use of personal information in other contexts.

**Qualifications**

4. I make this declaration as an expert in the field of identity theft and information privacy.

5. I was extensively involved in the public policy debate surrounding the

enactment of the Fair and Accurate Credit Reporting Act of 2003 ("FACTA"). I testified before the House Financial Services Committee on the legislation[1], and more generally, before the Senate and House on the problem of identity theft and of securing Social Security numbers. I authored an amicus brief in *ABA v. Lockyer*, No. 05-16560 (9th. Cir. Sept. 8, 2004), concerning the preemptive effect of FACTA.

6. My scholarly writing focuses on the problem of identity theft. *See e.g*: Toward a Market for Bank Safety, 21 LOY. CONSUMER L. REV. 101 (Fall 2008)(discussing public reporting of identity theft incidents); Identity Theft: Making the Unknown Knowns Known, 21 HARV. J. OF L. & TECH. 97 (Fall 2007)(discussing the advent of "synthetic" identity theft); Putting Identity Theft on Ice: Freezing Credit Reports To Prevent Lending to Impostors, in Chander, Radin, Gelman, SECURING PRIVACY IN THE INTERNET AGE (Stanford University Press 2008)(discussing negligence in credit granting, and the need for consumer control over credit granting decisions).

7. My research focuses on identity theft, and is supported by consumer-oriented foundations and the National Science Foundation's Team for Research in Ubiquitous Secure Technologies (TRUST).

8. I am Director of Information Privacy Programs for the Berkeley Center for Law & Technology, at the University of California, Berkeley, School of Law. I have taught information privacy law there, and supervise numerous student projects focusing on information privacy. I make this declaration in my personal capacity as an expert in identity theft and information privacy.

9. Prior to Berkeley Law, from 2000-2006, I worked for the Electronic Privacy Information Center, a leading civil liberties and privacy advocacy organization, based in Washington, DC.

---

1 Hearing on H.R. 2622, the Fair and Accurate Credit Transactions Act of 2003, Before the House Financial Services Committee, 108th Cong. (2003).

10. I serve on the advisory boards of TRUSTe, a company devoted to promoting trustworthy transactions online, and the Future of Privacy Forum, which supports business-practical privacy protections and transparency for consumers.

11. I have not received remuneration from LifeLock, Inc. for writing this declaration, nor expect to. I commented upon this Court's Order prior to having any contact with LifeLock, Inc.[2]

**The Need for a Privacy Agent Market**

12. The Federal Trade Commission's 2006 Identity Theft Survey Report estimated that between 1.2 and 2.8 million Americans became victims of new account identity theft in 2005.[3]

13. To provide some perspective, consider that in the same year, roughly 775,000 cars were stolen.[4] To address this problem, a healthy market exists to protect cars from theft, one that actuates innovation among automobile manufacturers, that encourages the purchase of insurance policies, car alarms, and motivates self-help among automobile owners. Significant law enforcement resources are devoted to the problem of automobile theft.

14. Companies such as LifeLock, Inc., are "privacy agents." They are part of a nascent industry competing to protect individuals from identity theft, much like how car alarm companies and insurance companies attempt to prevent and mitigate the problem of automobile theft. Unlike the automobile theft problem, historically, the identity theft problem is largely not understood nor addressed by law enforcement.[5]

---

[2] Kim Zetter, Judge Rules LifeLock's Fraud Alert Service Illegal, Wired, May 27, 2009, available at http://www.wired.com/threatlevel/2009/05/lifelock/.

[3] Federal Trade Commission, 2006 Identity Theft Survey Report 3 (Nov. 2007).

[4] U.S. Dept. of Justice, Bureau of Justice Statistics, Criminal Victimization in the United States, 2005 Statistical Tables 14 (Dec. 2006), available at http://www.ojp.gov/bjs/pub/pdf/cvus05.pdf.

[5] Identity Theft: How It Happens, Its Impact on Victims, and Legislative (Continued…)

Furthermore, while automobile companies have incentives to make cars impervious to theft, consumer reporting agencies lack direct incentives to prevent identity theft. Consumer reporting agencies have strong incentives to sell as much information as possible. In some cases, this information sale directly facilitates identity theft. This is because every time a new account identity theft occurs, it occurs because at some point, a consumer reporting agency sold a consumer report to a credit grantor that failed to recognize the credit applicant as an impostor. And credit reporting agencies have it both ways: they sell information to creditors, and then drum up concern about the practice among consumers in order to sell credit monitoring services.[6]

15. Fraud alerts give consumers a way to reduce the risk of identity theft. Fraud alerts impose an obligation upon credit grantors to use reasonable efforts to verify the identity of a credit applicant.[7] This is an obligation that some consumers have chosen to exercise automatically through LifeLock.

