1    Mark Holscher (SBN 139582)
     mark.holscher@kirkland.com
2    Diana M. Torres (SBN 162284)
     diana.torres@kirkland.com
3    KIRKLAND & ELLIS LLP
     777 South Figueroa Street
4    Los Angeles, California 90017
     Telephone:  (213) 680-8400
5    Facsimile:   (213) 680-8500

6    Jeff E. Scott (SBN 126308)
     scottj@gtlaw.com
7    Jordan D. Grotzinger (SBN 190166)
     grotzingerj@gtlaw.com
8    GREENBERG TRAURIG, LLP
     2450 Colorado Ave., Suite 400E
9    Santa Monica, CA 90404-5524
     Telephone:  (310) 586-7700
10   Facsimile:   (310) 586-7800

11   Attorneys for Defendant and Counterclaimant
12   LIFELOCK, INC.

13

14                    UNITED STATES DISTRICT COURT

15                   CENTRAL DISTRICT OF CALIFORNIA

16                  SOUTHERN DIVISION – SANTA ANA

17

18   EXPERIAN INFORMATION              ) Case No.: SA-CV-08-00165 AG (MLG)
     SOLUTIONS, INC., a corporation,    )
19                                      )
                                        ) DECLARATION OF TODD J.
20        Plaintiff,                    ) ZYWICKI IN SUPPORT OF
                                        ) DEFENDANT LIFELOCK, INC.'S
     v.                                 ) MOTION FOR RECONSIDERATION
21                                      )
     LIFELOCK, INC., a corporation; and )
22   DOES 1 through 10, inclusive,      )
                                        ) Date: July 13, 2009
23                                      ) Time: 10:00 a.m.
          Defendant.                    ) Before: Hon. Andrew J. Guilford
                                        )
24                                      )
                                        )
25   _____)
                                        )
26   AND RELATED COUNTERCLAIM.          )

27

28

I, Todd J. Zywicki, declare and state as follows:

1.     I am familiar with and have personal knowledge of the matters set forth in this declaration and if called upon to do so, could and would testify competently thereto, except where my knowledge is based upon information and belief, and as to those matters, I understand and believe them to be true.

### QUALIFICATIONS

2.     I make this declaration as an expert in the field of federal consumer credit policies and protection, including the public policy established by the Fair Credit Reporting Act ("FCRA") and the 2003 amendments to the FCRA enacted in the Fair and Accurate Credit Transactions Act of 2003 ("FACTA"), PL 108-159 (Dec. 4, 2003).

3.     From May 2003 to August 2004 I served as the Director of the Office of Policy Planning, United States Federal Trade Commission ("FTC"). As Director of the Office of Policy Planning I reported directly to Chairman Tim Muris and was responsible for helping to conceive and execute policies and priorities of the Commission on issues of Consumer Protection, Competition, and Competition Advocacy. I was heavily involved in interactions between the Chairman's Office and the Bureau of Consumer Protection. Indeed, much of my time at the Federal Trade Commission was spent on issues of consumer credit policies and regulation.

4.     As Director of the Office of Policy Planning, United States Federal Trade Commission, I was intimately involved in the FTC's discussions regarding reauthorization and amendment of the FRCA in 2003. Specifically, I worked directly with Chairman Tim Muris and Howard Beales, who was then heading up the FTC's Bureau of Consumer Protection, to analyze the various policy and statutory language proposals suggested for inclusion in the FCRA 2003 amendments.

5.     I have testified in Congress on several occasions on issues of consumer credit regulation and consumer bankruptcy. *See e.g.,* *Modernizing Consumer*

**DECLARATION OF TODD J. ZYWICKI IN SUPPORT OF LIFELOCK'S MOTION FOR RECONSIDERATION**

*Protection in the Financial Regulatory System: Strengthening Credit Card Protections: Hearing Before the S. Comm. on Banking, Housing, and Urban Affairs*, 112th Cong. (2009); *Credit Card Practices: Current Consumer and Regulatory Issues: Hearing Before the Subcomm. on Financial Institutions and Consumer Credit of the H. Comm. on Financial Services*, 110th Cong. 15-30, 120-150 (2007); *Oversight of the Implementation of the Bankruptcy Abuse Prevention and Consumer Protection Act: Hearing Before the Subcomm. on Administrative Oversight and the Courts of the S. Comm. on the Judiciary*, 109th Cong. 21-22, 220-32 (2006). I have also provided advice to many congressional staffers as well as members of the Congressional Oversight Panel for the Troubled Assets Relief Fund (TARP). *See e.g., Circuit City Unplugged: Why Did Chapter 11 Fail to Save 34,000 Jobs?: Hearing Before the Subcomm. on Commercial and Administrative Law of the H. Comm. on the Judiciary*, 111th Cong. 45-53, 146-47 (2009).

6.     My scholarly writing focuses on consumer credit, policy and consumer bankruptcy. I have published numerous articles on the topic and am currently working on two books. The first is a book on consumer bankruptcy and consumer lending to be published by Yale University Press. The second is a book I am co-authoring on the regulation of consumer credit to be published by Oxford University Press.

7.     I am a Professor of Law at George Mason University School of Law. I received my A.B. *cum laude* from Dartmouth College in 1988, an M.A. in Economics from Clemson University in 1990, and my J.D. from the University of Virginia in 1993, where as a student I was a John M. Olin Fellow in law and economics. My *curriculum vitae* is attached as Exhibit A.

8.     I have been a law professor at George Mason University School of Law since 1998. I received tenure and promotion to Associate Professor in 2000. I received promotion to Professor of Law in 2002, and to George Mason University Foundation Professor of Law in 2009. From 1996 to 1998 I was Assistant Professor of Law at

Mississippi College School of Law. I have also served as a Visiting Professor of Law at Vanderbilt University Law School, Georgetown University Law Center, and Boston College Law School.