16. My research frames identity theft as an externality of the credit granting industry. In the rush to acquire new customers, credit issuers quickly grant new accounts. Impostors have taken advantage of this business model by posing as other individuals. In recent litigation on this issue, banks have argued that they have no duty to verify the authenticity of a credit application.[8] Between consumer reporting

---

Solutions, Hearing Before the U.S. Senate Judiciary Subcommittee on Technology, Terrorism, and Government Information, Jul. 12, 2000 (testimony of Beth Givens, Director, Privacy Rights Clearinghouse)("Law enforcement doesn't investigate many [identity theft] … crimes. There's just too much identity fraud occurring for them to handle all such cases, although the financial fraud departments of many police departments are being expanded.")

[6] Experian owns "Freecreditreport.com," a website that offers credit monitoring. Freecreditreport.com, available at http://www.freecreditreport.com/ ("See who's been checking your credit. Look for potential inaccuracies and unauthorized activity.")

[7] Pl. Comp. at 25.

[8] *Wolfe v. MBNA America Bank*, 485 F. Supp. 2d 874, 878 (W.D.T.N. Apr. 25, (Continued…)

agencies' incentives to sell data, and banks' refusal to accept a duty to verify credit applications, in a very real sense, individuals must rely upon themselves to prevent identity theft. Privacy agents such as LifeLock offer a new market solution to this externality of the credit system that can be effective because it forces market actors to actually verify credit applications.

**The Challenge of Expressing Privacy Preferences**

17. This Court's order could have a profound, negative effect on the larger market for companies that help consumers express strong pro-privacy preferences.

18. The complex landscape of statutory privacy rights and self-regulatory privacy protections is difficult for consumers to navigate. Take, for instance, the Fair Credit Reporting Act (FCRA).[9] It is well known that individuals can access their consumer reports and correct them under the FCRA. Less well known are several other pro-privacy interventions. For instance, FCRA allows individuals to opt out of "prescreened" offers of credit,[10] and thereby reduce the risk of becoming a victim of identity theft. A separate section allows individuals to opt-out of affiliate sharing of information.[11] Another allows individuals to gain access to records generated when identity theft impostors open accounts in their name.[12] Yet another allows individuals to block information generated by impostors from appearing on the victim's consumer report.[13] Many individuals may have strong privacy preferences, but lack knowledge of credit reporting, its privacy risks, and the many statutory rights to limit use of information. Even those with knowledge of the privacy risks may lack the time and

---

2007); *Huggins v. Citibank*, 585 S.E.2d 275, 276 (S.C. SCT 2003).

[9] 15 U.S.C. § 1681 et seq.

[10] 15 U.S.C. § 1681b(e).

[11] 15 U.S.C. § 1681s-3.

[12] 15 U.S.C. § 1681g(e).

[13] 15 U.S.C. §1681c-2.

attention to detail necessary to exercise these rights. Privacy agents perform this role, and provide value to consumers with strong privacy preferences.

19. The FCRA is just one of many federal privacy laws and self-regulatory rules. American privacy law is sectorally-based, meaning that rules, if they exist at all, are scattered throughout the U.S. Code. Thus, privacy agents can be hired to exercise many other rights to shield personal information from unwanted uses. These include opting out of telemarketing by enrolling in the national telemarketing do-not-call registry,[14] opting out of the sale of customer lists by video rental stores,[15] opting out from the sale of subscriber lists by cable television providers,[16] opting out of junk mail sent by members of the Direct Marketing Association,[17] and opting out from hundreds of data selling companies, each of which has its own opt out method.[18] It is rational for consumers to hire privacy agents to manage these preferences; for them to function efficiently, consumers must be able to delegate authority to exercise these rights to privacy agents such as LifeLock, Inc.

## Conclusion

20. A larger issue is in play in this case: the extent to which ordinary consumers can express strong privacy preferences by hiring experts to exercise privacy rights.

21. Data selling companies wish to appear to be responsible actors. Honoring requests to exercise privacy rights is one way to act responsibly. But these rights have costs; they reduce the ability of the data company to sell personal information. Thus,

---

[14] 15 U.S.C. § 6101.

[15] 18 U.S.C. § 2710(b)(d).

[16] 47 U.S.C. § 551(c).

[17] *See* https://dmachoice.org/.

[18] *See e.g.*, Acxiom, Opt-Out Request Form, http://www.acxiom.com/about_us/privacy/consumer_information/opt_out_request_form/Pages/Opt-OutRequestForm.aspx.

when consumers find efficient ways to exercise privacy rights, data companies respond by attempting to increase transaction costs.[19] This Court's Order furthers this anti-consumer strategy and should be reconsidered.

I declare, under penalty of perjury of the laws of the United States, that the foregoing is true and correct.

Executed this 18th day of June, 2009, at Berkeley, CA.

By: [signature]
Chris Jay Hoofnagle

[19] *See e.g.*, Ryan Singel, Acxiom Opts Out of Opt-Out, Wired, Nov. 17, 2003, available at http://www.wired.com/politics/security/news/2003/11/61240/ ("Acxiom calls itself the premier source of addresses and phone numbers for telemarketers and mass mailers. But when it receives a list of names of people who want to get off its lists, the company considers the request to be junk mail and sends it back.")