9.    I am a Research Fellow of the James Buchanan Center at George Mason University. I am the Editor of the *Supreme Court Economic Review*, which publishes peer-reviewed articles in the field of law and economics. I serve as a peer reviewer for the following scholarly journals: *Review of Austrian Economics*, *Journal of Institutional and Theoretical Economics*, *Journal of Bioeconomics*, *Supreme Court Economic Review*, *Journal of Institutional Economics*, and *Philosophy, Politics, and Economics*. I am the author of over 60 published scholarly articles in leading law journals and economics journals.

10.    I am currently a member of the Board of Directors and Board of Advisors to the Financial Services Research Program at George Washington University School of Business.

11.    I have been retained by counsel for LifeLock, Inc. to provide this declaration.

12.    This declaration renders opinions on certain aspects of the case involving federal consumer credit policies and protections, including the public policy established by the FCRA, and is subject to revision as further information becomes available.

## ISSUES ANALYZED

13.    Whether consumer protection efforts in general, and consumer credit fraud protection efforts in particular, are enhanced by private entrepreneurs providing new types of services not available in the marketplace at the time FACTA's modifications to the FCRA were enacted and, in particular, whether product offerings providing

4

contracted-for privacy and identity-theft protections, including through the placement of requests for initial and subsequent fraud alerts, can provide value to consumers.

14.    Whether, standing by itself, the submission by a corporation to a national credit reporting agency of requests for fraud alerts violates a public policy rooted in or arising from the FCRA, including its 2003 FACTA amendments.

15.    Whether there is a stated public policy that national credit reporting agencies are not required to process fraud alerts that are placed by *companies* as opposed to *individuals*.

## APPROACH TO ANALYSIS

16.    In preparation for providing this declaration, I reviewed certain legal pleadings in this case.  (A list of the pleadings I reviewed is attached as Exhibit B.)  I also re-reviewed the FCRA, including the 2003 amendments, and certain legislative history and agency materials related to the FCRA, including certain materials with which I was already familiar.

17.    With these materials as background, I applied my experience and expertise in formulating, analyzing, evaluating, and executing federal consumer protection policies, including my special expertise in interpreting and implementing federal statutes administered by the FTC, and in particular the FCRA.  In this fashion, I made the determinations and reached the conclusions reflected in this Declaration.

## SUMMARY OF CONCLUSIONS

18.    Consumer protection efforts in general, and consumer credit fraud protection efforts in particular, are often enhanced by private entrepreneurs providing new types of services not available in the marketplace at the time FACTA's modifications to the FCRA were enacted.  Here, LifeLock's fundamental business objective of providing consumers with contracted-for privacy protections that go beyond the statutory minimum protection levels, including contracted-for initial and

5

**DECLARATION OF TODD J. ZYWICKI IN SUPPORT OF LIFELOCK'S MOTION FOR RECONSIDERATION**

subsequent fraud alert requests, will, if properly executed, provide consumer value and further the purposes of the FCRA by making enhanced anti-fraud protections available to those consumers who choose to pay for them. Although any business model has a potential for abuse, there is nothing inherently abusive or anti-consumer in the value proposition LifeLock seeks to provide.

19.    Under the FCRA as amended, no statutory policy forbids the submission by a corporation to a national credit reporting agency of requests for the placement of fraud alerts. As the Director of the FTC's Office of Policy Planning at the time of FACTA's enactment, I was at the center of the legislative discussions in the agency that was most integral to the enactment and charged with the primary enforcement of the FACTA provisions governing protections against identity theft. My contemporaneous knowledge at the time and my subsequent review of the question both convince me that no such policy can be identified, regardless of whether one looks to the plain language of the statute, its legislative history, or its underlying thrust and purposes.

20.    There is no settled or established public policy that national credit reporting agencies are *not* required to process fraud alerts placed by corporations as opposed to individuals. While I recognize that a statutory basis for alleging such a policy has been asserted in this case, any such public policy would have certain arbitrary, irrational, and anti-consumer consequences. These arbitrary, irrational, anti-consumer consequences should be carefully explored and evaluated by the FTC before any conclusion is drawn that such a public policy under the FCRA is settled, established, or in place.

### PUBLIC POLICY / PUBLIC BENEFIT

21.    Congress enacted the 2003 amendments to the FCRA against a backdrop of serious Congressional concern about identity theft. During its legislative

**DECLARATION OF TODD J. ZYWICKI IN SUPPORT OF LIFELOCK'S MOTION FOR RECONSIDERATION**

deliberations, Congress heard testimony that identity theft is a growing problem in the United States, and that it is very expensive, both economically and emotionally, for consumers to remedy the effects of identity theft *after* it has occurred.  *See The Fair Credit Reporting Act and Issues Presented by Reauthorization of the Expiring Preemption Provisions: Hearings Before the S. Comm. on Banking, Housing, and Urban Affairs*, 108th Cong. 83 (2003) (Statement of Timothy Caddigan, Special Agent in Charge Criminal Investigative Division U.S. Secret Service) ("Caddigan") ("What victims do have in common is the difficult, time-consuming, and potentially expensive task of repairing the damage that has been done to their credit, their savings, and their reputation.  According to the General Accounting Office, GAO, the average victim spends over 175 hours attempting to repair the damage inflicted by identity criminals."); *id.* at 102-03 (Statement of John M. Harrison, Captain, U.S. Army (Retired)) (describing his embarrassment over "[t]he emotional impact from identity theft" including having suffered from anxiety, insomnia, and Post Traumatic Stress Disorder, which eventually led to his loss of employment, and explaining that what victims go through in attempting to repair their credit "would drive anybody nuts."); *see also H.R. 2622 Fair and Accurate Credit Transactions Act of 2003*: *Hearing Before the H. Comm. on Financial Services*, 108th Cong. 255 (2003) (testimony of D. Russell Taylor, President and CEO, Rahway Savings Institution and Chairman, America's Community Bankers on behalf of America's Community Bankers) ("Taylor") ("While the U.S. system of credit is clearly the most effective and efficient in the world, it is not without its glitches.  The rising number of identity theft cases is creating enormous hardships both to consumer victims and community banks.").

22.    Congress also heard testimony regarding the potential dangers arising from the widespread availability of consumer credit — what then-FTC Chairman Muris often called "the miracle of instant credit."  *H.R. 2622 Fair and Accurate Credit Transactions Act of 2003*: *Hearing Before the H. Comm. on Financial Services*, 108th

7

Cong. 10 (2003) (testimony of FTC Chairman Timothy Muris); *see also id.* at 243-45 (2003) (testimony of Treasury Secretary John W. Snow) ("Snow") ("A hallmark of our country is readily available credit" but relatedly "[p]erhaps the most serious threat to financial consumers today is identity theft."); Caddigan at 83 ("The burgeoning use of the Internet and advanced technology coupled with increased investment and expansion, has intensified competition within the financial sector. Although this provides benefit to the consumer through readily available credit and consumer-oriented financial services, it also creates a target-rich environment for today's sophisticated criminals, many of whom are organized and operate across international borders.").

23.    FACTA's 2003 amendments to the FCRA provide consumers, among other things, a minimum level of protection against identity theft.

24.    But despite the minimum protection afforded by the amended statute, the serious economic and emotional costs associated with consumer attempts to remedy identity theft after it has taken place has since created a significant consumer demand for products that take proactive measures to prevent identity theft before it occurs. *Cf.* Snow at 245 ("Further, one of the most distressing aspects of identity theft is how quickly an identity thief can damage your credit history and how long it can take to undo the damage. The cases are so significant that a market in identity theft insurance is developing.").

25.    The demand for services that take proactive measures to prevent identity theft before it occurs is further fed by the information and transaction costs associated with monitoring one's own credit to see whether an identity thief has struck. Contracting for those services may be especially valuable to consumers who believe they are especially vulnerable to identity theft or for whom monitoring to prevent identity theft is especially burdensome, such as the ill, those who travel often, and consumers whose attention may be focused on more pressing personal or family

8

**DECLARATION OF TODD J. ZYWICKI IN SUPPORT OF LIFELOCK'S MOTION FOR RECONSIDERATION**

matters. *See* Taylor at 255 (explaining that he became a victim of identity theft a time when he "was dealing with a serious family medical crisis and had little time or emotional energy to investigate what had happened and the steps needed to resolve the situation.").

26.    Precisely because legislation, and even FTC regulation, is comparatively static and slow to respond to innovation, it would have been unwise, in my view, for Congress to prohibit consumers from contracting privately for additional protections. During the 2003 legislative process, Congress heard compelling testimony that identity thieves are dynamic, creative and entrepreneurial. *See* Caddigan at 86-87 (identity thieves evolve, becoming more organized and more sophisticated over time). Anti-fraud measures must necessarily be equally creative, dynamic, and entrepreneurial in order to keep up. For this reason, the added verifications and other identity theft protections enjoyed by consumers who privately contract for fraud alerts provide a public benefit.

27.    I recognize, of course, that added verifications, privacy protections, and anti-theft protections entail certain costs as well as benefits. But the principal burden of a fraud alert on consumers is the relatively minor one of having to wait for new credit while the credit issuer conducts an identity-verification process. These relatively minor burdens from additional verification procedures will apply only to those consumers who affirmatively choose to bear them — that is, consumers who want to pay the (in-kind) cost of waiting for identity verification in order to reap the (in-kind) benefit of added anti-fraud protection. Moreover, these burdens will be imposed on businesses only to the degree that consumers individually choose to impose them on the credit-issuing business community. The fact that any burdens on business will arise only from thousands of individual consumer choices is significant because the heightened protections against identity theft provided to these consumers should induce otherwise worried consumers to be more willing to enter into legitimate credit

9

transactions with legitimate credit providers.  Put differently, privately contracted for consumer-privacy and identity-theft protections should reduce the marginal increase in fraud risk that a consumer incurs as an externality every time they enter a legitimate credit transaction.  This reduction in identity-theft risk should benefit the legitimate, credit-providing business community.

### THE FEDERAL TRADE COMMISSION'S UNDERSTANDING OF THE 2003 FCRA AMENDMENTS

28.    I have personal knowledge of the contemporaneous understanding of the relevant senior Federal Trade Commission officials regarding the 2003 FCRA amendments, which are known as the Fair And Accurate Credit Transactions Act. Congress sought out the views of the Commission in framing those amendments.  As the Director of the Office of Policy Planning, United States Federal Trade Commission, I was intimately involved in the Commission's internal policy discussions and analysis concerning the 2003 reauthorization and amendment of the FRCA and in the framing of testimony presented to Congress.  Over the course of 2003, as draft legislation was wending its way through the legislative process, I consulted regularly with then-Chairman Tim Muris and then-Director J. Howard Beales, III (Bureau of Consumer Protection, U.S. Federal Trade Commission) on FCRA policy issues.  The purpose of the discussions was, among other things, to develop the FTC's position on potential amendments to the FCRA that might be made in connection with its reauthorization and to discuss the Congressional testimony of Mr. Muris and Mr. Beales before Congressional committees.

29.    As the Director of the Office of Policy Planning during the reauthorization and amendment of the FRCA in 2003, I never interpreted the provisions that ultimately became the FACTA amendments, including the provision that ultimately became FCRA section 605A, to limit consumers from privately contracting for added protections from identity theft.  Nor do I recall anyone else within the FTC, including

10

then-Chairman Muris and then-Director Beales, interpreting those provisions to limit or eliminate entirely the possibility of consumers obtaining additional identity-theft protections as a matter of private contract. Nor do I recall anyone at FTC expressing the view that obtaining additional identity theft protections as a matter of private contract would be contrary to the public policies embodied in the FCRA or FACTA.

30.    As I reflect on the matter today, based on my many conversations at the time, I am certain that if back in 2003 anyone involved in the relevant FTC discussions had interpreted the proposed 2003 FCRA amendments to set a ceiling on consumer protection by outlawing the right of consumers to contract for the placement of continuous fraud alerts, I would have learned of that interpretation. I am also certain that if someone at the FTC had proposed such an interpretation in 2003, I would have questioned whether the FTC should permit the enactment of such a provision without voicing its opposition. Accordingly, as I reflect on the matter today, I am certain that had anyone involved in the relevant FTC discussions interpreted the proposed FCRA amendments as prohibiting consumers from obtaining additional contracted-for protections, including continuous privately contracted-for fraud alerts, as opposed to simply establishing a floor of minimum, statutorily required protections, I would have learned of, internally questioned, and voiced opposition to that interpretation. Having no recollection of learning of any such interpretation in 2003, and hence no recollection of voicing such opposition, I am certain that the FTC did not contemporaneously interpret the FACTA to prohibit consumers from contracting for privacy protections beyond those required by the statute, including privately contracted–for requests for fraud alerts.

31.    In addition, based on my contemporaneous understanding of the legislative debates, I believe that, had members of Congress learned and understood that the proposed 2003 FCRA amendments would be interpreted to so limit consumer protection, those proposed amendments would have been opposed by legislative

**DECLARATION OF TODD J. ZYWICKI IN SUPPORT OF LIFELOCK'S
MOTION FOR RECONSIDERATION**

leaders on both sides of the aisle and would have encountered great difficulty in being enacted into law.

### PUBLIC POLICY IMPLICATIONS OF THIS LITIGATION

32.   When applying the consumer protection provisions of the FCRA, government actors should be careful not to apply the statute in a way that eliminates an entire market of consumer identity theft protection services.  That a private market for heightened identity theft protection has come into existence demonstrates that consumers value the service; are willing to expend effort to obtain it; and are willing to pay for it.  To be sure, any business model carries a potential for abuse, from telecommunications companies like WorldCom to investment vehicles like the Madoff funds to business conglomerates like Tyco.  But there is nothing inherently abusive or anti-consumer in seeking to provide consumers with additional identity-theft protections by placing requests for fraud alerts that will prompt credit issuers to undertake additional identification verifications before making additional credit available.  Overzealous application of the law thus creates a real danger of chilling legitimate lawful conduct that furthers the very purpose of the 2003 FCRA amendments: consumers obtaining protections against identity theft.

33.   If careful review demonstrates that abuses have developed at the margins of a market that otherwise provides a lawful and valuable service, government actors should work to repair the market at the margins, rather than to eliminate it altogether. *See* Frank Easterbrook, The Limits of Antitrust, 63 Tex. L. Rev. 1, 15-16 (1984) ("Other things equal, we should prefer the error of tolerating questionable conduct, which imposes losses over a part of the range of output, to the error of condemning beneficial conduct, which imposes losses over the whole range of output.").

34.   As the Supreme Court has explained in the antitrust context, "[m]istaken inferences and the resulting false condemnations 'are especially costly, because they

12

chill the very conduct the antitrust laws are designed to protect.'" *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko*, LLP, 540 U.S. 398, 414 (U.S. 2004) (quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986)).    Relatedly, the Court has recognized that "it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *Norfolk Southern Ry. Co. v. Sorrell*, 549 U.S. 158, 171 (U.S. 2007) (quoting *Rodriguez v. U.S.*, 480 U.S. 522, 526 (U.S. 1987) (*per curiam*) (emphasis added).

35.    This risk of chilling legitimate, lawful conduct that promotes consumer welfare through the overzealous application of the law or pushing the application of a statute beyond its proper scope is greatly exacerbated in the context of litigation between competitors.    Where, as here, a competitor has initiated litigation, that competitor has a substantial motive, and often has substantial resources, to seek to induce legal error as a strategic weapon to gain a competitive advantage. *See* Compl. ¶¶ 101-07 (alleging that Experian is a competitor of LifeLock).    Such efforts should be carefully guarded against.

36.    Simply put, government actors should be wary of interpreting the FCRA in a way that chills lawful conduct and threatens to eliminate an entire market.    This wariness should be especially heightened where, as here, litigation has been initiated by a competitor and threatens the very existence of socially beneficial businesses that, if lawfully conducted, will further the purposes of the 2003 FCRA amendments by providing consumers with protections against identity theft.

### STATUTORY ANALYSIS BEARING ON PUBLIC POLICIES

37.    Against this general policy backdrop and in light of these general policy considerations, I have been asked to consider several specific questions of public policy relevant to this litigation.    These questions concern the public policies embodied

**DECLARATION OF TODD J. ZYWICKI IN SUPPORT OF LIFELOCK'S MOTION FOR RECONSIDERATION**

in or arising from the Fair Credit Reporting Act, as amended by the Fair and Accurate Credit Transactions Act, with which I am intimately familiar both from academic work and from my experience as the Director of the FTC's Office of Policy and Planning.

38.    In addressing these questions, I have called especially upon my FTC experience, including my expertise in taking the broad mandates appearing in statutes administered by the FTC, such as the FCRA and FACTA, and turning those mandates into concrete public policies through tools such as regulations, guidance documents, interpretive statements, legislative testimony, mass communications to regulated parties and the public, informal communications with regulated entities and consumers, and other means.

39.    It bears noting in this regard that courts have recognized that the FTC in has a primary role in the interpretation and implementation of the FCRA, including its 2003 amendment by FACTA. *See e.g.*, *Morris v. Equifax Info. Servs, LLC*, 457 F.3d 460, 470 n.16 (5th Cir. 2006) (crediting the FTC's interpretation of the FCRA's text and legislative history); *Estiverne v. Sak's Fifth Ave.*, 9 F.3d 1171, 1173 (5th Cir. 1993) (As the agency empowered to administer and enforce the FCRA, the FTC's interpretation of the Act should be given "considerable weight" and "should not be disturbed unless it appears from the statute or legislative history that Congress intended otherwise.") (citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843 (1984)); 15 U.S.C. § 1582s (granting the FTC administrative and enforcement powers over the FCRA).  My service as the Director of the FTC's Office of Policy and Planning put me at the center of exercising that primary responsibility for interpreting the FCRA in light of its underlying policies.  I therefore believe that, as a former Director of Policy Planning, I am especially well positioned to offer a helpful analysis of the public policies arising from the FCRA.

**DECLARATION OF TODD J. ZYWICKI IN SUPPORT OF LIFELOCK'S
MOTION FOR RECONSIDERATION**

1
2

**PUBLIC POLICY REGARDING THE SUBMISSION OF**
**FRAUD ALERT REQUESTS TRANSMITTED BY CORPORATIONS**

3    40.    I have been asked to assume for the moment (and strictly *arguendo*) that
4    national credit reporting agencies are *not* required to process fraud alerts placed by
5    corporations as opposed to individuals (a proposition that I do not necessarily accept)
6    and then to consider whether, under those hypothetical circumstances, one should
7    conclude that the FCRA and FACTA establish a public policy that companies like
8    LifeLock that assume the corporate form must not place requests for fraud alerts at all.

9    41.    For the reasons described below, I conclude that the FCRA and FACTA
10    give rise to no such public policy. Indeed, the absence of any such public policy seems
11    very clear to me, while the dangers for consumers of concluding otherwise appear very
12    substantial.

13    42.    In declaring this conclusion, I am aware that the Court in this litigation
14    came to a different view in its May 19 partial summary judgment ruling. I am also
15    aware that the Court's May 19 ruling was consistent with — indeed, induced by —
16    briefing and argument submitted by Experian Information Solutions, Inc. I am
17    therefore aware that my views place me in respectful disagreement with Experian's
18    position in this case.

19    43.    My reasons for this respectful disagreement are grounded in substantial
20    measure on the public policy considerations set out above, including the dangers posed
21    by erroneous verdicts in strategically brought litigation, together with an analysis of
22    FCRA's statutory text, structure, and legislative history of a sort I routinely performed
23    as part of my job at the FTC.

24    44.    As an initial matter, during my review of pleadings, I noticed repeated
25    references by Experian to the unusual concept of requests for fraud alerts being
26    "authorized" by the FCRA. *See, e.g.*, Mem. in Sup. of S.J., at 2 ("Section 1681c-1
27    does not *authorize* corporations to request fraud alerts on behalf of customers.")

28

**DECLARATION OF TODD J. ZYWICKI IN SUPPORT OF LIFELOCK'S**
**MOTION FOR RECONSIDERATION**

(emphasis added); *see also* Compl. at ¶ 28 ("*unauthorized* fraud alerts") (emphasis added); ¶ 37 ("FCRA does not *authorize* the placement of an initial fraud alert ...") (emphasis added); ¶ 131 ("The public policy inherent in 15 U.S.C. § 1681c-1 is [that] *only* specific individuals, not companies such as LifeLock, *may* request the placement of initial fraud alerts ...") (emphasis added).  I am not sure what these references to being "authorized" are meant to convey.

45.    The FCRA does not operate like the FTC's telemarketing "do not call" list — another project I contributed to during my Commission tenure.  The FTC's "do not call" regulations make plain, in unambiguous terms, that they prohibit initiating contact, the mere placing of calls, with telephone numbers listed on the "do not call" registry.  *See* 16 C.F.R. § 310.4(b); ); *id.* at § 310.4(b)(1)(iii)(B) ("It is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to engage in, or for a seller to cause a telemarketer to engage in ... (iii) [i]nitiating any outbound telephone calls to a person when (B) that person's telephone number is on the 'do-no-call' registry ..."); *see also* 15 U.S.C. §§ 6151 *et seq.*  By contrast, the FCRA contains no such prohibition on corporations (or anyone else) initiating contact with credit reporting agencies.  I therefore cannot say what in the statute Experian might be referring to in its repeated references to "authorized" versus "unauthorized" requests for fraud alerts.  I know of no statutory provision requiring an "authorization" before a fraud alert request is submitted to a consumer reporting agency.

46.    More generally, it would be a disaster for consumers if the FCRA itself — or its statutory interstices by way of a finding of an unfair trade practices — were to be read to outlaw every consumer protection not expressly "authorized" or "contemplated" by the statute, or every protection that happened to be unavailable in the marketplace at the time the statute's 2003 amendments were enacted.  Such a reading would hobble the evolution of the market for anti-fraud and anti-identity theft protections.  It would mean that identity-thieves and cheats have nothing to fear from

the evolution of a market in consumer protections aimed at thwarting their ever-changing rip-off schemes. In light of the extensive testimony presented during the FACTA legislative process regarding identity theft and its consequences, I cannot believe that Congress intended to enact such a perverse, ossifying, anti-consumer principle into law.

47.    In my view, the market for consumer credit protections, and the participants in that market, need to be just as creative, dynamic and entrepreneurial as the identity thieves and credit cheats. I would therefore oppose on consumer protection policy grounds any reading the FCRA that effectively mandates that only those protections that are expressly "authorized" or "contemplated" by the statute or that happened to be available in marketplace of 2003, may be made available to the public. Such a reading would mean that, as identity thieves honed their skills and schemes, consumers would be powerless to react by purchasing improved protections. As a former FTC official responsible for policy and planning, I believe as a matter of consumer protection policy that any such interpretation of the FCRA should be disfavored.

48.    Despite my concerns rooted strictly in considerations of effective consumer protection, I recognize that analysis of statutory policies must also take into account the express terms of the relevant statute, as well as the statutory structure and, to the extent appropriate, legislative history. Accordingly, in analyzing statutory policies during my tenure at the FTC, I typically engaged in careful analysis of these embodiments of statutory policies, typically beginning with relevant statutory text. I now turn to such a review.

49.    ***Statutory Text.***    The statutory text most relevant to the question under consideration appears to be that of FCRA section 605A, 15 U.S.C. § 1681c-1. That provision says nothing about "authorizing" or "prohibiting" any sort of contact, solicitation, entreaty or request regarding fraud alerts. It instead imposes obligations,

17

**DECLARATION OF TODD J. ZYWICKI IN SUPPORT OF LIFELOCK'S
MOTION FOR RECONSIDERATION**

by its terms and through its use of the mandatory verb "shall," on the "consumer reporting agenc[ies] described in section 603(p)." I therefore see nothing in section 605A that leads me to conclude that it was intended to function like a "do not call" mandate. Nor do I see in section 605A anything that leads me to conclude that the FCRA establishes a public policy that companies such as LifeLock that assume a corporate form must not place requests for fraud alerts.

50. My approach to discerning statutory policies during my FTC tenure as the head of the Office of Policy and Planning was not limited to textual analysis. As noted above, I would also consult a statute's underlying thrust and purposes, its structure, and its legislative history, among other considerations. Of course, I approached legislative history back then as I approach it now, with a skepticism born from the knowledge that legislative history is especially susceptible to becoming interspersed with stray statements inserted at the behest of narrow groups — statements that may or may not reflect the considered views of the purported speaker(s), much less the Congress as a whole. With that cautionary admonition as background, I will now provide an analysis of certain legislative history and structural considerations in light of the relevant statutory text and purposes.

51. ***Legislative History.*** I recently refreshed my recollection of the 2003 congressional deliberations over FACTA by reviewing certain legislative history materials. That review, together with my contemporaneous recollections, confirmed my view that members of Congress were concerned in 2003 about the problem of identity theft and that they recognized the need for comparatively easy and inexpensive mechanisms for consumers to protect themselves. *See, e.g., H.R. 2622 Fair and Accurate Credit Transactions Act of 2003: Hearing Before the H. Comm. on Financial Services*, 108th Cong. 23-24 (2003) (questioning by Rep. Jeb Hensarling and response by Timothy J. Muris, Chairman, FTC); *id.* at 25-26 (questioning by Rep. Spencer Bachus and responses of John W. Snow, Secretary, Department of the Treasury)

**DECLARATION OF TODD J. ZYWICKI IN SUPPORT OF LIFELOCK'S MOTION FOR RECONSIDERATION**

(discussing the dangers posed by adopting a rigid statutory approach to identity theft protections and the importance of providing creative solutions to threats posed by smart, capable and ruthless identity thieves); *id.* at 45 (remarks by John C. Dugan on behalf of the Financial Services Coordinating Council in response to question by Rep. Bachus) (same).  Although FACTA's legislative record is voluminous, and I certainly was and am not familiar with all the FACTA legislative materials, I can recall and I have found nothing indicating that Congress intended to prohibit private corporations from providing enhanced identity theft and data privacy protections to those consumers who choose to pay for them.

52.    I note in this regard that the legislative history of FCRA section 605A, 15 U.S.C. § 1681c-1, supports my view that the provision's plain text imposes *obligations* on consumer reporting agencies, as opposed to *prohibitions* on those who might submit requests for initial fraud alerts.  *See, e.g.*, H.R. No. 108-263 at 41 (Sept. 4, 2003) ("The committee notes that the *obligations* described above apply only to those consumer reporting agencies that compile and maintain files on consumers on a nationwide basis.") (emphasis added).

53.    For the sake of completeness, I have reviewed the pleadings to determine whether any statements in the legislative history might militate in favor of a contrary conclusion.  My review disclosed that Experian's briefing contends that two such statements do appear in a House Committee report.  For ease of reference I label these statements "must" and the "may" statements.  *See* Experian Mot. for S. J. at 11 (quoting H.R. Rep. No. 108-263 at 40 (Sept. 4, 2003))("must" statement); Experian Reply in Sup. of Mot. for S. J. at 11 (quoting H.R. Rep. No. 108-263 at 39 (Sept. 4, 2003))("may" statement).  Experian's briefing invokes both statements in defense of the proposition that the writers of the House report had in mind that section 605A would function like a "do not call" regulation, prohibiting certain entities from initiating contacts with national consumer reporting agencies.  *See, id.* (contending for

the "existence" of a "public policy against a corporation *requesting* fraud alerts") (emphasis added).

54.    Having examined these committee report statements, I disagree with Experian's conclusion that the writers of the House Committee report contemplated that section 605A would function in a manner similar to the FTC's "do not call" regulation. Experian's "may" and "must" statements both appear in the House Report in a "section-by-section" analysis of the House bill. *See* H.R. Rep. No. 108-263 at 40 (Sept. 4, 2003)("A request for a fraud alert *must* be made directly by the consumer") (emphasis added); H.R. Rep. No. 108-263 at 39 (Sept. 4, 2003)("Fraud alerts *may* be placed on consumer reports in the following manner.")(emphasis added).    Both statements thus refer only to a draft of what was to become section 605A of the FCRA, 15 U.S.C. § 1681c-1.    Accordingly, while Experian interprets these statements as absolute, read in context both statements apply only to the particular provision under examination and should be interpreted to include by implication the phrase "under this section."    Once this phrase is inserted, it is clear that neither statement contradicts the statutory language and legislative history discussed above, which strongly indicates — at the very most — that section 605A merely imposes *obligations* on consumer reporting agencies, but does not impose "do not call"-style *prohibitions* on requestors and potential requestors of initial fraud alerts. *See* H.R. Rep. No. 108-263 at 40 (Sept. 4, 2003)("A request for a fraud alert [in order to trigger the obligations under this section] must be made directly by the consumer"); H.R. Rep. No. 108-263 at 39 (Sept. 4, 2003)("Fraud alerts [triggered by obligations under this section] may be placed on consumer reports in the following manner.").

55.    ***Statutory Structure.***    My examination of related FCRA provisions confirms my conclusion that the FCRA does not give rise to a public policy that companies like LifeLock that assume the corporate form must not place requests for fraud alerts.

20

**DECLARATION OF TODD J. ZYWICKI IN SUPPORT OF LIFELOCK'S**
**MOTION FOR RECONSIDERATION**

56.    As an initial matter, I am concerned that an interpretation of section 605A that would preclude corporations from initiating contacts requesting fraud alerts might also tend to preclude corporations from initiating other contacts with consumer reporting agencies, such as contacts requesting credit reports for a fee.

57.    Section 609(a) of the FCRA provides, "Every consumer reporting agency *shall*, upon request, and subject to section 610(a)(1) clearly and accurately disclose to the consumer: All information in the consumer's file at the time of the request. . . ." 15 U.S.C. § 1681g. To my knowledge this language in section 609(a) has always been read, consistent with its use of the verb "shall," as imposing obligations on "consumer reporting agencies." I do not know of any instance where it has been read as a prohibition on the making of disclosures to entities other than "the consumer," including for example disclosing "information in the consumer's file" to issuers of credit who buy credit reports for a fee from consumer reporting agencies. Section 609 is relevant here because it appears that any interpretation of section 605A that would prohibit corporations from requesting fraud alerts might also prohibit them from requesting credit reports. At this juncture, I do not see language that would imply a prohibition on requesting contracted-for "fraud alerts" under section 605A that would not also prohibit requesting contracted-for credit reports to be issued to persons other than "to the consumer" under section 609. This is further evidence that the FCRA does not give rise to a public policy that companies like LifeLock that assume the corporate form must not place requests for fraud alerts.

58.    Finally, I note that the effectiveness of a fraud alert in compelling users and prospective users of credit information to employ added identification verification procedures does not depend on whether the obligations of section 605A have been triggered, further suggesting that the section 605A criteria are relevant only for purposes of determining the obligations of consumer reporting agencies.

**DECLARATION OF TODD J. ZYWICKI IN SUPPORT OF LIFELOCK'S MOTION FOR RECONSIDERATION**

59.    The effectiveness of an FCRA "fraud alert" ultimately depends on whether the "fraud alert" satisfies the definitional requirements of section 603(q)(2); falls within the definitional language of section 605A(h)(1)(A); and has been included in a consumer's file with one of one of the three national consumer reporting agencies. *See* 15 U.S.C. § 1861a(q)(2) ("The term[] 'fraud alert' mean[s] a statement in the file of a consumer that (A) notifies all prospective users of a consumer report relating to the consumer that the consumer may be a victim of fraud, including identity theft, . . . and (B) is presented in a manner that facilitates a clear and conspicuous view of the statement described in subparagraph (A), by any person requesting such report."); *see also* 15 U.S.C. § 1681c-1(h)(1)(A) ("Each initial fraud alert ... under this section shall include information that notifies all perspective users of a consumer report on the consumer to which the alert relates that the consumer does not authorize the establishment of any new credit plan (as defined in section 103(i)), in the name of the consumer, or issuance of an additional card on an existing credit account requested by the consumer, except in accordance with subparagraph (B).").

60.    So long as a "fraud alert" satisfying these definitional requirements has been included in the file of one of the three national credit reporting agencies, (1) the obligations of 605A(e) regarding referrals of fraud alerts to other national credit reporting companies apply, *see* 15 U.S.C. § 1681c-1(a)(1)(B), and (2) the identity-verification obligations of section 605A(h) on "users" and "prospective users" of such reports also apply, *see* 15 U.S.C. § 1681c-1(h); hence, the fraud alert will be fully effective.   The fact that Congress did not tie the existence *vel non* of these other statutory obligations to the satisfaction of the of section 605A criteria for triggering the responsive obligations of consumer reporting agencies further indicates that Congress did not intend for section 605A's conditional *obligations* on consumer reporting agencies to be construed as *prohibitions* on corporate requests for fraud alerts.

61.    In sum, each and every one of the factors I have considered points in favor of a single conclusion.    The factors I have considered include (1) the consumer-protective policies, embodied in FACTA, that permit consumers to purchase anti-identity-theft protections beyond those provided for by statute; (2) my contemporaneous recollections of Congress's 2003 deliberations over the FCRA's reauthorization and amendment; (3) my belief that courts should hesitate before depriving consumers of entire categories of product offerings that they are willing to purchase and pay for; (4) my analysis of statutory text; (5) my analysis of legislative history; and (6) my analysis of the FCRA's statutory structure.    The single conclusion all six of these factors, plus the other considerations discussed above, point to is the following: the FCRA and FACTA do not establish a public policy that companies that assume the corporate form must not place requests for fraud alerts.

### PUBLIC POLICY REGARDING THE OBLIGATION TO RESPOND TO FRAUD ALERT REQUESTS TRANSMITTED BY CORPORATIONS

62.    I have also been asked to consider whether there is a stated public policy that national credit reporting agencies are not required to process fraud alerts that are placed by *companies* as opposed to *individuals*.    Although this question is more complex than the one just analyzed, for the reasons described below, I conclude that no such public policy, is settled, established, or in place.

63.    As noted above, it was my custom during my FTC tenure to analyze statutory policies by examining relevant statutory text.    I recognize in this regard that an FCRA definitional provision, section 603(b) draws a distinction between an "individual," which cannot be a "corporation," and a "person," which may be a "corporation." 15 U.S.C. § 1681a(b), (c).    I also recognize that the statutory language describing the automatic triggers for issuing initial fraud alerts under section 605A(a) employs the term "individual" not the term "person." 15 U.S.C. § 1681c-1(a)(1).    I therefore recognize the essence of the argument that section 605A(a) draws a conscious

distinction between "individuals" and "persons," and it permits only "individuals," but not non-individual "persons" like corporations, *see* 15 U.S.C. § 1681a(b), (c), to act "on behalf of" or as "the personal representative" of consumers in placing requests for fraud alerts.

64.     Notwithstanding this statutory distinction, I believe it would be premature to conclude that there exists a "public policy" of *not* requiring national credit reporting agencies to process fraud alerts placed by corporations.  Any such public policy would present both difficulties of statutory interpretation and entail certain arbitrary, irrational, and anti-consumer consequences.  I will now describe these interpretive difficulties and anti-consumer consequences.

65.     Consider as an initial matter the distinction the statute draws between "acting on behalf of" a consumer and acting "as a personal representative of" a consumer.  I do not recall any discussion of that distinction during the 2003 legislative process, nor have I seen legislative history that illuminates it.  But the distinction between "on behalf of" and "as a personal representative" must be meaningful.  Giving meaning to the distinction is initially problematic, however, because acting "as a personal representative" necessarily means, in some large and important sense, acting "on behalf of" the person represented.  A "personal representative" always and incurably acts "on behalf of" that person.  The statutory reference to acting "on behalf of" therefore threatens to swallow the entirety of "acting as a personal representative."

66.     Several interpretive approaches might be employed to defuse this risk of the distinction between "on behalf of" and "as a personal representative" being rendered meaningless.  As a matter of plain language, this distinction might be viewed as differentiating between one-time events (such as a daughter or son helping an elderly parent by acting on their "behalf") and an on-going status (being "a personal representative").  In other words, a natural distinction might be drawn between (1) acting informally, by non-contractual consent, and on one occasion "on behalf of" a

24

consumer and (2) assuming a formal and continuing status under a contractual or statutory designation "as a personal representative."

67.   This distinction between an informal one-time action and a formal, on-going status solves the interpretive problem of giving meaning to "on behalf of" separate from "as a personal representative."  But the solution creates problems of its own.  In particular, it raises acute problems if one also seeks to adhere to a distinction between an "individual" and a "person."  That is because almost every type of entity that one might wish to act under contract "as a personal representative" is organized as some form of "non-individual," such as a partnership, stock corporation, limited liability corporation, association, or cooperative.  *See* 15 U.S.C. § 1681a(b), (a).

68.   The critical fact here is that "personal representative" relationships involve consumers on one side and, on the other, entities that typically assume one of the "non-individual" organizational forms encompassed by the section 603(b) definition of "person."  Examples include attorneys who practice in limited liability corporations (LLCs); attorneys who practice as part of partnerships; attorneys who practice as solo practitioners and have incorporated professional corporations; non-attorney trust officers who work in firms organized as partnerships; and non-attorney trust officers who work for incorporated banks, among many others.  Most of the likely candidates to serve as a "personal representative" will therefore, by definition, not be "individuals."

69.   The statutory language thus produces a dilemma.   The desire to give independent effect to "individual" and "person" pulls in the direction of concluding that "persons" that are not "individuals" *may not* act as "personal representatives" of consumers.  The desire to give independent effect to "as a personal representative" that goes beyond "on behalf of" pulls in the opposite direction — that of concluding that "persons" that are not "individuals" *may* act as personal representatives of consumers.

**DECLARATION OF TODD J. ZYWICKI IN SUPPORT OF LIFELOCK'S MOTION FOR RECONSIDERATION**

70.   As noted above, it was my custom during my FTC tenure to analyze statutory policies by examining relevant legislative history, albeit with a healthy degree of skepticism.  Here, such analysis presents further layers of complexity and confusion.

71.   On the one hand, the legislative history includes a statement asserting that the use of "the word 'individual' instead of 'person'" was deliberate.  H.R. Rep. No. 108-263 at 40 (Sept. 4, 2003).  On the other hand, the same passage in the legislative history also includes a clear indication that this same committee of Congress failed to recognize that limiting "personal representatives" to "individuals" might completely disqualify most of the most likely organizational candidates from acting as "personal representatives."  The committee (the same one that noted the definitional distinction between "individual" and "person") stated its expectation that section 605A fraud alerts would be made by "attorneys acting as personal representatives" and "authorized representatives from bona fide military service organizations" — two categories of "personal representatives" that only in comparatively rare circumstances (such as that of an in solo attorney practice who declines to incorporate a professional corporation) or in absolutely unheard-of circumstances (such as that of a bona fide military service organization that is not an "association," "cooperative," "partnership," or "corporation") will qualify as "individuals" and not "persons."

72.   Finally, it also was my custom during my FTC tenure to analyze statutory policies by looking to their effects.  In administering consumer protection statutes during my tenure, I would seek to understand the effects of alternative interpretations of the statute on consumers.  In evaluating policies under the FCRA, I would seek to understand the effect of alternative approaches on consumers who seek or obtain credit.

73.   Accordingly, during my FTC tenure, I would have found it significant that any public policy holding that national credit reporting agencies are *not* required to process fraud alerts that are placed by "persons" other than "individuals" would mean, for example, (1) that attorney solo practitioners practicing as unincorporated

**DECLARATION OF TODD J. ZYWICKI IN SUPPORT OF LIFELOCK'S
MOTION FOR RECONSIDERATION**

proprietorships would be treated differently than attorney solo practitioners practicing as professional corporations; (2) that bona fide military service organizations established as sole proprietorships (likely an empty set of organizations) would be treated differently from bona fide military service organizations established as "corporations," "partnerships," "associations," or "cooperatives;" and (3) that as a practical matter *no* known bona fide military service organizations would be permitted to assist our servicemen and servicewomen in taking advantages of the protections of section 605A(a).    Those distinctions and considerations, particularly the disqualification of every likely candidate for inclusion in the status of "bona fide military service organization," appear to me to be arbitrary, irrational and anti-consumer.

**DECLARATION OF TODD J. ZYWICKI IN SUPPORT OF LIFELOCK'S MOTION FOR RECONSIDERATION**

74.     Given the confusion of the statutory language and the confusion of the legislative history, I do not believe there is a single solution to this interpretive dilemma.  I do believe, however, that in light of this confusion there is no settled or established public policy that national credit reporting agencies are *not* required to process fraud alerts placed by *corporations* as opposed to *individuals*.    While I recognize that a statutory basis for alleging such a policy has been asserted, any such public policy would have the arbitrary, irrational, and anti-consumer consequences I just described.    In my view, these arbitrary, irrational, anti-consumer consequences should be carefully explored and evaluated by the FTC before any conclusion is drawn that such a public policy under the FCRA is settled, established, or in place.

\*     \*     \*     \*     \*

I declare, under penalty of perjury of the laws of the United States, that the foregoing is true and correct.

Executed this 20th day of June, 2009, at Falls Church, Virginia.

By: _____
    Todd J. Zywicki

**DECLARATION OF TODD J. ZYWICKI IN SUPPORT OF LIFELOCK'S
MOTION FOR RECONSIDERATION**